UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HAROLD R. STANLEY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br>15-00271-01-CR-W-RK |

TRANSCRIPT OF PROCEEDINGS - VOLUME I
BEFORE THE HONORABLE ROSEANN KETCHMARK
UNITED STATES DISTRICT JUDGE
MAY 31, 2016
KANSAS CITY, MISSOURI

FOR THE PLAINTIFF:
MR. PAUL S. BECKER
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Floor 5
Kansas City, Missouri 64106

DEFENDANT APPEARING PRO SE:
MR. HAROLD R. STANLEY
P.O. Box 1236
Oologah, Oklahoma 74053

STANDBY COUNSEL:
Mr. F. A. White, Jr.
7924 North Cherry Street
Kansas City, Missouri 64118

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

# I N D E X

Page

MAY 31, 2016

Pretrial conference. . . . . . . . . . . . . . . . . . . . . . 17

DEFENDANT'S OFFER OF PROOF

CARL WESTON
Direct examination by Mr. Stanley . . . . . . . . . . . 31

RODNEY D. CLASS
Direct examination by Mr. Stanley . . . . . . . . . . . 37

GOVERNMENT'S EVIDENCE

RAMON HERNANDEZ
Direct examination by Mr. Becker. . . . . . . . . . . . 66
Cross-examination by Mr. Stanley. . . . . . . . . . . . 132

INDEX (continued)

Page

JUNE 1, 2016

JANICE WILLARD
Direct examination by Mr. Becker. . . . . . . . . . . . 155
Cross-examination by Mr. Stanley. . . . . . . . . . . . 176

SHAUNA HENLINE
Direct examination by Mr. Becker. . . . . . . . . . . . 177
Cross-examination by Mr. Stanley. . . . . . . . . . . . 191
Redirect examination by Mr. Becker. . . . . . . . . . . 198

WENDELL THOMAS
Direct examination by Mr. Becker. . . . . . . . . . . . 219
Cross-examination by Mr. Stanley. . . . . . . . . . . . 229

DAVID MELCHER
Direct examination by Mr. Becker. . . . . . . . . . . . 236
Cross-examination by Mr. Stanley. . . . . . . . . . . . 253

RICHARD LITTRELL
Direct examination by Mr. Becker. . . . . . . . . . . . 256
Cross-examination by Mr. Stanley. . . . . . . . . . . . 293
Redirect examination by Mr. Becker. . . . . . . . . . . 298
Recross-examination by Mr. Stanley. . . . . . . . . . . 299

Defendant's opening statement. . . . . . . . . . . . . . . . 309

INDEX
(continued)

Page

JUNE 2, 2016

Conference out of the hearing of the jury. . . . . . . . . . 333

DEFENDANT'S EVIDENCE

HAROLD R. STANLEY
Direct testimony of the defendant . . . . . . . . . . . 356
Cross-examination by Mr. Becker . . . . . . . . . . . . 362
Redirect testimony of the defendant . . . . . . . . . . 377

Defendant's closing argument . . . . . . . . . . . . . . . . 392

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE GOVERNMENT: | | | |
| 5 | Treasury regulation | 298 | 298 |
| 6 | Certification of lack of record | 75 | 76 |
| 8 | 2007 Form 1040 | 75 | 76 |
| 9 | 2008 Form 1040 | 75 | 76 |
| 10 | 2009 Form 1040 | 75 | 76 |
| 11 | Mailing to IRS | 75 | 76 |
| 11(a) | Payment document | 75 | 76 |
| 12 | Mailing to IRS | 75 | 76 |
| 14 | IRS account transcripts | 75 | 76 |
| 14(a) | 1990 account transcript | 75 | 76 |
| 14(b) | 1991 account transcript | 75 | 76 |
| 14(c) | 1992 account transcript | 75 | 76 |
| 14(d) | 1993 account transcript | 75 | 76 |
| 14(e) | 1994 account transcript | 75 | 76 |
| 14(f) | 1995 account transcript | 75 | 76 |
| 14(g) | 1996 account transcript | 75 | 76 |
| 14(h) | 1997 account transcript | 75 | 76 |
| 14(i) | 1998 account transcript | 75 | 76 |
| 14(j) | 1999 account transcript | 75 | 76 |
| 14(k) | 2000 account transcript | 75 | 76 |
| 14(l) | 2001 account transcript | 75 | 76 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 14(m) | 2002 account transcript | 75 | 76 |
| 14(n) | 2003 account transcript | 75 | 76 |
| 14(o) | 2004 account transcript | 75 | 76 |
| 15 | Mailing to IRS | 75 | 76 |
| 15(a) | Payment document | 75 | 76 |
| 16 | Mailing to IRS | 75 | 76 |
| 16(a) | Accepted for value document | 75 | 76 |
| 18 | IRS revenue agent report | 167 | 167 |
| 20 | IRS summary of changes | 172 | 172 |
| 21(a) | Summary of compensation and expenses | 170 | 170 |
| 22 | 11/21/08 Bio Pappel check and invoice | 65 | 66 |
| 23 | 7/15/09 Bio Pappel check and invoice | 65 | 66 |
| 26 | 2008 Bio Pappel 1099 | 65 | 66 |
| 27 | 2009 Bio Pappel 1099 | 65 | 66 |
| 30 | Mid America payments | 65 | 66 |
| 31 | Mid America invoices | 65 | 66 |
| 32 | 2005 Mid America 1099 | 65 | 66 |
| 33 | 2006 Mid America 1099 | 65 | 66 |
| 34 | 2007 Mid America 1099 | 65 | 66 |
| 35 | 2008 Mid America 1099 | 65 | 66 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 36 | 2010 Mid America 1099 | 65 | 66 |
| 37 | 2011 Mid America 1099 | 65 | 66 |
| 38 | 2005 Tri-State invoices, checks, documentation | 65 | 66 |
| 39 | 2006 Tri-State invoices, check, documentation | 65 | 66 |
| 40 | 2007 Tri-State invoices, checks, documentation | 65 | 66 |
| 41 | 2008 Tri-State invoices, checks, documentation | 65 | 66 |
| 42 | 2009 Tri-State invoices, checks, documentation | 65 | 66 |
| 47 | 2005 Tri-State payment log | 65 | 66 |
| 48 | 2006 Tri-State payment log | 65 | 66 |
| 49 | 2007 Tri-State payment log | 65 | 66 |
| 50 | 2008 Tri-State payment log | 65 | 66 |
| 51 | 2009 Tri-State payment log | 65 | 66 |
| 52 | 2010 Tri-State payment log | 65 | 66 |
| 53 | 2011 Tri-State payment log | 65 | 66 |
| 54 | 2012 Tri-State payment log | 65 | 66 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 55 | 2013 Tri-State payment log | 65 | 66 |
| 56 | 2005 Tri-State 1099 | 65 | 66 |
| 57 | 2006 Tri-State 1099 | 65 | 66 |
| 58 | 2007 Tri-State 1099 | 65 | 66 |
| 59 | 2008 Tri-State 1099 | 65 | 66 |
| 60 | 2009 Tri-State 1099 | 65 | 66 |
| 61 | 2010 Tri-State 1099 | 65 | 66 |
| 62 | 2011 Tri-State 1099 | 65 | 66 |
| 63 | 2012 Tri-State 1099 | 65 | 66 |
| 64 | 2013 Tri-State 1099 | 65 | 66 |
| 66 | 2/5/07 Industrial Project Management invoices and payments | 65 | 66 |
| 67 | 2/26/07 Industrial Project Management invoices and payments | 65 | 66 |
| 68 | 3/22/07 Industrial Project Management invoices and payments | 65 | 66 |
| 69 | 4/10/07 Industrial Project Management invoices and payments | 65 | 66 |
| 70 | 4/27/07 Industrial Project Management invoices and payments | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 71 | 5/21/07 Industrial Project Management invoices and payments | 65 | 66 |
| 73 | 2010 Emerson Electric 1099 | 65 | 66 |
| 74 | 2011 Emerson Electric 1099 | 65 | 66 |
| 75 | 2012 Emerson Electric 1099 | 65 | 66 |
| 76 | 2013 Emerson Electric 1099 | 65 | 66 |
| 78 | 10/29/12 letter | 75 | 76 |
| 78(a) | Payment document | 75 | 76 |
| 78(b) | 2005 IRS notice | 75 | 76 |
| 78(c) | 2007 IRS notice | 75 | 76 |
| 78(d) | Payment document | 75 | 76 |
| 79 | Notice of determination | 75 | 76 |
| 81 | Request for collection, due process | 75 | 76 |
| 83 | Notice of intent to levy | 75 | 76 |
| 84 | Notice of tax lien | 75 | 76 |
| 85 | Notice of tax lien | 75 | 76 |
| 86 | IBC Bank signature card | 65 | 66 |
| 87 | IBC Bank statements | 65 | 66 |
| 87(a) | 9/11 statement | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87(b) | 5/12 statement | 65 | 66 |
| 87(c) | 1/13 statement | 65 | 66 |
| 88 | The Hartford account | 65 | 66 |
| 89 | Ally Bank sale contract | 65 | 66 |
| 90 | Ally Bank payment log | 65 | 66 |
| 91 | Ally Bank checks | 65 | 66 |
| 92 | Ally Bank GMAC application | 65 | 66 |
| 93 | Ally Bank 5/30/12 letter | 65 | 66 |
| 94 | Tri-State contracts | 65 | 66 |
| 94(a) | 1/08 Tri-State contract | 65 | 66 |
| 95 | Freedom Electric payments 2005-2013 | 65 | 66 |
| 96 | 2012 Freedom Electric 1099 | 65 | 66 |
| 97 | 2013 Freedom Electric 1099 | 65 | 66 |
| 98 | Freedom Electric invoices | 65 | 66 |
| 99 | Bank of America loan history | 65 | 66 |
| 100 | Bank of Oklahoma loan information sheet | 65 | 66 |
| 101 | Bank of Oklahoma loan application | 65 | 66 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 102 | Bank of Oklahoma HUD settlement statement | 65 | 66 |
| 103 | CitiMortgage statements | 65 | 66 |
| 104 | Community Bank of Raymore signature card | 65 | 66 |
| 105 | Community Bank of Raymore statements | 65 | 66 |
| 106 | Community Bank of Raymore offsets | 65 | 66 |
| 106(a) | Check No. 1032 | 65 | 66 |
| 106(b) | Check No. 1057 | 65 | 66 |
| 106(c) | Check No. 1119 | 65 | 66 |
| 106(d) | Check No. 1203 | 65 | 66 |
| 106(e) | Check No. 1141 | 65 | 66 |
| 106(f) | Check No. 1193 | 65 | 66 |
| 106(g) | Check No. 1103 | 65 | 66 |
| 106(h) | Check No. 1117 | 65 | 66 |
| 106(i) | Check No. 1315 | 65 | 66 |
| 106(j) | Check No. 1149 | 65 | 66 |
| 106(k) | Check No. 1290 | 65 | 66 |
| 106(l) | Check No. 1016 | 65 | 66 |
| 106(m) | Check No. 1100 | 65 | 66 |
| 106(n) | Check No. 1047 | 65 | 66 |
| 106(o) | Check No. 1308 | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 106(p) | Check No. 1323 | 65 | 66 |
| 106(q) | Check No. 1056 | 65 | 66 |
| 106(r) | Check No. 1116 | 65 | 66 |
| 106(s) | Check No. 1055 | 65 | 66 |
| 106(t) | Check No. 1147 | 65 | 66 |
| 106(u) | Check No. 1175 | 65 | 66 |
| 106(v) | Check No. 1265 | 65 | 66 |
| 106(w) | Check No. 1110 | 65 | 66 |
| 106(x) | Check No. 1344 | 65 | 66 |
| 106(y) | Check No. 1237 | 65 | 66 |
| 106(z) | Check No. 1039 | 65 | 66 |
| 107 | Community Bank of Raymore offsets | 65 | 66 |
| 108 | Fidelity Insurance account setup | 65 | 66 |
| 113 | John Deere Financial acccount summary | 65 | 66 |
| 114 | John Deere contract | 65 | 66 |
| 115 | P&K Equipment records | 65 | 66 |
| 116 | P&K Equipment, John Deere revolving credit application | 65 | 66 |
| 117 | Rogers County, OK tax payments | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 118 | Wells Fargo Bank signature card | 65 | 66 |
| 120 | Wells Fargo Bank application and signature card | 65 | 66 |
| 121 | Wells Fargo Bank statements | 65 | 66 |
| 122 | 2005 transcript of account | 75 | 76 |
| 123 | 2006 transcript of account | 75 | 76 |
| 124 | 2007 transcript of account | 75 | 76 |
| 125 | 2008 transcript of account | 75 | 76 |
| 126 | 2009 transcript of account | 75 | 76 |
| 131 | 10/29/08 mailing | 75 | 76 |
| 131(a) | Payment document | 75 | 76 |
| 132 | Notice of deficiency | 75 | 76 |
| 133 | 11/23/09 letters and attachments | 75 | 76 |
| 134 | 11/25/09 letter | 75 | 76 |
| 135 | Notice of determination | 75 | 76 |
| 136 | 9/20/12 letter | 75 | 76 |
| 137 | 10/15/12 letter | 75 | 76 |
| 141 | 2/25/13 decision letter | 75 | 76 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 145 | Complete account transcript | 75 | 76 |
| 154 | Letter 3175C | 183 | 183 |
| 155 | Frivolous Return Program input form | 180 | 180 |
| 156 | Letter 3175 template | 186 | 187 |
| 162 | Summary of mortgage payments | 274 | 274 |
| 164 | Summary of GMAC/Ally payments | 272 | 272 |
| 165 | Summary of John Deere payments | 282 | 282 |
| 166(a) | Summary of compensation | 159 | 159 |
| 167(a) | Summary of reimbursed expenses | 162 | 162 |
| 168(a) | Summary of business expenses | 163 | 163 |
| 169(a) | Summary of payments | 164 | 166 |
| 170 | Timeline of events | 289 | 289 |
| 172 | Summary of events and correspondence | 290 | 292 |
| 173 | Filing history diagram | 284 | 284 |
| 175 | Blank Form W-2 | 71 & 75 | 71 & 76 |
| 179 | 2005 wage and income transcript | 75 | 76 |
| 180 | 2006 wage and income transcript | 75 | 76 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 184 | Postal money order | 222 | 222 |
| 185 | Bank money order | 223 | 223 |
| 186 | Wells Fargo checks | 65 | 66 |
| 186(a) | Check No. 1508 | 65 | 66 |
| 187 | Wells Fargo checks | 65 | 66 |
| 187(a) | Check No. 1515 | 65 | 66 |
| 187(b) | Check No. 1507 | 65 | 66 |
| 187(c) | Check No. 1048 | 65 | 66 |
| 187(d) | Check No. 1155 | 65 | 66 |
| 187(e) | Check No. 1509 | 65 | 66 |
| 188 | Form 3949A | 262 | 262 |
| 189 | Photograph | ADMITTED | 6/1/16 |
| 190 | Photograph | ADMITTED | 6/1/16 |
| 191 | Photograph | ADMITTED | 6/1/16 |
| 192 | Photograph | ADMITTED | 6/1/16 |
| 193 | Photograph | ADMITTED | 6/1/16 |
| 194 | Photograph | ADMITTED | 6/1/16 |
| 198 | McKinley Paper report | ADMITTED | 6/1/16 |
| 199 | Photograph | ADMITTED | 6/1/16 |
| 200 | Photograph | ADMITTED | 6/1/16 |
| 202 | Summary of tax due and owing | 175 | 175 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 203 | Summary of payments to Cass County Collector | 286 | 286 |
| FOR THE DEFENDANT: | | | |
| 1 | Form 3949A | 356 | 356 |
| 2 | 8/2/09 letter | 358 | 358 |
| 6 | 7/15/09 letter | 360 | 360 |
| 9 | 11/5/12 letter | 361 | 361 |

MAY 31, 2016

MORNING SESSION

THE COURT: Good morning. Please be seated.

This morning we're calling Case No. 15-00271, United States vs. Harold R. Stanley.

Will the parties please enter their appearances?

MR. BECKER: United States by Paul Becker, Assistant United States Attorney. Good morning, Judge.

MR. STANLEY: Good morning, Judge. Harold Stanley representing myself.

THE COURT: There's a few things that we need to take up. We are scheduled to have the jury come up approximately nine o'clock. We need to take up the proffer evidence that we spoke of in our pretrial conference; but before we get into that, I want to make sure we're all on the same page, Mr. Stanley, regarding your representation.

In looking at the docket sheet, and I've discussed this at length a couple of times with the magistrate who handled this issue on the front end. Initially upon your arrest in the Northern District of Oklahoma, I believe it was a public defender was appointed; is that correct? Can you recall?

MR. STANLEY: Yes, Your Honor. There was a public defender in Oklahoma.

THE COURT: Okay. And then when you came to your

initial appearance here on September 22nd, 2015, in front of Judge Hays, it was determined that you actually had monthly income and you did not qualify for public defender services, and you were encouraged to retain counsel; and if you were unable to find counsel, the Court offered to appoint a CJA counsel with some form of payment on your behalf. Do you recall that?

MR. STANLEY: Yes, I recall that.

THE COURT: And it was your decision to, I guess at that point in September, to not seek -- to not retain counsel?

MR. STANLEY: That's correct.

THE COURT: And then the following month, October, you filed an entry of appearance of Carl Weston and that was denied, and you were advised that Carl Weston couldn't represent you because he wasn't licensed to practice law. Do you recall that?

MR. STANLEY: Yes, I recall that as he could not represent me.

THE COURT: And then you did not -- it doesn't appear that you tried to retain counsel at that point.

MR. STANLEY: No, I did not.

THE COURT: Then later on that same month, October 13th, there was a status conference in front of Judge Hays; and she, again, notes that in reviewing your income information, you don't qualify for FPD, federal public defender

representation and that she encouraged you to retain counsel. And she also had -- at that October 13th status conference she had the federal public defender there in court, Ms. Holloman-Hughes, then she also had an attorney, criminal defense attorney, P.J. O'Connor, there in the courtroom; is that correct?

MR. STANLEY: Yes.

THE COURT: And that you advised Judge Hays that you wanted to represent yourself, and that you were warned that you would have to be familiar with the various rules and procedures and you would be expected to comply with those rules and procedures if you elected to represent yourself, and she -- there was a discussion on how difficult -- difficult for a nonlawyer to effectively represent himself and you were encouraged again to proceed with counsel. You, again, did not seek to retain counsel in October?

MR. STANLEY: No, I did not.

THE COURT: And then Judge Hays offered to let you consult with Ms. Holloman-Hughes or Mr. O'Connor regarding representing yourself and encouraging you to seek counsel, and it notes defendant declined an opportunity to confer further with either counsel and reaffirmed his intention to represent himself and they were both excused from the courtroom.

So at that point you were advised you couldn't earlier that month have Carl Weston represent you because he

was not a practicing attorney, you couldn't qualify for federal public defender services, and you were encouraged to retain counsel.

I think it's important for the record to note that because of your recent filings in your -- that you were clearly advised of your right to have representation and that you affirmatively elected to represent yourself, and I -- at our first hearing, pretrial conference hearing, which I'm not sure of the date, approximately a week or so ago, you made the comment that you thought you could do a better job than an attorney. You have the right to represent yourself, but it's always concerning for a court and I know Judge Hays continued to want to make sure you're advised of your right to counsel and is trying to assist you the best she knows how and was willing to find a CJA attorney to represent you at a fee, the standard CJA fee that is a little over a thousand dollars an hour. When I talked to her, we determined a thousand dollars per day. You declined to retain CJA appointment. That was like a week or so ago; is that correct?

MR. STANLEY: Yes, Your Honor. The understanding that -- maybe I should say observation. My understanding was that in October Judge Hays refused to allow Mr. Weston to represent me, to speak on my behalf. Now, I did not understand that order to be an order against using Mr. Weston or Mr. Class as a next friend to assist me at counsel because I had observed

that the prosecutor was having a special agent assist him at table who was not a bar attorney, so it made sense to me from an equity standpoint that I should be able to have nonbar next friend assistance at counsel table with me, and that was why I had made the second entry of appearance for Mr. Weston and an entry appearance for Mr. Class was to act as next friend, not to speak for me, not to address the Court, not to cross-examine witnesses, none of those things, just to assist me at counsel table to help me stay on track and make sure that I presented things I wanted to present was my understanding and interpretation.

THE COURT: And you did file your -- the same identical entry of appearance as to Carl Weston, or virtually identical, and as to Mr. Class. One problem was you endorsed him as a witness, unlike in criminal cases -- I think it's Rule 615. I don't know off the top of my head. The procedure and the rules allow for a critical agent who in some cases knows more about the facts than the Assistant United States Attorney, there is a provision that allows for that type of a critical witness who could also testify sit at counsel table, and those rules -- you have to follow those same rules as every other defense attorney when you elect to represent yourself. So that's just one example of a pitfall in not understanding the rules and protocol of criminal trials.

So here we are today and there's a few ways we can

go. Your endorsement of Mr. Class and Mr. Weston presents a little bit of an issue that you endorsed them as witnesses, but it doesn't appear that they have any relevancy -- their testimony, and I have preliminarily ruled that unless there's a showing made, a proffer this morning, that they will not be allowed to testify. So that's one issue.

If they are not allowed to testify, I am trying to be as open and as flexible because I do have some discretion in allowing folks at your table to assist you. So if they are not allowed to testify, you appear to specifically want Mr. Weston or Mr. Class as opposed to some other person that can help you stay on track and make sure you present the things you want. Is that accurate?

MR. STANLEY: That's an accurate statement, and at this point in time my preference would be to -- I could use Mr. Weston at counsel table to assist, would not present him as a potential witness but would present Mr. Class' credentials as a potential witness.

THE COURT: And you are free to make a proffer as to both of those, if you like, Mr. Weston and Mr. Class, before trial starts if you want to make at least a record of what you think your opinion is that they should be able to testify. Does that make sense?

MR. STANLEY: It makes sense. In fact, I thought I understood from the docket entry that they would be allowed a

few minutes to speak themselves to the Court on the type of testimony that they could offer to the Court.

THE COURT: Well, I'll be very flexible on your proffer and if you want to just ask them an open-ended question during their testimony. I would also be curious if the U.S. Attorney's Office would like to make some type of a proffer as to cross-examination of these witnesses. I'm just giving you a heads up, Mr. Becker, that may be something that this is the best timing to make a record of why they shouldn't be allowed to testify if that isn't flushed out to your satisfaction on direct. Does that make sense?

MR. BECKER: Yes, Judge. Along those lines, the defendant has not given notice that either of these individuals is an expert witness.

THE COURT: Yes.

MR. BECKER: So that's one issue. Just so I don't forget, that part of the Court's ruling in the pretrial conference was that the defendant should list or make known to the government what materials he relied upon should he testify. He's failed to do so. And so I just want to make sure I didn't forget that.

THE COURT: And I think the ruling was that was to be provided for your review last Wednesday. Is that --

MR. BECKER: That's correct, Judge.

THE COURT: That was my recollection of the rule.

Okay. I think the record's clear that he affirmatively noted that he is not using them as an expert, correct?

MR. STANLEY: That is correct. My understanding last hearing was that if I wanted to hold up something during opening statement to the jury, that I needed to notify of that. I'm not planning to hold up anything in front of the jury. That's why I didn't provide any kind of a list. That was intended to be anything I was going to refer to, then, no, I did not provide any kind of list like that to the prosecutor.

THE COURT: There's two different things. There's the opening statement. If there's any demonstrative or any exhibit you intend to use, both sides need to show that to each other. That's different from your obligation to allow the other side to review your exhibits.

MR. BECKER: That was my understanding that the discussion in the pretrial conference was whether or not if the defendant chooses to testify and relate that he relied upon certain items in forming his beliefs, that he had to give notice to the government by last Wednesday of what those items were. That was the discussion.

THE COURT: And I think in our pretrial conference the example that I gave is if you relied on a book, then that means the prosecutor should be able to review that book ahead of time because in the forward it might say, This book is for entertainment purposes only. It's not to be used as legal

advice. Some books say that. And that would be an area of cross-examination that he could get into, but he needs to know what items you intend to rely on so that he could do his background and homework to see if there are limitations or caveats to any of those exhibits. So we may just have to handle that as we move forward.

The second area along these same lines is -- and I don't know if it was one of my orders or one of Judge Hays' because we've been working closely together on this issue, I think it was Judge Hays, appointed Al White who is a very experienced, talented, one of the topnotch criminal defense attorneys in town. It was Judge Hays' suggestion, and I fully agreed with her, that Al White would be here today to serve as only legal adviser if you get, for instance, in a jam of how do you offer some type of an exhibit and he could simply tell you one of the elements you're missing, for example. Or if you don't understand voir dire and jury selection and you wanted to go above and beyond and have that resource for you, and at the 11th hour we decided to utilize court resources at no expense to you for Mr. White being a resource. So I don't know. Have you had a chance to meet Mr. White who's in the courtroom today?

MR. STANLEY: We had a five-minute discussion in the five minutes before eight o'clock. So that's the extent of our discussion.

THE COURT: And I'll give you a bit more time if you would like to visit with him. And there's a lot of ways that you could utilize Mr. White. Like I said, he's very experienced. He's very flexible. I have all the confidence in the world that he can do what you want him to do except for represent you on substantive issues. I have given him every assurance, reassurance that he is not being asked to know any of the facts. He knows none of the facts and he's not in the position and that would be unfair to put him in that position to advise you as to substantive factual issues.

I did have a chance to visit with Mr. White. There's a number of ways that he can help you. He could sit in the gallery and the jury can know nothing about him and his name cannot be mentioned. He could sit at counsel table with you. He could sit -- he's currently sitting at the staff attorney table in the courtroom. He could remain there. If you don't want the jury to know that he is available for your help, we could take a minimal amount of recesses, let the jury go out of the courtroom, let you confer with Mr. White. I want to be very flexible, but I want you to utilize that resource.

I would allow you to have an assistant that's not a witness and has no speaking part sit with you. And I don't know who that's going to be yet. We need to go ahead and finish up our proffer. You could also have Mr. White as a resource.

Would you like to speak with Mr. White regarding those options now that we've kind of talked a little bit more about that in court, or do you have a firm opinion at this point?

MR. STANLEY: At this point in time the present arrangement is fine. I was kind of waiting to see what the final ruling was going to be on who could sit at table with me before I made any commitment to him one way or the other.

THE COURT: Okay. Okay. And one other issue, if by chance Mr. Weston or Mr. Class sits at your table, I would not want them to be virtually an exhibit in that you're referring to them, you're referring to their conversations that you had with them or the information they provided. That wouldn't be fair for them to be sitting at counsel table in front of the jury and you likewise referring to them. Is that going to be an issue?

MR. STANLEY: No, it's not going to be an issue. I think what you're saying is you don't want them spending five minutes whispering in my ear and for me to stand up and say something?

THE COURT: No. I said that wrong.

MR. STANLEY: I misunderstood.

THE COURT: For instance, with a witness -- I'm totally making this up. With a witness you say, Well, you know, you were there in the conversation when Mr. Weston and me

and you had a conversation and reviewed this book about tax law. Well, I don't want you to be mentioning Mr. Weston in your case in chief or in any of your cross-examination if he's seated at counsel table. Does that make sense?

MR. STANLEY: Yes, that makes sense, Your Honor.

THE COURT: So whoever's at your counsel table I don't want you to be referring to them in some type of a factual role. I think that adds a layer of confusion that wouldn't be proper for the jury.

Mr. Becker, now that you've heard the comments, do you have any comments for the Court or for the record regarding some of these issues?

MR. BECKER: It's the government's position that the defendant knowingly and willfully waived his right to counsel and elected to go pro se. He has -- it's not the normal procedure in the court to allow nonlawyers to be at counsel table. There's -- I'm not familiar with the concept of next friend, and I don't believe that there should be anybody at defense counsel table other than the defendant.

THE COURT: I understand your position, Mr. Becker, and I'm going to do the best I can to move this case forward.

You did file a last-minute continuance request to hire an attorney which -- because I also have a very -- an obligation in case management and that continuance is a procedural issue and because of the repeated advice of your

right to trial counsel and your repeated encouragement to hire trial counsel, the 11th hour request to retain counsel was denied.

Is there anything, Mr. Stanley, that you want to put on the record regarding your last request for a continuance?

MR. STANLEY: Your Honor, there was probably two things that I would like to point out in regards to that. The first one regards the first continuance that was counted to me on October the 13th of last year. That was roughly three weeks after my first appearance in this court. It was two weeks prior to the original trial date of October the 27th.

At that point in time the government had 7,356 pages of discovery that I didn't have the first page of. So, you know, I really didn't feel like -- I mean, that continuance was just almost essential. It would have been a super-human effort for anybody to review 7,356 pages of discovery even if we had it all in our hands on the 13th in preparation for trial on the 27th. So, you know, that first continuance to me, okay, you can call it mine. Yes, I wanted it because I had outstanding motions; but from a practical standpoint, that first trial date was not attainable just from the standpoint I didn't have the discovery yet. And I know that they had -- I know that Mr. Becker had attempted to get it to the public defender. There was something that happened there that the public defender didn't get it to me. I don't know what happened there. Mr.

Becker got the discovery to me about a week later, most of it about a week later. So I guess that's kind of the first thing. So in my mind it wasn't really the fourth request for a continuance. It was the third request.

And the only reason I vacillated and thought about retaining counsel was that it looked like I was not going to have a friend familiar with the case at all at table with me, and that seemed highly inequitable to me with the prosecutor having two people familiar with the case assisting him at table; and so under that circumstance, it was like if I can't have any assistance at table from somebody familiar with the case, then I've got to back up and go the other direction to have a fair trial.

So that's the only reason I vacillated like that at the last minute was because I thought I was going to be stuck for an entire trial with nobody familiar with the case at table with me, and so I thought that I needed a continuance to get somebody familiar with it that the Court would accept as representation. So those are the two comments that I have, Your Honor.

THE COURT: Thank you. I appreciate that. And you do make a good point. That October 13th that is fairly standard for a first continuance to be granted, and I totally took that into account when I reviewed all of your continuances, but you do make a valid point.

I think we should move forward. Do you have Mr. Weston and Mr. Class here in the courtroom?

MR. STANLEY: Yes, they're in the courtroom unless one of them had to leave. One of them was having a bit of a coughing problem. They look like they're both present.

THE COURT: If you want to have one wait out in the atrium area and call the other one to the stand and make your record regarding the testimony that they would provide to the jury.

MR. STANLEY: Thank you, Your Honor.

Mr. Weston, would you come forward and Mr. Class leave the courtroom, please.

THE COURT: You can walk up to the witness stand and stay standing and you will be given an oath.

CARL WESTON, being sworn by the courtroom deputy, testified:

THE COURT: You may proceed.

MR. STANLEY: Customary to stand here?

THE COURT: Yes.

THE WITNESS: Can I stand?

THE COURT: Go ahead and be seated.

DIRECT EXAMINATION BY MR. STANLEY:

Q Mr. Weston, thank you for traveling here today from Grand Lake o' the Cherokees.

Mr. Weston, are you a Private Attorney General?

A Yes, I am. Twenty years ago I started researching our

laws, different laws, God's laws, the judicial system law as we know it today, it's why we're here, and being to the Library of Congress several times.

Mr. Class and I have traveled to Washington, D.C. over a dozen times, so many times I can't count now, pulling research out of the Library of Congress. The Private Attorney General first started many years ago in -- find my notes here -- the Private Attorney General started in Congress in conversation way back during the beginning of the creation of our forefathers back in the 1700s.

The Private Attorney General, what I'm calling an act, coming under Title 42 U.S.C. 1988 and others, establishes we, the people, have a right to address the courts when it becomes time that the courts are out of control. We have seen this in Federal Judge Jones' testimony to Harvard Law School saying similar things.

We have done research and research and research and years -- I've been doing this 20 years. I was looking at going and spending the four years years ago, but I was encouraged by a couple of attorneys in Tulsa, Oklahoma, not to do that because I was wasting my time. The system that we live in today is beyond recognition according to Federal Judge Edith Jones.

MR. BECKER: I can't understand what he's saying.

THE WITNESS: That's a quote.

MR. BECKER: What judge are you referring to? I couldn't understand what you were saying.

THE COURT: Federal Judge Edith Jones. And I have -- you know, I don't know. You want me to go into detail about Edith Jones? Are we just touching base here or am I going to spend a couple of hours? How much time do I have?

MR. STANLEY: What was the Court's allotted time? I know the primary testimony is an hour. What were you considering appropriate for this proffer or presentation?

THE COURT: For you to place on the record what his evidence would be, to make a record of why he's relevant. So you don't have -- we've got to move forward on the trial. As I mentioned, the jury panel will come in at nine and you also have Mr. Class you need to get in. So you need to hit all the highlights and make your record of the areas that you're wanting him to testify to.

MR. STANLEY: Okay.

Q (By Mr. Stanley) Mr. Weston, do you have something that you wanted to read to the Court?

A Okay. My presentation as a Private Attorney General, as a witness in this court will be addressed to this evidence and exhibits here that's already been filed in the record. This is the Handbook For Special Agents from the Internal Revenue Service. It has documentation in it saying that our income taxes are voluntary. It says it in their own books.

Also the Congressional Record shows --

MR. BECKER: Judge, can we have the witness identify what he's referring to?

THE COURT: Mr. Weston, will you show Mr. Becker the Handbook of Special Agents?

MR. BECKER: I do have a copy of that. That was listed as an exhibit and we printed out a copy of it.

THE COURT: Okay. Did you have the area where he specified the voluntary nature?

MR. BECKER: Yes. But he was moving on to some other document.

THE COURT: Okay. What is your next document, sir?

THE WITNESS: Okay. The next document here is the Congressional Record. I don't have it all here. Internal Revenue investigation hearing before the subcommittee of the Committee on Ways and Means, House of Representative, 83rd Congress, First Session on Administration of Internal Revenue Laws, if there is laws.

THE COURT: Will you hand that to Mr. Becker so he can review that exhibit?

THE WITNESS: Okay. Well, I've got something else here. Also included in this, if you'll see on page 13 in the testimony at that time in these hearings --

MR. BECKER: Judge, I'd like to review what he's talking about. It was not listed as an exhibit. And so if

he's going to be potentially reading from documents, the government needs to be given copies of these.

THE COURT: And let me ask you, do you have a copy of these that you have in your stack of exhibits?

MR. STANLEY: The stack of exhibits includes a copy of the Handbook for Special Agents. It's Exhibit D23.

Now, the Congressional Record, I don't believe it's presently in anything in the exhibits unless it's part of the exhibits. It will be around D14 or 15 which was the case filed in the Northern District of Oklahoma. It may be attached to that but I'm not positive to that.

THE COURT: I would ask that the witness show the United States Attorney what documents you're going to refer to.

MR. BECKER: This apparently appears to be hearings from 1953 before the Congress of the United States.

THE COURT: Thank you.

MR. BECKER: A statement from someone who's the head of the Alcohol and Tobacco Tax Division.

THE COURT: And we will need to preserve your record. We will need to have these marked as exhibits; otherwise, we cannot keep track of these documents.

Okay. Proceed.

THE WITNESS: Well, I just want it on the record if it's not going to be able to get on the record later for some reason. And I quote Mr. Avis, There is just no such thing.

That is where this structure differs. Quote, let me point this out now. Your income tax is 100 percent voluntary tax. That has been documented more than this. Our personal income taxes are voluntary. I have not paid or filed since 1995. And there's a lot of people, in my opinion, sitting in the prisons right now that don't need to be in there.

That's all I have.

MR. STANLEY: Thank you, Mr. Weston.

THE COURT: Any other evidence that you wanted him to get in during your trial or is that it?

MR. STANLEY: Those -- well, the D23 has already been submitted as potential evidence. The Congressional Record, I believe, will be the other major thing.

THE COURT: He will need to leave those documents and have you get them marked.

THE WITNESS: Your Honor, may I speak?

THE COURT: Yes.

THE WITNESS: I would like to waive what I have left in time supposed to be documented -- if I'm called as a witness, I would like to waive the rest of my time to Mr. Class.

THE COURT: That won't be necessary, but you can step down.

THE WITNESS: Thank you.

THE COURT: And if he can wait outside.

MR. STANLEY: Mr. Weston, if you will step out. And he can go ahead and send Mr. Class in?

THE COURT: Yes.

And by the clock at the back of the courtroom, it's ten 'til nine. I don't want to hurry you, but I want you to be aware of the time.

Did he hand you those documents, Mr. Stanley?

MR. STANLEY: I'm sorry. I did not grab those.

THE COURT: At a break let's get those organized and marked.

MR. STANLEY: He was hurrying to save the Court's time.

THE COURT: Mr. Class, come on forward. If you can come right up by the screen and you'll have a seat over here in the witness chair, but before you sit down you will need to remain standing.

THE WITNESS: Now, I'm deaf. You will have to speak up, speak loud, speak slow.

THE COURT: Thank you.

THE WITNESS: I've got hearing aids in.

RODNEY D. CLASS, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. STANLEY?

Q Mr. Class, thank you for traveling from North Carolina to be with us today. I know it was a very long day yesterday.

Mr. Weston's already given us kind of the history of the Private Attorney General in relation to the Congressional Record, so I'm just going to try to conserve the Court's time and not be repetitious.

Mr. Class, what have you done in North Carolina using your position as a Private Attorney General?

A Yes, I have. I went to United States Congress to the Judiciary, House, and Senate. I brought paperwork in. I had the House and Senate stamp it under the Private Attorney General because that is passed in the law in the same fashion that the Court was created in 1789, the United States Marshal's Office was created, the United States Attorney's Office was created, the Department of Justice was created, all in the same fashion that all these other agencies were created. So I did go to Congress and I do have credentials.

MR. BECKER: Once again, the defendant -- this witness is holding up a document that's not been identified. It has not been listed as an exhibit. It has not been provided to the government. It's rather difficult to proceed if defendant's going to proceed in this manner.

THE COURT: Mr. Class, would you show Mr. Becker the document, please?

THE WITNESS: Yes. This would be equivalent to a bar card. Title 36 gets into it.

MR. BECKER: It's impossible, Judge, to investigate

the validity of this. It's just a printed up document. Without having been provided in advance so that we could investigate the veracity of this that's been presented to the Court.

THE COURT: Mr. Becker, do you have any objection to us making a copy of those two documents and marking those as exhibits, the copies as exhibits and letting him retain that original or do you want to --

MR. BECKER: Copies are fine, Judge.

THE COURT: Very well. And we'll do this at the recess. Make sure you have your evidence preserved by the exhibits. Thank you.

MR. STANLEY: Thank you, Your Honor.

Q (By Mr. Stanley) Mr. Class, again, to conserve time, I'm not going to ask you anything regarding the income tax system at this point, but can you explain to the Court your understanding of the monetary system? And we are quite short on time because we're trying to get the jury in here. It's pretty close to nine o'clock. So if you would, please.

A Okay. Through my research, and I do research, and I've had a case in the North Carolina tax department.

THE COURT: Can you move the microphone towards your mouth. Thank you.

A Through my research, and I've had an issue in North Carolina with the tax department, we brought in the McFadden

Speech from 1932 and it showed the Federal Reserve Note is not money. It is a mere promise to pay. We got into Title 12 United States Code and it says the Federal Reserve Note is an obligation of the Federal Reserve Bank and the banking system. United States Code, Title 18, Section 8 says the Federal Reserve Note and United States notes, certificates, money orders, checks, stamps are all obligations of the United States.

Now, under the United States Code it's considered theory in concept. Under statutes at large, which is the law, it is defined in the same fashion that the Federal Reserve Note is an obligation of the United States. The McFadden Speech gets into it and explains that, but it also gets in and explains as well as Title 12 that your signature is the collateral because the Federal Reserve Note is a credit line.

When the Treasury Department goes to the Federal Reserve and asks for credit, it doesn't get gold. It doesn't get silver. It gets a Federal Reserve Note which is a credit. That credit goes down to the comptroller of currency, goes down to the banking system and then it goes down into the public as a credit line.

Now, these are what the statutes at large say. Congress wrote this. And if we can't believe Congress, then who do we believe?

Q (By Mr. Stanley) So, Mr. Class, how does that -- do

those facts concerning the monetary system, what effect does that have on the income tax?

A Speak louder.

Q How do those facts concerning the monetary system based on the statutes at large, how does that impact our ability to assess and pay income taxes?

A Well, see, the issue is at the very top of this sheet of paper it has three words. It says Federal Reserve Note.

THE COURT: And for the record you're holding up a one dollar bill. Thank you.

A And the Congressional Records, McFadden Speech in 1932 and when Lindbergh spoke in 1917, they talked about this. This was a credit line. This was not money. This was a means of credit. Same thing with the Federal Reserve Act. It was created in 1913. It clearly went back and showed under Section 16 that this was strictly internal currency and this was what McFadden was also explaining, the Federal Reserve Note is internal. It was never supposed to be external.

Q (By Mr. Stanley) Thank you, Mr. Class.

MR. STANLEY: I assume we're getting very close to nine o'clock.

THE COURT: You have a few more minutes if you want to continue.

MR. STANLEY: Few more minutes.

Q (By Mr. Stanley) Mr. Class, what do you mean by a tort

claim?

A I beg your pardon?

Q What do you mean by a tort claim, t-o-r-t, claim?

A Tort claim. What was as in 1866 when they passed the Private Attorney General Act, Title 1942, 1988 it allows the private citizen to act as a Private Attorney General only and when under the tort claim under Title 28 under Chapter 171, Section 2674 through 2680, after we go to the United States and go to the agency, we have to go to them and file a complaint. If they turn it down within six months or don't answer you and you turn in an SF 95 and they come back and say, We're not going to get involved, the Attorney General's Office has officially walked off the case.

So the private citizen can now bring a lawsuit, and that's why under that Title 28, Section 2476, it says you cannot sue the United States or you cannot sue the agencies. You can't sue any of the employees for negligence unless, that key word "unless," you go back and contact the agency first. You bring your complaint. That's where the SF 95 tort claim comes in. That's why you are complaining.

They have up to six months to answer you. If they do not answer you, then they have waived the immunity for you to be prosecuted as a Private Attorney General. That's the position of the Private Attorney General. We have to first go to the Attorney General's Office to ask him to go after the

corruption. When he doesn't, now it's up to the people. That's why Congress gave it to us.

Q Thank you, Mr. Class.

MR. STANLEY: I have no further questions for Mr. Class during this proffer period.

THE COURT: Okay. Very good. You may stand down.

(Witness excused.)

THE COURT: Any other -- Mr. Becker, I'm sorry. Did you have any cross? I'm sorry.

MR. BECKER: I don't think it's necessary, Judge, as much as I look forward to it.

THE COURT: Thank you. You can stand down.

(Witness excused.)

THE COURT: Based on the government's two motions in limine, the first being Document 52, government's motion in limine to exclude certain exhibits and limit certain testimony; and based on government's second motion in limine, which is Document 86, government's second motion in limine to exclude certain exhibits and limit certain testimony, and upon the proffer made by Mr. Stanley as to Carl Weston and Rodney D. Class, the government's motion will be sustained.

There is also a motion in limine filed, I believe, yesterday, Document 120, defendant's demand to dismiss for fraud for failure to produce an injured party, the Court will deny that motion of the defendant.

And, Mr. Becker, are there any other outstanding motions or rulings that the Court needs to make regarding the government's case?

MR. BECKER: Not that I'm aware of, Judge.

THE COURT: Mr. Stanley, are there any outstanding rulings or motions that you have lodged that the Court needs to rule on?

MR. STANLEY: Well, I think there we need to clarify regarding Document 52 in particular because the plaintiff would pretty much exclude all of my proposed exhibits, and so I thought you wanted -- I thought my proffer on the evidence was to include what I was going to use the evidence for. That was my interpretation of the previous meeting. Exhibits 1 through 13 the government expressed concern about, and those exhibits will be used to demonstrate the facts of my correspondence with the IRS, the tax court, and the court of appeals.

Exhibits 14 through 17 contain my good-faith understanding of the tax laws, which the plaintiff refers to be misunderstandings, and I don't see how I can present a good-faith defense without presenting the Court my understanding. It seems rather fundamental if I can't present my understanding, then I can't make a defense that I'm operating in good faith.

Exhibit 18, the prior memorandum, is successful argument by Mr. Cryer who had an understanding similar to my

good-faith understandings.

Exhibit 19 I will not present unless I give an unredacted copy first to the plaintiff.

And Exhibits 20 through 23 are statutes at large and the IRS Handbook, which are public documents under Federal Rule 902.

So I believe that all of my exhibits, with the exception of 19 which we made a remark about it in the previous hearing. I won't present that unless I give an unredacted copy to the plaintiff first, but I believe the other exhibits should be admissible.

THE COURT: Mr. Becker.

MR. BECKER: Judge, I believe it's important to look at each exhibit, and skipping over D1 and D2, which the defendant intends to offer, I think the government intends to offer those as well as Government's Exhibit 188, which corresponds to D1, and D2 corresponds to Government's Exhibit 15.

The next series -- the next 3, 4, and 5 are pleadings that the defendant prepared himself for his case -- his unsuccessful case in the tax court. It's addressed in the government's motion in limine that these self-serving statements of law, claimed statements of law, prepared by the defendant in his unsuccessful tax court case should not be admissible.

D6 corresponds to Government's Exhibit 154. We don't have an objection to that.

D7 and D8, again, are the defendant's pleadings in the Eighth Circuit Court of Appeals, his unsuccessful appeal of the tax court ruling against him of the assessment in 2006. His briefs are not admissible evidence. They're merely self-serving statements of the defendant.

D9 we do not object to. It corresponds to Government's Exhibit 80.

So then D10, 11, 12 are -- well, his Eighth Circuit petition for rehearing and rehearing on bond which is D10. That's after he was ruled against by the Eighth Circuit Court of Appeals. We object to that. That's, again, a self-serving statement by the defendant. His petition for the writ of certiorari is, again, a self-serving statement of the defendant prepared in litigation -- unsuccessful litigation of his tax cases.

The same is true of the U.S. Tax Court, petitioner's reply to respondent's answer. That's D12.

D13 is a letter to the United States Attorney's Office. It's unclear what, if any, relevance that has to the trial of this case. It did -- it was a matter of some relevance in the pretrial rulings concerning the defendant's request to appear before the grand jury, but it does not have any relevance to the trial of this case.

D14 is another tax court submission by the defendant.

D15 is his lawsuit against various persons in the IRS and me.

The same thing is true with D16 and 17. They are other pleadings that the defendant has submitted in support of his complaint in the Northern District of Oklahoma just last year after his indictment.

D18 is a memoranda of Mr. Cryer. We have been given a copy of that, printed it out. It has, as the Court was earlier referring to, a disclosure page that says at the front, This is not something that you should rely on, that you should seek competent counsel. It's merely Mr. Cryer's pleading that was filed in 2006 in the Western District of Louisiana. Mr. Cryer's deceased. We don't believe that that is admissible in the case.

We -- again, we're awaiting Mr. Stanley to produce an unredacted copy of D19, his Social Security statement.

The excerpts from the statutes, D20, 21, 22, I guess we'll get to those when they come up.

And D23, there's been no foundation at all for this IRS Handbook from 1982. And, frankly, again, has doubtful relevance.

Those are the government's positions on the specific items listed in defendant's second amended exhibit list.

THE COURT: Do you have any other comments?

MR. STANLEY: Well, I believe that I in support of -- or my opposition to his in limine motion, those things that he's calling self-serving testimony I have no interest in using those as supposed arguments for law. I'm only using those to present the facts of my correspondence with the IRS, the tax court, the Eighth Circuit Court of Appeals, questions that I asked that stood unanswered.

So, you know, the plaintiff's belief that I'm going to try to rely on those as some kind of primary source of law, I have plenty of primary sources of law. If I want to go to a primary source of law, I'm not going to go to things I wrote. I'll go to the primary sources. Those things that I wrote are just to show that I asked certain questions of certain groups on multiple occasions and those questions were not answered. So that's the point of those, Your Honor.

MR. BECKER: And, once again, we get to the defendant claiming he has primary sources of law but doesn't give any notice of what exactly he's talking about. We've raised this issue in the hearing on the 19th. The defendant was given a deadline. He failed to respond. So there seems to be no other purpose for these documents he's intending to offer.

THE COURT: Thank you.

And I appreciate you, Mr. Becker, filing your motion

in limine and your response to give the Court a heads up of what to expect in the trial. So many of these issues -- I can't try the case ahead of time and make specific rulings. The best I can do at this point is to, and I'll reiterate my order of May 19th, is to give the parties clear parameters and a clear direction of how I will rule without making a detailed ruling on each document.

And specifically the defendant will not be permitted to argue or present evidence as to what the law is or was or ought to be. The defendant will be allowed, if he chooses to testify, he can testify as to what his beliefs of the law are and the basis for those beliefs. He is entitled to the defense of general denial as he set forth in one of the pretrial hearings; and although he hasn't, I don't believe, provided a good-faith defense instruction as one thing I want him to be able to present.

So with those parameters, I hope that both sides are relatively clear on how the rulings will go, and we will just have to take the specifics up at the time.

Mr. Stanley, I want you to, at a minimum, show Mr. Becker your exhibits at a break. Probably over the lunch hour.

MR. BECKER: The defendant has provided me the items that are on his exhibit list, 1 through 21.

THE COURT: Okay. Mr. Becker, do you want to make any record regarding any plea offers pursuant to Frye?

MR. BECKER: Judge, the government sent the defendant a letter informing he would be allowed to plead guilty to Count 1 of the indictment, and the government would move to dismiss Count 2. The government would recommend a sentence within the applicable guideline range, and the defendant could argue for any potential sentence. The defendant failed to respond to that offer.

THE COURT: Mr. Stanley, did you receive that offer?

MR. STANLEY: Yes, Your Honor. I did not specifically respond to Mr. Becker because the reply date was during the time period when I was honestly trying to retain counsel and thought it would be inappropriate of me while I was trying to retain counsel to hamstring them by making some kind of a response to Mr. Becker that might be contrary to what the counsel would advise me to do. So that was the only reason I did not provide the response to Mr. Becker by his May 24th deadline was because I was expecting to retain counsel and wanted to leave that up to counsel to handle that with Mr. Becker.

Once the deadline had passed and I was not going to be retaining counsel, I figured it was -- the offer was closed, so I didn't pursue it any further. The monetary side of it was something that -- I'm three and a half years from retirement age. I wouldn't be able to meet the monetary amount with all that I could earn in the next three and a half years, so it was

just something that I couldn't touch. It just was not anything that I needed to think about considering.

THE COURT: You could not think about considering accepting; is that what you're saying?

MR. STANLEY: Yes. I could not reasonably expect to meet that kind of a plea with three and a half years before full retirement age.

THE COURT: Okay.

MR. STANLEY: Plus a felony indictment. What was that going to do to my -- with a felony on my record, I didn't know if I'd be able to even get any kind of a job in my chosen profession. So it was just not really anything I could work with.

THE COURT: And that remains your position today that is not an offer that you could accept?

MR. STANLEY: No, I could not accept that today. I could not in good faith commit to the monetary settlement.

THE COURT: Okay. And I don't want to get into negotiations. I just want to put on the record that you were notified of that offer and that was rejected. I just need to make a record of that.

Anything else, Mr. Becker, regarding --

MR. BECKER: Judge, I didn't understand the government's letter to address really the monetary penalties. It was the incarceration period that the government was

focusing on. This is the federal criminal case and really the obvious -- the practice is to outline the potential punishment that the defendant would be exposed to if he were to go to trial as opposed to accepting a plea of guilty.

THE COURT: Okay. And just out of an abundance, Mr. Becker, are there any offers that you want to make to the defendant before we begin or is the offer off the table?

MR. BECKER: He certainly can plead guilty to Count 1 and we'll argue the sentencing issues, the same offer.

THE COURT: Okay. The same offer. And what is your position? Do you accept or reject? I don't want to know any details or any of your thinking.

MR. STANLEY: There was a dollar amount in the plea offer, and I'm not going to disclose that; but, no, if I plead guilty, then I think I'm out of business.

THE COURT: Okay. Very well.

Couple more housekeeping things. I want to go over Mr. White's role. Mr. Stanley, do you need a chance to visit with Mr. White or do you know what your intentions are in utilizing him and if you want the jury to be aware of that resource or not?

MR. STANLEY: Am I to understand from your exclusion of Mr. Class and Mr. White -- or Mr. Weston as potential witnesses that they, one or both of them, could be permitted to assist at counsel table?

THE COURT: I would allow one of them to sit at counsel table to assist you with administrative items. They're not to be disruptive. They're not to say anything the jury can hear. It's just a privilege that I'm giving you that I can revoke at any time if it's disruptive or confusing to the jury. So, yes, you could have someone to assist you at counsel table, and you can decide how you want to utilize Mr. White, specifically where you want him to sit. I'm going to have him sit, at a minimum, at the back of the courtroom in the gallery; but if you want him to be more involved, he can sit at the back of the courtroom, at your counsel table, or where he's currently sitting on the side of the bench.

MR. STANLEY: Okay. One final clarification on sitting at the table. In the previous hearing a person assisting me during voir dire could not be a witness, but can the same person -- can whoever is sitting at counsel assist me during voir dire and the rest of the trial?

THE COURT: Yes. But one person. You can't swap them out. Who are you going to have sit with you? Mr. Weston or Mr. Class? And I would note that Mr. Class was hard of hearing and if that becomes an issue, that might not be wise. If he's discussing stuff out loud, he leaves and you don't get to replace anyone.

MR. STANLEY: I will use Mr. Weston at table. He's more familiar with the case.

THE COURT: And he can assist you in voir dire and I'll just try to accommodate the best I can. And then with Mr. White, what is your preference?

MR. STANLEY: At this moment present arrangement is fine with me --

THE COURT: Okay.

MR. STANLEY: -- at staff counsel table.

THE COURT: Do you want the jury to be advised that he is a resource for you if in the case that you want to walk over and ask him a question, such as how do you get a piece of evidence properly admitted, or do you want the jury to not know of Mr. White's involvement?

MR. STANLEY: I would prefer they not know of his involvement and will -- I believe you offered that we could take a very limited number of recesses to visit with him if there's a need.

THE COURT: Okay. And we typically take a midmorning break and midafternoon break so you'll always have that opportunity, but it's got to be very minimal.

MR. STANLEY: All right. Thank you, Your Honor.

THE COURT: Mr. White, do you have any questions or concerns that we should clarify?

MR. WHITE: Judge, I think you've covered them very well.

THE COURT: I will question the panel, therefore, on

you representing yourself to make sure that they don't make it easier on you or harder on you because you elected to do that.

I have incorporated the questions of both parties into my voir dire. After I do general questions, if the parties have individual questions that you would like the Court to ask, we will take a bit of a break, have those prepared, and let me know what individual questions or follow-up questions you may have. Typically follow-up questions are five to ten minutes, Mr. Stanley, just to give you some idea.

Mr. Becker, is there anything regarding jury selection that we should take up?

MR. BECKER: Just curious, Judge, how the Court explains the presence of Mr. Weston at counsel table.

THE COURT: That he is helping him with administrative duties. He's not an attorney representing him. He's to just assist him with housekeeping nonlegal matters.

MR. BECKER: That's great.

THE COURT: Do you have any objection to that?

MR. BECKER: No, Judge. Thank you.

THE COURT: Mr. Stanley, do you have any objection to that?

MR. STANLEY: That's fine, Your Honor.

THE COURT: Mr. Stanley, I don't know you've researched jury selection, but we will fill the courtroom starting with the jury box and then the front rows of the

gallery. We'll ask questions. You need to keep tabs of which panel members you believe should be struck for cause, basically that they can't be fair and impartial. After questioning, I will ask both sides to give me their proposed strikes for cause. You'll need to have a list of those. After those strikes for cause have been determined, the government will make their strikes first. They strike six venirepersons. They then give you the list of, I think it's like the first 28. They strike their six. You get ten strikes. They can be for any reason. They cannot be for any protective reasons such as race or gender. And then once you make your ten strikes, the remaining folks, I believe from the 27 or 28, will be the panel. We usually give a group of three for an alternate where the government makes their alternate strike, you make your alternate strike, the one remaining is the alternate. I intend to have just one alternate.

Is there any request for any more than one alternate?

MR. BECKER: No, Judge.

THE COURT: Mr. Stanley, any request for more than one alternate?

MR. STANLEY: No, Your Honor.

THE COURT: Ms. Moore, any other housekeeping issues before we call in the panel?

THE COURTROOM DEPUTY: You might go over the

anticipated length to see if they're still --

THE COURT: The parties had advised that you anticipate approximately a two- to three-day trial. Is that still your anticipation, Mr. Becker?

MR. BECKER: Yes, Judge.

THE COURT: So Tuesday, Wednesday, Thursday. So if I inform the jury that should wrap up by Thursday, on the off chance, let's ask until Friday, would that be doable for you, Mr. Becker?

MR. BECKER: We should be done.

THE COURT: Mr. Stanley, what is your position?

MR. STANLEY: That should be fine, Your Honor.

THE COURT: I've been notified we have 55 venirepersons.

And, Ms. Moore, how do you need the gallery to be situated to accommodate the venirepersons?

THE COURTROOM DEPUTY: As long as they're not sitting where there's a number. You need to move back if you're sitting anywhere where there is a number.

THE COURT: Mr. Stanley, your preference is to have Mr. White seated where he is at the staff attorney table; is that correct?

MR. STANLEY: Yes, it is, Your Honor.

THE COURT: And then my intention is to introduce him as a court attorney at this point. I think there may be

folks that may know Mr. White. I need to make sure that if they know Mr. White, they may be confused. I'm open to suggestions from either party. Or, Mr. White, if you have a better description than a court attorney.

MR. BECKER: I think that's appropriate, Judge, to make him look like one of the court staff. A little old for a clerk but --

THE COURT: Mr. White, are you okay with that?

MR. WHITE: Sure, Your Honor.

THE COURT: Thank you.

I also will ask you, Mr. Becker, to introduce the folks at your table and just their titles.

Mr. Stanley, I may ask for you to introduce the folks at your table, and if you can introduce first and last name and administrative assistant who will be assisting me.

MR. STANLEY: All right. Thank you, Your Honor.

THE COURT: We'll play that by ear.

If either side has any objections during voir dire, I would ask that you just say objection and come to the bench. I doubt there will be any objections.

MR. WHITE: One question did occur to me on approaching the bench. I'm assuming I'm not going to?

THE COURT: You can. And I have Ms. Russell approach the bench and she comes right behind Ms. Moore. Thank you for that.

I can't think of anything else. Are you ready to call the venirepersons in?

MR. BECKER: Yes, Judge.

THE COURT: Mr. Stanley, are you ready?

MR. STANLEY: Yes, Your Honor. At which point can Mr. Weston cross the bar?

THE COURT: Yes, he may. He can come on in. You may want to go on out and get him.

MR. STANLEY: Of course.

THE COURT: We will be off the record and if you would bring the venire panel in.

(Recess taken at 9:30 a.m.)

(Voir dire examination was had but is not herein typed.)

AFTERNOON SESSION

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Mr. Stanley and Mr. Becker, can we put a couple of things on the record before we call the panel back in?

MR. BECKER: Ready, Judge.

THE COURT: Did both sides get a copy of the jurors? I think Ms. Moore is going to make a copy of the jurors.

Do you have that noted who the jurors are, Mr. Stanley?

MR. STANLEY: I don't see it in this pile of paper.

THE COURTROOM DEPUTY: I'll print it off right now.

MR. BECKER: I don't have a copy either.

THE COURT: We'll get a copy of that. Then as far as housekeeping issues, Mr. Stanley, you've done a great job of demeanor in the courtroom. I appreciate that.

When you question a witness or cross-examine, come to the lectern and remain at the lectern. If you want to approach a witness, just ask if you can approach a witness if you want to, like, show them documents, for example.

If you have an objection, just say "objection" or if you can describe it with one word "hearsay," "irrelevant," whatever the objection is, you can use the one word or else come to the bench and give your explanation outside the hearing of the jurors. So basically there's no speaking objections.

You don't have to let me know now but at some point you'll make a decision whether you want to testify or not. And if you elect to not testify, I want to make a record of that. And if you elect to testify, I want to make sure you understand you'll have to be cross-examined if the government selects to do that.

We've already invoked the rule.

That is all the housekeeping issues I can think of. I think Ms. Russell placed the preliminary instruction packet on each table that we read before opening statements.

The government makes opening statements first, and then, Mr. Stanley, if you choose to do so, you can make an opening statement after the government or you can wait and make your opening statement when you present evidence at the start of your case in chief or you cannot make opening statement if you don't want to. So you have basically three choices.

Do you know at this point what your choice is or do you want to wait to make that determination?

MR. STANLEY: Considering the number of witnesses that the government's planning to call, it's going to be a long time between my opening statement and presenting any evidence. If I give my opening statement this afternoon, it will be a long time from, you know, probably the better part of a day from the time I give my opening statement until I'm supporting it. So I think I would prefer to put the two together.

THE COURT: Your opening statement, then go right into your evidence?

MR. STANLEY: Go right into evidence. I believe that will be my preference.

THE COURT: Okay. Very well. Then I will ask you something similar, do you want to give your opening statement or do you want to wait?

MR. STANLEY: I appreciate that. If I change my mind, I assume I can do so.

THE COURT: Mr. Stanley, do you have any

housekeeping questions or issues that you can think of that we should take up now before we seat the jury and have opening statements?

MR. STANLEY: I don't have any housekeeping. We are getting Mr. Weston's things that he held up in evidence right now.

THE COURT: Very good.

Mr. Becker, do you have any housekeeping issues?

MR. BECKER: Just to alert the Court. The first witness will be perhaps longer than an hour. Hopefully not much, but that's potentially the case.

THE COURT: Okay. And as I indicated, as long as you're moving, progressing with your direct and cross, I will give leeway in that.

Ms. Moore, do you have any other issues?

THE COURTROOM DEPUTY: I don't.

THE COURT: Okay. I will have Ms. Russell place the instructions as I read them on the overhead so that the jurors can read them while I read them.

Okay. We can seat the jury.

(The following proceedings were had in the presence of the venire panel:)

THE COURT: Ms. Moore, are you ready to seat the jury?

(The courtroom deputy seats the jury panel.)

THE COURT: Mr. Becker, is this consistent with your notes?

MR. BECKER: Yes, Your Honor.

THE COURT: Do you have any objection or any record you want to make regarding jury selection?

MR. BECKER: No, Your Honor.

THE COURT: Mr. Stanley, is this consistent with your notes?

MR. STANLEY: Yes, it is.

THE COURT: Any record that you would like to make?

MR. STANLEY: No, Your Honor.

THE COURT: Thank you.

For the panel that's in the gallery, I want to sincerely thank you on behalf of the parties and on behalf of the Court. As you know, this process can't take place unless we have each of you, and I appreciate your attention this morning and your service.

And, Ms. Moore, can you give them directions if they need to report to the second floor?

THE COURTROOM DEPUTY: Yes. You do not need to check down at the second floor where you checked in this morning unless you need a certificate of attendance. Other than that, you're released.

(The remaining venire panel was excused from the courtroom.)

THE COURT: Ms. Moore, would you administer the jury oath?

(Courtroom deputy swears in jury and one alternate.)

THE COURT: Thank you, ladies and gentlemen.

At this point I will now read to you Instructions 1 through 9. I will also have my staff attorney, Ms. Russell, place them for you to read along with me.

(The Court read Instructions Nos. 1 through 9, inclusive.)

THE COURT: Mr. Becker, are you ready with your opening statement?

MR. BECKER: Yes, Your Honor.

(The government's opening statement was had but is not herein included.)

THE COURT: Mr. Stanley, do you wish to make an opening statement at this time?

MR. STANLEY: I'll defer my opening statement until later.

THE COURT: Very well.

Mr. Becker, are you ready to call your first witness?

MR. BECKER: Yes, Judge.

GOVERNMENT'S EVIDENCE

MR. BECKER: The United States calls Ramon Hernandez. And before we do, Judge, pursuant to the Court's

ruling on records custodians, the government offers to admit into evidence the business records; Exhibits 22, 23, 26, 27, 30 through 42, 47 through 64, 66 through 71, 73 through 76, 86 through 108, 113 through 118, 120, 121, 186, and 187. There are subparts in some of these exhibits. That would be 87(a), (b), and (c); 94(a); 106(a) through (z); 186(a); and 187(a) through (e).

MR. STANLEY: Objection, Your Honor.

(Counsel approached the bench and the following proceedings were had:)

MR. STANLEY: Did we not create an instruction that the witnesses would be sequestered? This witness has been in all the time.

THE COURT: Is he the one seated in the first row? I just saw him walk in.

MR. BECKER: I just called him in. That has nothing to do with the records.

MR. STANLEY: He's not the one seated at the table.

MR. BECKER: That's Rich Littrell, the case agent.

MR. STANLEY: Well, that will be an issue when you call him.

MR. BECKER: The case agent is allowed to be in the courtroom even though he's going to be a witness.

THE COURT: Yes.

(The proceedings returned to open court.)

MR. BECKER: We'll call Ramon Hernandez, Judge.

THE COURT: Let me ask, Mr. Stanley, those exhibits that were listed as business records, do you have any objection?

MR. STANLEY: I object to the ones that are outside the tax years of the indictment.

THE COURT: Any other objections?

MR. STANLEY: No, Your Honor.

THE COURT: Those will be admitted.

You may call your first witness.

MR. BECKER: United States calls Ramon Hernandez.

RAMON HERNANDEZ, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good morning -- good afternoon. Please state your name and spell your last name.

A Ramon Hernandez, H-e-r-n-a-n-d-e-z.

Q How are you employed?

A I work with the IRS in Austin, Texas.

Q How long have you been doing that?

A I've been in my current job for about four and a half years. I've been with the IRS for 14 and a half years.

Q What is your current position?

A I'm an appropriates (ph) coordinator.

Q Could you briefly tell us what that means?

A Sure. I review returns and transcripts. I prepare IRS records to use as exhibits at trial; and when I appear at trial, I represent the commissioner of IRS as custodian of records.
Q You talked about transcripts. What are transcripts from the IRS?
A Well, the transcript covers a 12-month period. It's a record of -- it's usually a record that's created when a return is filed, and it's just a history of what happens to that return, any tax debts assessed, payments made toward that tax. If the refund issued, it will show a refund being issued; or if a change is made to that return, it will show that also a change to be either like an audit or an amended return and a correction to the return.
Q Does the transcript also reflect any contact, usually correspondence, between the taxpayer and the Internal Revenue Service or vice versa?
A It can, yes.
Q You talked about certified records. What does that mean?
A It means it's a process we have that -- where we attach the IRS seal to the record. It indicates it's a true and accurate record of the IRS.
Q And it's maintained by the IRS in the ordinary course of its business?

A It is, yes.
Q What is your -- very briefly what's your previous experience at the IRS?
A Well, my job immediately before this job I was with the Taxpayer Advocate Service. What the Taxpayer Advocate Service is it's an independent organization within the IRS. It works for Congress and it was created to help people that were having issues or that have issues with the IRS that weren't being handled through normal channels or with direct contact through the IRS, their problems weren't being resolved.
Q How long did you have that position?
A I had that position for about three years.
Q Did you have a previous position involving reading IRS records and codes that are in those records?
A I did. My first position, which I started back in September 2001, was in the accounts management section of the IRS. And they mainly deal with looking at accounts, the same information that's in account transcripts. We looked at that. We had to be able to understand it and make changes to it when needed. And I did that for about four years. In the position I had after that also included having to deal with the IDRS and the IRS accounts.
Q What is IDRS?
A Sorry. It stands for integrated data retrieval system.
Q What does that system do or what is it intended to do?

A Well, it allows IRS employees to access tax account information. It's basically how we access the main database for taxpayer records.

Q And you became familiar with that how?

A Well, first with my first position back in September 2001, and I had to use it in each of my positions up through current, this current position.

Q Could you give us an idea, then, how records are filed at the IRS, say, with a return coming in to a service center like we have here in Kansas City?

A Sure. Well, when a return comes in, the first thing that happens after they open the envelope, the IRS will search for a payment. They'll immediately process that payment, and they'll group -- if it's a return that's come in, they'll group that return with like returns, meaning like if it's a Form 1040A, they'll put that on a stack of Form 1040A's for that same year. Then they go into batches of 100.

The returns are -- they're checked and if they need to be edited to allow them to be processed, that happens. It goes through processing. The IRS will assign a unique locater number to that one return. It's called a document locater number. The information is then transcribed from that return. That information is processed. It creates a record on the IRS master file.

Q So when you say "transcribed," looking at a regular tax

return, a 1040, what information is generally drawn from that to put -- I assume you don't scan the return. How do you get that information in the computer system?

A Well, it's keyed in by the person, and the information that comes -- that they key in is like the entity information, the information at the top of the return that identifies who's filing the return. We'll transcribe the address to make sure we have the most up-to-date address for the person. They won't transcribe every line. There's certain items, key items that they need to process, like adjusted gross income, taxable income, the amount of taxes being assessed on that return, and withholding, any payments that could be applied to the tax.

Q And a couple things. On a regular Form 1040 is there a threshold in dollar number requiring people to file a tax return?

A There is. It varies year to year, but for self-employed people the threshold is much lower. It's $400 of self-employment income. If they have that amount of money, they're required to file a return.

Q And on the return, then, for a self-employed person, does it generally have a Schedule C?

A It does, yes.

Q What is that?

A A Schedule C is a worksheet that you attach to a return, and it lets you know whether you have business income

or a business loss for that year related to that business.
Q So generally a self-employed person, their major tax calculations would happen on a Schedule C?
A Right. That's where you get to declare your income and reduce that income by any expenses you had related to that business.
Q I'm going to show you what's not yet in evidence as Government's Exhibits --
MR. BECKER: May I approach, Judge?
THE COURT: Yes.
Q (By Mr. Becker) -- 175 and 59. Could you take a look at 175, please, and tell us what that is?
A Exhibit 175 is a Form W-2. It's a wage and tax statement.
Q Is that a fair and accurate representation of a Form W-2 that would be processed by the IRS?
A Yes, it is.
MR. BECKER: I offer that into evidence as Government's Exhibit 175.
THE COURT: Any objection?
MR. STANLEY: No, Your Honor.
THE COURT: 175 is admitted.
Q (By Mr. Becker) Could you tell us what information is on 175 that is, then, transmitted to the taxpayer and the IRS?
A Well, all the information on this W-2 is given to both

the taxpayer -- should be given to both the taxpayer and the IRS. I can go through the major sections.

Q Major fields please, yes.

A Sure. Well, the Box C, which would show who paid the wages to the person that's identified in Box E. That would be the recipient of the wages. Box 1, which shows the amount of wages paid and whatever the tax year this form is being filed for. In this case this form is for tax year 2016.

Box 2 would be any amount that was withheld for federal taxes.

And then Boxes 4 and 6 are also taxes withheld from that employer's pay -- employee's pay. Sorry.

Q Could you look at what's received in evidence now as Government's Exhibit 59. What is that?

A This is Form 1099 Miscellaneous. This is for tax year 2008. And what the form reports, this reports nonemployee compensation generally.

Q What information is contained on this Form 1099?

A Well, it has similar information -- it has similar fields to the W-2 we just looked at. In this case it identifies the payer, the nonemployee compensation as Tri-State G&T.

Q And does it identify who the money was paid to?

A It does. It identifies Harold Stanley as the recipient.

Q Does it identify an amount?
A Yes, it does.
Q What is that?
A That amount is $254,784.43.
Q On that Form 1099 is reported miscellaneous income. Is there any amount for withholding?
A There's not on this reporting, no.
Q I would like to move to the computer system of the Internal Revenue Service. We talked a little bit about IDRS, the integrated data retrieval system. Does it have information, something called the master file information?
A It does, yes.
Q What is that?
A Well, the master file, it's the main database for IRS tax records. It's held in the computing center. There's actually two computing centers that back each other up. The main one is in Martinsburg, West Virginia, and the other one is in Tennessee.
Q That's where all the information resides?
A One of those two places, yes.
Q How do you retrieve information from the integrated data retrieval system?
A It's normally done by -- you need to know the tax I.D. number for the person or business. For a person it's usually the Social Security number. You need to know their name, the

name that's been listed by the Social Security Administration. They have to match up in our records. And you have to know what tax form you're looking for, and you have to specify the tax year that you're looking for.

Q How do you physically go about retrieving -- obviously in preparation for this case, did you search out documents relating to Harold Stanley?

A I did.

Q How do you go about doing that?

A By name, by Social Security number, by tax year, and the form type.

Q Were you able to retrieve documents relating to Mr. Stanley?

A I was, yes.

Q Before coming here today, did you review those records and documents to prepare for your testimony?

A I did.

Q Did you and I have a chance to go through those records several weeks ago; is that correct?

A We did, yes.

Q There's a binder there in front of you containing Government's exhibits. Did you prepare those documents as certified records of the IRS?

A Yes, I did.

Q Could you, again, very briefly tell us how you certify

records? What does that mean?
A It means I pull the record or I search for a record. Depending on what I get or do not get, I'll prepare a form that goes on top of the record or talks about the search results from that for my search. I will then affix the IRS seal on that and will have an approving official sign that form.
Q And are those documents in the binder, then, certified records relating to Harold Stanley or certificate of lack of records relating to Harold Stanley?
A Yes, they are.
Q Do they have the official certificate of the -- or certifying seal on those documents?
A They do, yes.
Q The documents that -- are those documents ones that the IRS keeps in the ordinary course of business of assessing and collecting taxes?
A They are.
Q Is it the regular practice of the IRS to make or create these records and to maintain them?
A Yes, it is.
MR. BECKER: Your Honor, I'd offer into evidence Government's Exhibits 6, 8 through 12, 14, 15, 16, 78, 79, 81, 83 through 85, 122 through 126, 131 through 137, 141, 145, 175, 179, 180. And then some subparts, 11(a), 14(a) through (o), 15(a) 16(a), 78(a) through (d), and 131(a).

THE COURT: Any objections?

MR. STANLEY: My standard objection, except for the ones outside of the tax years of the indictment.

THE COURT: Any objections besides outside the tax year listed in the indictments?

MR. STANLEY: No, Your Honor.

THE COURT: Your objection will be denied and those exhibits will be admitted.

Q (By Mr. Becker) Let's look at some of these IRS records, then, Mr. Hernandez. First of all, the area of the tax returns of Mr. Stanley from 2005 through 2009, could you look at Government's Exhibit 6, please?

A Yes.

Q What is that?

A This is a certification of lack of records. It shows the results of my search for returns filed by Mr. Stanley for the tax years 2005 and 2006, and it shows that the IRS had on record no returns being filed.

Q Next I would like you to please look at Government's Exhibit 8. What is that?

A This is a Form 1040 for tax year 2007 filed by Harold Stanley and Ellen Stanley.

Q Does it list, then, as we go down, income for Mr. Stanley?

A It does, yes.

Q What was his at the -- I guess adjusted gross income or gross income?
A Adjusted gross income is $138,107.
Q Then on the next page, please. Is there any indication of the tax that was due and owing?
A There is not. I'm sorry -- no, there's not.
Q If you'd scroll down, please.
A I'm sorry. I'm looking at the wrong line here. The tax on this form is $16,003.
Q What would that represent?
A The tax owed on this return.
Q And then as you carry through, is that signed by -- it appears to be Harold Stanley?
A Yes, it is.
Q And what, if any, payment was included with this return?
A There was no payment with this return.
Q Next I'd ask you to look at Government's Exhibit 9. What is that?
A This is the tax year 2008 Form 1040 for Mr. and Mrs. Stanley.
Q Is there adjusted gross income listed at the bottom of the first page of the 1040?
A There is. It's $239,242.
Q Then on the next page does it appear to be signed by

Mr. Stanley?

A Yes, it does.

Q And now looking at -- there's a penned-in notation of $19,311 there. What is that?

A That is an IRS edit of this return.

Q Please tell us about that. How does that work?

A Although it's part of the processing, when the steps were taken in processing returns, sometimes the numbers like -- especially in handwritten Form 1040s, people might write the dollar amounts not exactly in the right place, so we'll have to edit it. We'll math verify it to make sure we're putting the dollar in the right field where it belongs, but there needs to be a dollar amount in some of these fields for it to go through processing. That's part of what's transcribed.

Q And if you go back up, please, to line 44. So it has taxable income line 43 of $221,342. Then the next line is for the tax amount, line 44. Could you explain that, please?

A I cannot. There should be a tax amount if you have taxable income on the return.

Q So the taxpayer, if they have 221,000 in income, normally that line would list some amount of tax?

A Right. You would look for that 221,000 amount on the tax table for this year and that determines the amount of tax that's on line 44 of this return.

Q Was there any payment included in this filing by Mr.

Stanley?

A There was not, no.

Q Take a look at Government's Exhibit 10, please. What is that?

A This is the tax year 2009 Form 1040 for Harold Stanley.

Q Does it list on the first page Mr. Stanley's gross income and then adjusted gross income?

A It does, yes.

Q What are those numbers?

A Well, the adjusted gross income is $219,724 and income before adjusted was $229,418.

Q On the next page, again, signed at the bottom of what appears to be Harold Stanley; is that correct?

A That's correct.

Q As a consulting engineer?

A Yes.

Q And the same questions about the tax due and owing on line 44, and then the red amount that's written in it at the bottom. What is supposed to be on line 44?

A Line 44 should be the tax amount based on the tax table for 2009, for tax year 2009.

Q And at the bottom there there's a red pen indicating 19,387. What is that?

A That is an edit to the tax amount shown on line 56 that was pulled down to line 75 of the form.

Q It's listed 56. Just the self-employment tax; is that correct?
A That's correct.
Q And that's in addition to any tax that would be on his gross or adjusted income of $200,000?
A That's a separate tax, yes.
Q So the tax on the 200,000, plus the 19,000 for the self-employment tax?
A Correct.
Q I would like to review with you the IRS transcripts for Mr. Stanley's -- for Mr. Stanley. Could you tell us again what is an IRS transcript?
A It's a history of a tax year for a person or for married persons. It shows generally that return has been filed, the amount of tax assessed on that return, payments applied to that tax; and it will show if a refund was issued, it will indicate when that was issued, and the amount of refund that was sent out.
Q Did you retrieve the transcripts for Mr. Stanley for at least 1990 through 2009?
A I did.
Q And the transcripts 1990 through 2004, I believe, are Exhibit 14; is that correct?
A It's 1990 through 2005.
Q '5?

A Yes.
Q Well, let's take a look at those, please. First of all, if you look at Government's Exhibit 14(a), could you tell us what that is?
A 14(a) -- well, the first sheet we're looking at, if this were in color, it would be the blue ribbon certification process that I talked about. This is a 1990 account transcript for Harold Stanley and Marcia Stanley.
Q And what information, then, is on the next page entitled account transcript?
A It begins the account transcript information for Mr. and Mrs. Stanley.
Q And what information is on the transcript then?
A Well, the first information after it states account transcript on the left side it identifies the form type, the form type that was filed for this year and the tax year. The tax year is 1990. It's a Form 1040. Right below that it identifies the filers that returned, Harold and Marsha Stanley.
Q Then does it give any information about income or tax due and owing and that type of information?
A It does. There's some information that was pulled -- or that comes off of the return, and that's the information from the return or adjusted section.
Q And could you tell us, just walk through with that particular information for Mr. Stanley in 1990.

A Sure. Well, it shows the filing status for this return was married filing joint. The adjusted gross income on the return was $74,006.21. Taxable income on the return was $45,610.71. And the tax listed on the return was $8,557.
Q Does it indicate, then, towards the bottom whether -- when the return was filed and whether or not there was any withholding and a refund or a payment?
A Yes, it does.
Q Please walk us through that.
A Sure. Well, right above the line that says transactions there's an entry for return due date or return receive date. That shows a date of April 15th, 1991. So what that tells me is this return was filed timely, either before or on April 15th. Below that is the transaction section, and that's where you look to see if there was any payments towards the tax and if a refund was issued. In this case there was withholding on the return or withholding held from wages. That amount was $9,768.13. And that amount was greater than the tax amount so a refund was issued in the amount of $1,211.13.
Q Next I'd like you to look at Government's Exhibit 14(b). Can you tell us what that is, please?
A Sure. This is an account transcript for tax year 1991 for Harold and Marsha Stanley.
Q And, similarly, could you tell what the adjusted gross income was and the taxable income and the tax due and owing for

that year?
A Sure. The adjusted gross income for this year was $82,528.64. Taxable income was $53,630.04. And the tax on the return was $10,596.41.
Q Was this return filed timely, could you tell?
A It was filed timely, yes.
Q And what information is there about whether or not Mr. Stanley had withholding and received a refund or made a payment?
A It's the final entry on the first page of this transcript showing a refund of $1,031.27 was issued.
Q Because he had withholding from his paycheck of 11,000 and change?
A Correct.
Q Next I'd ask you to look at Government's Exhibit 14(c). Would you tell us what this is, please?
A This is an account transcript for Harold and Marsha Stanley. It is for tax year 1992.
Q What information was on this sheet concerning his income and his tax due and owing for 1992?
A On this year adjusted gross income is $78,803.76. Tax on that income was $9,479.
Q Was that tax return filed timely?
A It was filed timely.
Q And was there a refund or payment made by Mr. Stanley?

A Yes. There was withholding applied to the tax. Withholding amount was $9,582.87. And the refund amount was $103.87.

Q Next I'd ask you to look at Government's Exhibit 14(d). Tell us what that is, please.

A This is a tax account transcript for tax year 1993 for Marsha and Harold Stanley.

Q What does it reflect in terms of Mr. Stanley's -- or their joint gross income and taxable income and tax that was due and owing?

A Adjusted gross income was $90,257.16. Taxable income was $61,227.97. Tax on the return was $12,413.17.

Q Was this return filed timely?

A It was, yes.

Q Now, this is -- walk through, then, there's a number of transactions reflected on Government's Exhibit 14(d). Can you walk us through that, please?

A Sure. Well, the first transaction is tax return filed transaction. It indicates we received the return and processed it, and it says tax in the amount of $12,413.17. The next dollar amount is the withholding amount that is applied to the tax, and that is $11,850.03. The next item shows there was a payment included with the return. That payment was $563.14.

Q So over there on the left payment sent in with the return, is that what it is?

A That's it, yes.
Q What's on the next page?
A The next transaction is reversing that payment. The explanation for that is dishonored payment with return. So we tried to cash the check and weren't able to, so we reversed the payment on the account. After that, you see assessments of penalty and interest.
There was a payment made on July 25th of 1994 in the amount of $589.40. It looks like that payment was a little more than what was needed to pay the tax and interest, so the next entry is dated August 15th, 1994. It starts backing out the overpaid interest.
Q The $11?
A Right. Or the $1.79.
Q In this instance it indicates Mr. Stanley made one attempted payment and then later made a payment in July of 1994 for his 1993 taxes?
A And also August 15th, 1994, there was a small payment.
Q Okay. Next I'd ask you to look at Government's Exhibit 14(e), as in Edward.
A Okay.
Q Can you tell us what that is, please.
A This is an account transcript for Harold and Marsha Stanley. It's for tax year 1994.
Q What was his adjusted gross income -- their joint

adjusted gross income, taxable income and tax due and owing for that year?
A Adjusted gross income was $95,659. Taxable income was $67,258. Tax on the return was $13,897.
Q And the information at the bottom of the page, was there a refund or payment made with this tax return? First of all, was it timely filed?
A It was not. It was received on May the 22nd of 1995.
Q Then what, if any, refund or payment status for taxes for 1994?
A There was no issue -- no refund issued this year. There was a payment received with the return of $562, and then a subsequent payment of $64.09 on September 18th of 1995.
Q Next I'd ask you to look at Government's Exhibit 14(f), the 1995 transcript.
A Okay.
Q Could you tell us the tax information that's reflected in Government's Exhibit 14(f) for Marsha and Harold Stanley?
A Sure. The adjusted gross income for this year was $97,030. Taxable income was $69,479. The tax on the return was $14,383. This return was filed timely.
Q Was there a payment or a refund in this instance?
A There was a payment included with the return. It was in the amount of $1,741.
Q Next I'd ask you to look at Government's Exhibit 14(g).

What is that?
A This is an account transcript for Harold and Marsha Stanley for tax year 1996.
Q Once again, could you tell us their adjusted gross income, taxable income and tax that was due and owing for that year?
A Yes. Adjusted gross income that year was $97,717. Taxable income was $68,668. And tax on the return was $14,016.
Q Was that return timely filed?
A It was, yes.
Q Could you tell us whether or not there was a refund to Mr. Stanley or payment by Mr. Stanley for tax year 1996?
A There was a payment included with the return in the amount of $2,751.
Q Next I'd like you to look, please, at Government's Exhibit 14(h). What is it?
A It's an account transcript for tax year 1997 for Harold Stanley.
Q In this case it was an individual, not a joint return?
A That's correct.
Q What was his -- what's the filing status and the income and tax information here?
A Filing status was married filing separate. Adjusted gross income was $83,831. Taxable income was $67,435. Tax on the return was $16,730.

Q Was there a refund or a payment made to -- refund to Mr. Stanley or payment made by Mr. Stanley that year?
A There was a payment included with the return. That payment amount was $1,746 from Mr. Stanley.
Q Again, was that timely filed in 1998 for his taxes in 1997?
A It was, yes.
Q Please look at Government's Exhibit 14(i). What is that?
A This is an account transcript for Harold Stanley tax year 1998.
Q What information is there concerning his filing status and then the income and tax due and owing?
A Filing status this year was single. Adjusted gross income amount was $69,377. Taxable income was $52,977. Tax on the return was $12,375.
Q Was that return timely filed?
A It was.
Q April 15th like we all --
A Correct. Yeah.
Q What was -- whether or not there was a refund to Mr. Stanley or payment by Mr. Stanley?
A There was a payment included with the return. It was for $1,095.
Q What information about -- is on the second page of this

transcript for tax year 1998?

A This information -- it falls at the bottom of the return. It shows that the IRS sent out a notice. Looking at the notice might help.

Q Sure.

A It's a notice of unreported income, and the way that works is the IRS receives the information from third parties. It could be from employers or from banks. It's usually payers, the payers of income, of taxable income.

So just like we receive W-2 statements in January sometime, that same information is reported to the IRS, and we keep it in a third-party data storage.

And what we do with that later on after the people have filed their returns, we compare the information on the third-party database with the information that people file on their returns. We try to match up the income. It's a dollar matching program. Sometimes we'll find a mismatch; and if we do, we'll send out a notice letting that person know that it looks like they received this income but didn't include it on their return.

Q So if a company were -- always reports to the taxpayer and the IRS, you match -- you try and match that number?

A Right. Correct.

Q What happened here?

A Well, it worked out in Mr. Stanley's favor as far as I

can see. We issued a notice to ask him to review his return to see if there was any unreported income. He subsequently -- or there was subsequently an amended return filed in February of 2001. The result of that return being filed was the IRS reduced his tax amount by $659 and issued a refund amount of $780.22.

Q Would you like some water? Are you okay?

A I'll get some water.

THE COURT: Mr. Becker, were the -- sorry for the interruption. But I would like to admonish any visitors, guests, or spectators regarding personally identifiable information as being displayed pursuant to my April 6th, 2016, order. Anyone in the gallery who is able to view any personally identifiable information is instructed and admonished to not disseminate any of this information or utilize any of this information being shown that spectators may have access to, and this will be a standing order throughout.

MR. BECKER: Thank you, Judge.

Q (By Mr. Becker) Please look at Government's Exhibit 14(j). What is that?

A It's an account transcript for tax year 1999 for Harold Stanley.

Q What was his filing status and then income, taxable income, and the tax due and owing?

A Filing status was married filing separate. Adjusted

gross income that year was $86,205. Taxable income was $69,592.15. And tax on the return was $16,884.

Q Was that tax return filed timely?

A It was, yes.

Q What, if any, withholding and tax was due and owing or refunded to Mr. Stanley?

A There was a payment included -- or a payment sent to the IRS in the amount of $185.32. The withholding on the return was a little less than the tax on the return.

Q There's some more transactions there. Could you briefly describe them for us?

A Sure. Well, with the receipt of the payment, you'll see the IRS figured an additional amount of interest and penalty for -- that payment was due with the return. There was a refund issued of $5.56 because the 185.32 payment was more than we needed to cover the tax and interest and penalty.

There was an amended return filed after the processing of the return in February 2001. It resulted in a tax decrease of $1,079, and the net result was a refund being issued of $1,179.03.

Q Please look at Government's Exhibit 14(k). What is that?

A This is an account transcript for Harold Stanley for tax year 2000.

Q Would you tell us the information about his filing

status, adjusted gross income, taxable income, and tax due and owing?

A The filing status on this year was single. Adjusted gross income was $90,310. Taxable income was $78,959. And the tax on the return was $19,163.

Q Was this return filed timely?

A It was, yes.

Q What, if any, withholding and refund or payment was made?

A There was withholding in the amount of $23,787. And the result was a refund being issued in May 2001 of $4,624.

Q I'm showing you what's in evidence as Government's Exhibit 14(l). What is that?

A This is the account transcript for Harold and Ellen Stanley for tax year 2001.

Q Could you tell us what the income numbers were and the tax due and owing in this -- for tax year 2001?

A Sure. The adjusted gross income that year was $189,080.

Q Filing status was what?

A Filing status was married filing joint. Taxable income was $156,682. Tax on the return was $38,861. And there was withholding applied to that tax in the amount of $46,218.

Q Was there a refund made to Mr. Stanley then?

A Yes. There were two refunds issued. The first one is

shown in the amount of $5,723.77 and the other refund was for $1,633.23.

Q I show you what's in evidence as Government's Exhibit 14(m). What is it?

A It's the account transcript for tax year 2002 for Harold and Ellen Stanley.

Q What income information and tax information is on this account transcript for tax year 2002?

A Filing status is married filing joint. Adjusted gross income is $1,000 -- I'm sorry -- $179,710. Taxable income is $146,740. And tax on the return is $34,433.

Q Was that tax return filed timely?

A Yes, it was.

Q April 15th of the following year?

A Yes.

Q What was the refund or payment status for tax year 2002?

A Well, there was a refund issued in the amount of $14,819.

Q I'm showing you what's in evidence as Government's Exhibit 14(n). What is that?

A This is the account transcript for tax year 2003 for Harold and Ellen Stanley.

Q What is the income information and tax due and owing for this year -- I'm sorry -- tax year 2003?

A Filing status is married filing joint. Adjusted gross income is $125,990. Taxable income is $101,600. And tax on the return was $20,140.
Q Was that tax return filed timely?
A Yes, it was.
Q Was there a refund issued that year to Mr. Stanley?
A Yes, in the amount of $1,287.
Q That's based on his withholding from his paycheck of approximately $21,000?
A That's correct.
Q I would like to show you Government's Exhibit 14(o). What is that?
A It is the account transcript for tax year 2004 for Mr. and Mrs. Stanley.
Q Could you give us the information, the financial information of adjusted gross income, taxable income, and tax on that -- for tax year 2004?
A Yes. Adjusted gross income that year was $88,140. Taxable income was $51,772. And tax on the return was $11,381.
Q Was that return filed timely by, that is, April 15th, 2005?
A It was, yes.
Q What was the tax on that, either due and owing or refunded?
A Well, the amount of withholding was applied to the tax

was less than the amount of tax withholding amount which was $11,145. There was an adjustment of the tax that reduced the amount of tax on the account. That is dated September 19th, 2005. It reduced the tax in the amount of $915. So the net result of that was a refund issued in September 2005 in the amount of $695.26.

Q Ask you to review Government's Exhibit 122. What is that?

A This is the account transcript for Mr. Stanley for tax year 2005.

Q And I believe earlier we saw Exhibit 6 which indicated a certified lack of record for 2005 and 2006; is that correct?

A That's correct.

Q How are these numbers then generated?

A These numbers were generated by the third-party reporting system that I spoke of earlier. It's information the IRS receives from payers of income.

Q So, for example, it would be the companies that Mr. Stanley was working for in 2005?

A Yes.

Q What information is on the transcript for tax year 2005?

A Well, looking at the transaction section down at the bottom, the first page, and the first transaction I see is substitute tax return prepared by IRS.

Q What does that mean?
A That means that the IRS had information showing that a return was due for that year but there was none filed. So when that happens, we contact the taxpayer and let them know we have this information showing that they received income and to either file a return or explain why they're not required to file a return for that year. What happens is normally -- if they don't respond, we'll take the information that we have that's been reported to us by the employers and we'll prepare a return for them.
Q And that's called the substitute for return?
A Yes.
Q And does it indicate whether or not there's ever been any payments made by Mr. Stanley for tax year 2005?
A There are no payments showing on the account transcript.
Q I just want to show you -- you talked about the third-party notices or third-party information that the IRS receives about income that companies pay to individuals. I ask you to look at Government's Exhibit 179 and could you tell us what that is?
A This is the information that we see on the IRS side. It's the reporting of the third-party information that I spoke of. It's called the information report program.
Q Could you sort of -- it looks like a lot of

gobbledygook up there. Could you walk us through that, please?

A Sure. The top portion of the page we're looking at it corresponds to that Form 1090 Miscellaneous that we looked at earlier, just in a different format. But the first identifying information is the recipient of the income. It's Harold Stanley. And it shows his address on line 3 and line 4. Below that is the payer information. It shows Tri-State G&T paid Mr. Stanley some income tax for 2005.

Q Where is the income information on this sheet then?

A There is -- this is kind of a summary of all of the reporting for this year, but in the second column at the bottom of what we're looking at on the screen there's an entry for nonemployee compensation, and that amount is $90,909.

Q What is the IRS' understanding of what is nonemployee compensation?

A It's income received by self-employed persons.

Q And the company, Tri-State, is making a report of that payment that's made to an independent contractor, Mr. Stanley?

A They are, yes.

Q The rest of this exhibit -- what other information is on Exhibit 179 just generically, I suppose?

A Well, the bottom half of the page we're looking at shows information on the contributions made to an IRA. So that's not information the IRS really does anything with.

Q The next page?

A On the next page shows interest payments made on a student loan. So this could be a deductible on a tax return potentially by Harold Stanley.
Q And the next page?
A The next page is a tuition statement. It's Form 1098-T issued to Harold Stanley from the University of Phoenix showing the amount of tuition paid for that year.
Q Once again, that would possibly be a deduction that Mr. Stanley could take on his taxes?
A Yes.
Q Next what's at the bottom of that page?
A The bottom of the page shows state income tax refund amount of $746 made to Harold Stanley by the Kansas Department of Revenue.
Q So that would be an income figure for Mr. Stanley in 2005?
A Yes, potentially.
Q Going to the bottom of the next page, what is that?
A This is a Form 1099 Miscellaneous issued by Mid-America Consultants to Harold Stanley showing payment of nonemployee -- or payments of nonemployee compensation in the amount of $39,376 in tax year 2005.
Q What's the line above the nonemployee compensation?
A That would show any federal withholding for taxes.
Q If you go to the last page, then, please, what is the

information that's listed at the bottom of that page? It's all one page there. Look up a little bit more, please. What is that?

A This is a 1099-R. It's issued on his retirement accounts showing there was a gross distribution of $11,863 by Mid-America Consultants to Harold Stanley in tax year 2005.

Q So that would be a withdrawal from his retirement plan?

A Yes, it would.

Q I'd like to look now at the 2006 tax year, Government's Exhibit 123. What is that 123?

A This is the account transcript for tax year 2006 for Harold Stanley.

Q What information is contained on here concerning his status and the income figures?

A It's showing it was filed as married filing separate. The adjusted gross income was $194,169. Taxable income was $187,919. There was no tax on the return.

Q What is this self-employment taxable income? What is that?

A It shows that there was a Schedule C filing included with the return, and the taxable amount of that income was $94,200.

Q What is the self-employment tax?

A The self-employment tax is a tax that's figured on the self-employment taxable amount, and that amount is $17,110.

Q Was there any indication whether or not Mr. Stanley made any payments of any tax due and owing for tax year 2006?
A No, there are no payments shown.
Q Next I want to show you Government's Exhibit 124 for tax year 2007. What is this?
A This is the account transcript for tax year 2007 for Harold and Ellen Stanley.
Q What information about income and tax due and owing is on this return?
A Adjusted gross income was $138,107. Taxable income was $120,607. Tax on the return was $16,003.
Q Does it indicate whether any payments were made by Harold or Ellen Stanley for tax year 2007?
A There are no payments made, no.
Q Could we just look at that second page? What are all -- not every one of them -- but some of these entries that are made for tax year 2007 on this transcript? What are these things that are indicated on the screen on Exhibit 124?
A Most of these transactions, dollar amounts, are assessment of penalty or interest that are owed with the return. They recalculate from time to time because we don't have the computing power to do this every day and post it on the account every day, so we assess it in the background and then periodically we'll post it to the account.
Q Towards the top there it indicates a notice issued in

several instances. What would that be?

A That notice would be the notice to let them -- at the top is CP 0059. That's a notice to let them know we have information showing that they should -- this person should file a return based on the returns filed by the employers for the companies.

The later notices are notices to let them know what the amount of tax that's owed and what our collection efforts are or might be and to let them know what the current balance due is and those payments.

Q Next I want to show you Government's Exhibit 125. What is that?

A This is the account transcript for tax year 2008. It is for Mr. and Mrs. Stanley.

Q What was the adjusted gross income and taxable income and tax due and owing in this tax year according to the transcript?

A Adjusted gross income was $239,242. The taxable income was $221,342. And the tax that was on the return was $19,311.

Q Does the transcript indicate Mr. Stanley made any payment for his tax that was due and owing for tax year 2008?

A No, it does not.

Q Once again, if you'd look, there's a number of notices listed at the top there. Just generally, what kind of paperwork is going on? What does this transcript indicate is

being sent to Mr. Stanley?

A Well, they're balance due notices letting him know this amount of tax is owed. It tells him -- instructs him on how to make the payment or contact us to go into some kind of payment arrangement. It also lets them know the possible consequences of not paying the tax, of not addressing the notice.

Q Next I want to show you Government's Exhibit 126. What is that, please?

A This is the account transcript for tax year 2009. It's for Harold Stanley.

Q What was the income information?

A Adjusted gross income --

Q Yes.

A Was $219,724. The taxable income was $209,158. Tax on the return was $19,387.

Q We saw that return, is that correct, earlier this afternoon? That was just the amount of the self-employment tax that didn't have any actual tax listed on the income?

A Right. That's why the notice specifies it's tax for the return and not necessarily the tax that was assessed with the filing of the return.

Q Does it indicate -- does the account transcript for tax year 2009 indicate whether or not Mr. Stanley ever made any payments of tax due and owing on his income of $209,000?

A There are no payments shown on this account transcript,

no.

Q Now, I'm going to show you what's been marked for identification purposes as Government's Exhibit 173. Could you tell us what that is, please?

A This is a tax filing history covering tax years 1990 through tax year 2009.

Q Does the information on that chart accurately reflect the information we've just reviewed for Mr. Stanley's tax history from 1990 through 2009?

A It does, yes.

Q Additionally, it has information about the tax due and owing from tax years 2005 through 2009; is that correct?

A That's correct.

Q Was that information -- are you familiar with that information and how it was arrived at?

A I'm not, no.

Q Next I want to show you what's -- some documents and letters that were sent to Harold Stanley from the IRS. First I'd like to show you Government's Exhibit 132. What is that?

A This is a letter dated November 4th, 2008. It is from the IRS addressed to Harold Stanley. And it's called a Notice of Deficiency.

Q What information is in this letter to Mr. Stanley from the IRS?

A Well, it lets him know the amount of tax that the IRS

is looking to assess for this tax year. It lets him know that he has the right -- from the date of this letter he has 90 days to petition the tax court, and what that does is it takes this case out of the IRS' hands and he gets to go before a tax court judge and plead his case to let that person know what their position is on this year.

Q And this is for tax year -- if you look up at the top there -- 2006?

A It is, yes.

Q It lists a deficiency of how much?

A The deficiency amount is $69,507.

Q Next I want to show you what's in evidence as Government's Exhibit 135. What is that?

A This is a Notice of Determination. It is from the IRS' Appeals Office dated January 22nd, 2010, to Harold Stanley.

Q What information is the IRS communicating to Mr. Stanley in 2010? What tax year are we talking about, first of all?

A The tax year is the same, 2006. And the second page shows the summary of the determination.

Q What is that -- please read that to us.

A "The Office of Appeals has determined that the proposed collection action is the most efficient collection at this point. A review of all information available indicates that all legal and procedural requirements have been followed. The

decision made by Compliance to pursue the issuance of a levy is appropriate. Collection alternatives are not currently a viable option."

Q Next I want to show you what's marked as Government's Exhibit 83. What is this?

A This is a Notice of Intent to Levy.

Q What does that mean?

A It means that the IRS -- that a levy issuance is submitted by the IRS in order to collect the tax shown for the tax year -- let's see. It's basically a warning letting him know that if payment's not made, payment's not received, or a payment arrangement is not agreed to, that the IRS will levy as a means to collect on the taxes owed.

Q What does a levy mean?

A It means that we'll attach to either his wages or like a bank account, just any source of income or money that a person has, the IRS will draw from those funds to pay this amount of tax off.

Q I'm sorry. What is the date of this letter?

A This letter is dated July 25th of 2012.

Q Then on the second page does it list the amounts that the IRS is informing Mr. Stanley were due and owing?

A It does, yes.

Q Look at that, please.

MR. BECKER: This is 83, second page. There we go.

Q (By Mr. Becker) What are those amounts? It looks like 2005, '7, '8, and '9; is that correct?
A That's correct.
Q Was 2006 separate from this then?
A It is, yes.
Q What are the amounts that were due and owing for those years?
A The total amount or do you want --
Q The total amount is fine.
A Total amount is $356,164.15.
Q That was the tax plus the penalty and interest?
A That's correct.
Q Next I want to show you what's in evidence as Government's Exhibit 84. What is that?
A This is a Notice of Federal Tax Lien Filing.
Q What information is being sent to Mr. -- well, Ellen Stanley and what's the date on that letter?
A The date on this letter is August 9th, 2012, and the information contained in it is regarding tax year 2007 and tax year 2008.
Q Does it list the amounts, then, that were due and owing?
A It does, yes. The amount for 2007, tax year 2007 is $60,404.70. The amount due for tax year 2008 is $89,697.59.
Q And also does it inform Mr. Stanley of his right to

contest this amount and ask for an appeal?
A Yes, it does.
Q Next I want to show you what's in evidence as Government's Exhibit 85. What is that?
A Sorry.
Q Is this a different tax year, same notice?
A Yes. Same type of notice, Notice of Federal Tax Lien. This covers tax years 2009, 2005, 2006, and it also gives the amounts of tax due on those years.
Q What's the date on this letter?
A This letter is dated August 9th of 2012.
Q Does it also inform Mr. Stanley of his right to a collections appeal?
A It does, yes.
Q Next I show you what's in evidence as Government's Exhibit 136. What is this?
A This is an acknowledgment letter from the IRS appeals office in Kansas City. It's addressed to Harold Stanley and it's dated September 20th of 2012.
Q What is the nature of this letter to Mr. Stanley?
A This letter lets him know that they've received Mr. Stanley's request for an appeal or for a hearing. It gives contact information for the office, and I believe it lets him know when he can expect to be contacted.
Q Next I want to show you Government's Exhibit 137. What

is that?

A This is a similar type of letter. This one acknowledges that the IRS Appeals Office has received Mr. Stanley's request for a collection due process hearing. It gives a date for the hearing or for a phone conference of October 31st, 2012.

Q Now, what is a collection due process hearing?

A It's one of the functions of appeals. If a person feels that the IRS didn't take proper steps allowing them to either pay the tax or contest the fact that they owe the tax, then the IRS can conduct one of these hearings.

One of the effects of this hearing -- one of the effects of the hearing is that the IRS will back off on collection action. So until the hearing is completed just to make sure that the IRS followed all their -- the correct process in an attempt to collect the tax, they'll have an appeals officer review the information of the account history to make sure that we took the right steps.

Q And so it puts a hold on the collection process until the appeal can be resolved?

A It can. However, I'm looking at the letter now. It says the legal collection period is not suspended, nor is levy action prohibited during these tax periods. So it looks like the levy -- if there is any levy action taken for these years, it would not be affected by the collection due process hearing.

Q And at the top there, who is the person to contact? Who was sending this out?
A The contact person is David Melcher.
Q And who is he at the IRS?
A He's an appeals officer.
Q I'm showing you what's in evidence as Government's Exhibit 79. What is this?
A This is a Notice of Determination from the Kansas City Appeals Office. It's dated February 25th of 2010.
Q So is this the result of the collection due process hearing?
A It is, yes.
Q And what was the page 2 -- what was the result of the collection due process hearing?
A I believe it's on page 3.
Q I'm sorry.
A Summary and recommendation.
Q Could you go through that for us, please?
A Sure. The final paragraph summarizes what the recommendation is. And that final paragraph reads, "Appeals decision is the issuance of the Notice of Federal Tax Lien and the Notice of Intent to Levy by the service was appropriate for the reasons stated below. You did not did not propose any viable collection alternatives." And in the following page gives the history of -- I'm sorry -- a history of what they

reviewed in making this determination.

Q Okay. Will you look, please, then at Government's Exhibit 141. What is that? It's also dated February 25, 2013; is that correct?

A That's correct.

Q And what is this letter?

A This is a decision letter from the Kansas City Appeals Office. It's addressed to Harold Stanley for tax periods 2005, 2007, 2008, and 2009.

Q Could you read the summary of the decision that was sent to Mr. Stanley?

A Sure. Well, the meat of the letter is in the second paragraph. It's basically stating that, "Your due process hearing request was not filed within the time frame prescribed under Section 6320 and/or 6330. However, you received a hearing equivalent to a due process hearing except that there is no right to dispute a decision by the Appeals Office in court under IRC Sections 6320 and/or 6330."

Q Now, I'd like you to review, please, Government's Exhibit 145. Could you tell the jury what that is?

A This is a transcript. It's called a complete transcript. It's from the IRS' -- the big database that we have that contains taxpayer information. This one is for Harold Stanley and it's several pages long.

Q Fifteen or 20 pages long; is that fair to say?

A Yes.

Q What's listed on this master transcript, 145?

A It has entity information. That information includes the first and last name of the taxpayer, their mailing address, different names or names used in the past, names of people they filed returns with in the past.

Q Does it indicate the type of mailings that are sent to Mr. Stanley over the course of his life as a taxpayer?

A It does. There's information in here that's specific to certain tax years.

Q So, for example, on page 6 and 7 is that tax information related to 2005?

A Yes, it is.

Q Could you tell us what information about notices is contained on page 6 or 7?

A Yes. At the bottom of this page, the first page concerning tax for 2005, on the left side there is a master file. It stands for master filed status. Each one of those numbers that follows the status is a status code, and typically we'll see -- you'll see a notice going out when the status updates. So in this case the first status is 2. There's no dollar amount next to that, but the first status it does have a dollar amount next to the status 21. It's dated March 15th of 2010. And the dollar amount next to that is $60,082.36.

And that tells me the balance due notice, the notice

letting the taxpayer know how much is owed, the amount of taxes owed for that year.

Q Does each of these entries indicate a notice, then, that is sent out if they are on a particular date? For example, if there is a column with dates there?

A Yes, typically. The 24/7 status might be a little different sometimes, but the other statuses do generate notices.

MR. BECKER: I'm going to move to a different section. Is this a good time for a break?

THE COURT: This is a good time for a break if you're at a stopping point.

It is 3:04 by the back-of-the-courtroom clock. Let's take a 15-minute break. Let's resume back at 3:20.

Is that doable, Ms. Moore?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Very well. We'll be in recess until 3:20.

(Recess taken at 3:04 p.m.)

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Mr. Becker, before we call the jury back, if you would give us your guesstimate who the witnesses are this afternoon, the last hour and a half to two hours we have left.

MR. BECKER: Yes, Judge. I anticipate Mr. Hernandez will be done on direct in about a half an hour. And then we have two other witnesses. That is Ken Ludwig from one of the employers, Mid-America Consultants, and Barry Rogers from Industrial Project Management. So that's all I have for this afternoon.

THE COURT: Okay. And my plan is to let the jury go as soon after five o'clock as possible without being disruptive to either side on direct or cross.

Are there any other issues that we should note now while the jury is out of the room?

MR. BECKER: Judge, I'm sort of focused on the witness, but I do hear things coming from counsel table, and perhaps you have a better view than I do, but I do hear sounds, not speaking sounds but, you know, coming from counsel table, and I'd ask if that's occurring, it should discontinue.

THE COURT: Okay. And I don't find that they're disruptive at this point, but I'll keep an eye out or ear out for that, but I'll note your objection for the record.

Mr. Stanley, do you have anything that you would like to -- any issues we should bring up?

MR. STANLEY: No. I think my only issues will happen in cross-examination.

THE COURT: Very good. Are you ready to bring the jury back in, Mr. Stanley and Mr. Becker?

MR. BECKER: Yes, Judge.

MR. STANLEY: Yes, Your Honor.

(The following proceedings were had in the presence of the jury:)

THE COURT: Please be seated.

Mr. Becker, you can continue with your direct.

MR. BECKER: Thank you, Judge.

RAMON HERNANDEZ resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MR. BECKER:

Q Mr. Hernandez, let's turn to documents or letters that were sent from Mr. Stanley to the IRS. I'm going to show you what's in evidence --

MR. BECKER: May I approach, Judge?

THE COURT: Yes.

Q (By Mr. Becker) -- as Government's Exhibits 16 and 16(a). Could you tell us what those are, please? First 16.

A 16 is a Form 4549. It's a report detailing proposed changes that the IRS might take on a person's account. This account we're looking at is for Harold Stanley for tax year 2006.

Q What is this next page, which I believe is 16(a)?

A 16(a) is a portion of a letter that the IRS sent dated August 25th of 2008 to Mr. Stanley. It's a Letter 1862, and the purpose of this portion of the letter is to -- if you're making a payment to the IRS, you are supposed to cut this part

out and return it with a payment. It helps us apply the payment correctly or the way the taxpayer intends to.

Q Is that is what is up on the screen?

A Yes, it is.

Q Okay. I just want to make sure. You have the actual pieces of paper there, right?

A I do.

Q Okay. And what information, then, is on the original form from the Internal Revenue Service?

A On the Letter 1862?

Q Correct. It's a little thin on the screen. We're having a hard time.

A Okay. Would you like me to read the top portion of the letter?

Q Yes, please.

A It says, "Cut here and return this portion with your correspondence. Be sure the IRS address appears in the envelope window. If you are responding to this notice with a payment, use this side of the stub. If you are responding to this notice without a payment, use the backside of this stub."

Q And what is written on this document?

A Well, first what you see on the right-hand side it states registered mail, the letters RB followed by numbers 504 232 454 and the letters US. The middle portion of the letter states, "Accepted for value. Exempt from levy. Harold

R. Stanley, 2008, September 25th. Exemption I.D." Then it lists his Social Security number. "Deposit to the United States Treasury and charged to the" -- "and charge the same to Harold R. Stanley," and it lists his Social Security number again.

Q Is that any form of payment to the IRS?

A It is not.

Q What is the next page? Income tax examination changes. I think you started to describe that originally.

A I did.

Q What is this form then?

A It details proposed changes to a person's income return if they filed one for that year. In this case it's for tax year 2006 for Harold Stanley. It totals up penalties in the amount of $24,836.51. It gives a summary of taxes down at the bottom on Item 19.

Q What is the bottom figure that was the amount due?

A The amount due was $104,038.98.

Q What is handwritten on there?

A It's the same statement, "Accepted for value. Exempt from levy. Harold R. Stanley, 2008, September 25th. Exemption I.D." And the statement, "Deposit to the U.S. Treasury and charge the same to Harold R. Stanley," and listing the Social Security number after that.

Q Let me show you Government's Exhibit 131 and 131(a).

MR. BECKER: May I approach, Judge?

THE COURT: Yes.

Q (By Mr. Becker) 131 and 131(a) I just handed you. Is that the original of the document that was sent to the IRS by Mr. Stanley?

A Yes, it is.

Q Could you describe, starting with the letter which is labeled in evidence 131, what that is?

A Sure. This is a Letter 692. It's sent from one of our examination offices. This letter is sent to Harold Stanley -- was sent to Harold Stanley. It's dated October 14th, 2009. And this letter is usually included with that Form 4549 we just looked at detailing proposed changes to a tax account.

Q Does it look like it's been returned, then, to the IRS?

A It has, yes.

Q How do you tell that?

A There are several stamps on it indicating it's been to at least three IRS offices.

Q Could you just explain those to us, please?

A Sure. The first receipt on the right-hand side with the box around it, it's received October 29th, 2008, in Memphis, Tennessee, Service Center.

Q What's the next indication of some office receiving this document?

A The next office that received it received it the

following day on October 30th of 2008, and it was then sent to a correspondence team, received by them November 3rd of 2008.

Q And it indicates -- if you look at paragraph 2, does it inform the defendant of what was due and owing for tax year 2006?

A Yes, it does.

Q And what, if anything, is handwritten on there?

A In the space below that paragraph is the statement, "Accepted," signed by Harold R. Stanley, October 27th, 2008, with the name printed Harold R. Stanley followed by his Social Security number.

Q Could you look at page 3 of Exhibit 16, please -- or of 131?

A Yes.

Q What is that?

A This is the IRS Form 1040-V. It's a payment voucher.

Q Does that indicate -- what's in Box 3?

A Box 3 is the payment amount that should be attached to the voucher. This amount -- the amount written in Box 3 is $104,262.16.

Q Could you look at page 4, which the original is 131(a). Do you have that original 131(a)?

A I do.

Q Could you just hold that up and show it to the jury, please?

A (Witness complied.)
Q Is that the top piece of paper there?
A It is. This little, small portion.
Q Is that what is depicted on the screen?
A It is.
Q Could you tell the jury what that purports to be?
A Well, it purports to be a money order in the amount of $104,262.16. It says, "Paid to the United States Treasury," memo account with Harold Stanley's Social Security number. It appears to be signed by Harold Stanley dated October 27th, 2008.
Q Next I want to show you Government's Exhibit 12. What is that?
A It's a portion of a balance due notice that the IRS sent to Harold Stanley. This is for tax year 2006.
Q Does it indicate whether or not it was received back by the Internal Revenue Service?
A It does. There are two IRS receive stamps on this.
Q Could you point those out and explain those to us, please?
A Sure. The earliest received date stamp is on the right-hand side of the paper. It's dated December 12th, 2008, showing it was received in the Cincinnati Service Center, and the next date stamp is another one of those box stamps received December 22nd, 2008. It looks like it was received in

Brookhaven on December 22nd.
Q Now, you indicated this was a voucher for payment. There's other -- the writing on there about money order and date, and so forth, on the left-hand side, is that part of the notice that's sent to the taxpayer?
A The page we're looking at?
Q Correct.
A Yes, it is.
Q Right, the page is. But what about the part where it's printed out, "Money order payment 100,000 to the U.S. Treasury"?
A No, that's not printed by the IRS.
Q And the line there for authorized representative, is that part of the IRS form?
A No, it is not.
Q And if you would look at page 2, please. Exhibit 12, page 2.
A Okay.
Q What is that?
A This is a Form 1040-V. It's an IRS form titled "Payment Voucher."
Q Did that come with the first page there of 12 that was just shown to the jury?
A Yes.
Q And finally if you'd look at page 3, please, what is

that?

A This is the envelope that was included with the correspondence, the correspondence was sent with.

Q So the IRS in some instances keeps the envelope as well; is that right?

A They do sometimes, yes.

Q Next I want to show you Government's Exhibits 11 and 11(a). If you look at page 11, please -- Government's Exhibit 11, page 1. What is that?

A This is a portion of -- it looks like part of a 4549. It's giving a computation of interest that's owed.

Q And this is one of the notices you were talking about earlier where we looked at the transcript, is that right, that's periodically sent out to the taxpayer?

A Yes, I believe so.

Q Could you tell from this when it was received by the IRS?

A Yes. The earliest date stamp I see on this page is March 13th of 2009.

Q Could you tell where it's received by the IRS?

A By the IRS office in Philadelphia.

Q Then what's the date stamp in the upper right-hand corner?

A That is a different office. That's an office in Ogden, Utah. It was received July 1st, 2009.

Q Is that the Frivolous Return Program?
A It is.
Q And what is handwritten on this document?
A Handwriting is, "Autograph by," and it gives the statement, "Accepted for value, Harold R. Stanley, authorized representative," and the name again, Harold R. Stanley, with his Social Security number below that.
Q What's page 2 of Government's Exhibit 11?
A This is another purported money order.
Q Did that come with the -- altogether with the first page of this document?
A It did, yes.
Q Next I want to show you Government's Exhibit 15. What is that?
A This is a letter from Harold Stanley addressed to the IRS ACS Support Group in Cincinnati, Ohio.
Q And could you read paragraph -- I guess it would be starting, "Your Letter 1058"?
A Yes. "Your Letter 1058, Revision 05-2002, LT-11, is herewith accepted for value by myself as the authorized signatory for Harold R. Stanley, with all related endorsements front and back, and returned to you with evidence of acquittance provided with your voucher for settlement, closure, and setoff in amount specified as owed on the face of the aforesaid voucher under public policy for settlement of tax

year ending December 31st, 2006. Please bill Harold R. Stanley for any additional obligation not tabulated at the time of this payment."

Q If you'd look then at 15(a), which is the payment voucher that came with this document, front and back. What is the writing on there?

A The writing at the bottom is, "Pay to the order of Department of Treasury." It looks like it's signed Harold R. Stanley.

Q What's on the back of that payment voucher?

A It's a statement, "By Harold R. Stanley, authorized signatory for settlement, closure, and setoff of this presentment."

Q 15(a). Let's take a look at what's up on the screen, then, as part of this -- this was, I believe, one of the earlier documents that was sent to Mr. Stanley. Is this a document that would have been sent out to Mr. Stanley as part of the tax process?

A Yes, as part of the collection process.

THE COURT: What's the exhibit number?

MR. BECKER: This is part of Exhibit 15.

THE COURT: Thank you.

Q (By Mr. Becker) And what's the date of this letter to Mr. Stanley?

A This letter is dated July 6th of 2009.

Q And what is written on this document?
A It's written, "Accepted for value and returned for value for settlement, closure and setoff. Date: September 27th, 1953, Harold R. Stanley."
Q And then if you'd go two pages further in this document, Request for a Collection Due Process. First of all, is there a date stamp when this is received?
A Yes, there is. It's August 12th, 2009.
Q Where is that received?
A At the Cincinnati Compliance Center.
MR. BECKER: If you'd scroll up a little bit, please. Up.
Q (By Mr. Becker) Okay. What is this document?
A It's a document used by the person that's being -- that's been in contact with collections. It's used to request an equivalent hearing or collection due process hearing.
Q And is that the process we were talking about earlier with the correspondence from Mr. Melcher, the appeals process?
A Yes, it is.
Q Next I want to show you what's in evidence as Government's Exhibit 133. I'll hand you a hard copy here, the original. Could you tell the jury what this is, please?
A This is a letter from Harold Stanley. It's dated November 23rd, 2009, addressed to L. Silva, settlement officer with appeals out of Fresno, California, with the IRS.

Q And what was Ms. Silva's role in the collections process?
A I believe that was when the settlement officer from appeals who was considering the collection due process request.
Q Could you look at -- have you reviewed this letter? Basically is it a recap that Mr. Stanley's providing to the collections officer of the process that he believes has been occurring?
A It is, yes.
Q I show you what's marked as Government's Exhibit 134. What is that?
A This is a letter dated November 25th, 2009. It's addressed to L. Silva, settlement officer of appeals, IRS in Fresno, California.
Q What is Mr. Stanley setting forth in this letter to the IRS? Is it basically a recap of his dealings with Ms. Silva?
A It is, yes.
Q Next I want to show you Government's Exhibit 81. What is that?
A This is a request for a collection due process hearing made by Harold Stanley for the tax years listed below at the bottom of the form.
Q Could you look at page 2 of that, please.
MR. BECKER: If I may approach, Judge. Here is the original of the document.

THE COURT: Yes.

Q (By Mr. Becker) What's the backside of the first page?

A Well, it's a continuation of the first page of the request for a collection due process form. There's a box that lists a reason for the request. And the reason listed on this page, on this page of the form is, "Tax liabilities settled per U.C.C. 2006 currently before Eighth Circuit Court of Appeals, Case 12-1914."

Q And next to the taxpayer signature what's the date on that?

A It's dated August 29th of 2012.

Q Next I want to show you Government's Exhibit 78.

MR. BECKER: If I may approach?

Q (By Mr. Becker) I'll hand you the original. What is that?

A This is correspondence from Harold Stanley. It was received by the Kansas City Appeals Office on October 30th of 2012. It's addressed to David Melcher.

Q And it has a number of pages. I'd like to go through them with you. First of all, page -- the first page is just the correspondence; is that right?

A That's right.

Q And could you read the second to the last paragraph?

A "Attached are copies of documents responding to presentments from the IRS for the subject tax years. No

original signed document has been returned by the IRS, and no notice of dishonor identifiable with these documents has been received from the IRS. The liabilities are therefore" -- I'm sorry -- "the liabilities therefore stand settled under the Uniform Commercial Code."

Q So if you'd look at the next page, please, does it break down, then, the attached documents for tax years 2005, 2007, 2008, and 2009? We can go through them. That's all right. If you look, please, at --

A Yes, it does.

Q -- page 6 and 7 of this document. What is on these pages?

A It's calculations of the amount owed for tax year 2005.

Q I'm sorry. Let's just go back to page 3 and go through them.

So we have the cover page was the letter from Mr. Stanley; is that right?

A Yes.

Q Then there's a page labeled "Tax Year 2005"?

A Yes.

Q What is the next page after that?

A It is a copy of the -- one of the balance due notices for tax year 2005.

Q That was mailed to the service center in Ogden, Utah?

A Yes.

Q What's the bottom part of that page?
A The bottom part of the page, it looks to purport to be a money order of some type of payment. It has language of, "Pay to the order of Department of the Treasury, sixty-three thousand dollars and no cents," signed Harold R. Stanley, authorized representative.
Q Would you look at the next page, please. What is that?
A There's a statement on the back of what we just looked at. It says, "Pay to the order of United States Treasury, Harold R. Stanley, authorized representative, for settlement and closure of this presentment."
Q What's the voucher on the bottom of that page?
A It's a payment voucher for tax year 2005 with Harold Stanley with the payment amount of $63,000.
Q Then next, page 6. Is this a notice that's sent to Mr. Stanley concerning tax year 2000 -- I'm sorry. What tax year? Tax year 2005?
A Yes, it is.
Q And what is the information to Mr. Stanley starting with the amount owed and going down from there?
A Well, it calculates the amount owed out to the date of September 13th of 2010, and as of that date the amount owed would have been $61,641.37.
Q It's a little hard to read. Could you read the next part for us, please?

A Sure. "You have a past due tax balance for 2005. By law, we must tell you each year how much you owe. We will send you a notice for each tax year for which you still owe." And below that it gives directions on how to make a payment.
Q Could you read that to us, please?
A Sure. "If you can make a payment: No. 1. Make your check or money order payable to the United States Treasury. Write tax year 2005 and this Social Security number on your payment.
"No. 2. Complete and detach the payment stub at the end of this notice.
"No. 3. Send the stub and your payment in the enclosed envelope."
And there's an additional statement after that, "If you can't pay the full amount owed: No. 1. Pay as much as you can now.
"No. 2. Review the payment options listed on the back of this page.
"No. 3. Call us at 1-800-829-3903 if you want to discuss payment options for the amount not paid."
Q Could we look at the next page, please, payment options?
A Sure.
Q Could you read that to us, please?
A Yes. "Payment options. The following payment options

may be available to you. Please call us at 1-800-829-3903 to discuss these options and make payment arrangements. To see if you are eligible for an online payment agreement, go to http://www.irs.gov and check on 'More Online Tools' and then 'Online Payment Agreement.'

"No. 1. Installment agreement.

"No. 2. Automatic deductions from your checking account.

"No. 3. Payroll deductions.

"No. 4. Credit card payments."

Q And what is handwritten on there?

A It's written, "Accepted for value and returned for value." Signed Harold R. Stanley.

Q We'll move ahead to tax year 2007. Look at page 11 and 12 of Government's Exhibit 78.

A Okay.

Q Yes. What is on this page for tax year 2007?

A First thing I see is a statement by Harold R. Stanley, "Authorized signatory for settlement, closure and setoff of this presentment." And attached is one of our balance due notices, CP 504, for tax year 2007 showing the amount due of $52,168.33.

Q Would you look at the next page, please?

A Yes.

Q What is the tax year there and what is the document

that was sent to Mr. Stanley?

A The tax year is 2007. The notice sent to Mr. Stanley is CP 504. It's a warning of the IRS' intent to levy, to collect taxes.

Q What is written on there?

A What's written is, "Accepted for value and returned for value for settlement, closure and setoff, dated September 27th, 1953 by Harold R. Stanley."

Q Next we look at 2008, page 16 of Government's Exhibit 78.

A 2007 or 2008? I'm sorry.

Q 2008. I'm sorry.

A 2008?

Q It you look at 78(c). What tax year is that?

A This is tax year 2007.

Q Okay. And what information, again, is being -- this is the one we just looked at 2007, right?

A Yes.

Q And then if you look at Government's Exhibit 78(d), as in David, what is that?

A This is a portion of the letter that's been returned to the IRS. It states, "Pay to the order of Department of the Treasury, ninety-six thousand dollars and no cents," signed Harold R. Stanley, authorized representative. It is a notice that was dated November 1st, 2010, sent by the IRS.

Q This is part of the letter that was sent to Mr. Melcher in October of 2012?
A Yes.
MR. BECKER: I have no further questions at this time, Judge.
THE COURT: Mr. Stanley, are you ready for cross-examination?
MR. STANLEY: Yes, I am, Your Honor.
THE COURT: Can you come to the lectern.
CROSS-EXAMINATION BY MR. STANLEY:
Q Good afternoon, Mr. Hernandez.
A Good afternoon.
Q Very early in your testimony Mr. Becker asked you about the IRS seal that gets affixed to documents to certify them. So is that -- does that make you personally liable for the accuracy of the transcripts when you sign that? Who stands personally liable for the accuracy?
A I'm not sure about that. The certifying official, which is not me. I prepare the documents to be certified, but one of the listed certifying officials in the office include my boss and the managers underneath my boss.
Q All right. Thank you.
So then they would be personally responsible for any errors in the transcripts?
A I believe so. They're signing that it is a true and

accurate document.

Q Thank you.

So is it -- did I understand you on Exhibits 8 and 9, which were Forms 1040 from, I believe, 2007 and '8, the red markings on there, that's a standard process to deface taxpayers' forms before scanning? Is that --

A It is a red pen that's used mainly by one function of the IRS, the accounts management function, and it's that color for a reason so we know it was not included with the return but that it is a correction being made to the return, and the only purpose of that is to help with the processing the return, because we -- in processing they do everything they can to not have to send back a return and get the information that was received by IRS through the system and processed.

Q All right. Thank you.

I'd like to return for just a minute to the transcript of 1998, which I wrote down as being Exhibit 14(i). Hopefully I kept those in sync.

A 1998?

Q Yeah, 1998. And I'm kind of interested in the second or third page where you were talking about the adjustments, and I believe you indicated that the top line suggested that there was income that wasn't reported on the form. Did I understand you to say that correctly?

A That's usually what it means, yes.

Q But the only adjustments on that page were negative numbers -- well, there may have been some positive numbers below but the next entry was a negative number for the amended return.
A That's correct.
Q Okay. So if there had been unreported income, shouldn't it have been showing up as a positive tax liability instead of the first thing being a negative liability perhaps?
A Perhaps. But that's not always the case. The IRS keeps statistics on the number of times that we examine or audit returns, and where the end result is actually money found that's owed to the taxpayer. I've seen that on irs.gov website and it's pretty interesting to me. I've examined returns where I found deductions that weren't claimed in the original filing and issued refunds instead of notices saying that you owe the IRS this amount of money. It's not common, though.
Q All right.
THE COURT: Mr. Stanley, I think it would be helpful to put the documents up. I would ask the government's assistance to help you.
MR. STANLEY: Thank you, Your Honor. Thank you, Your Honor.
Q (By Mr. Stanley) You mentioned the substitute for returns in the vicinity of Exhibits 122 and 123 which regard tax years 2005 and '6 and I'm not -- we don't need to refer to

those specifically, but you mentioned substitute for return. Who prepares that substitute for return under penalty of perjury?

A It would be, I believe, a revenue officer with signing authority for that.

Q Okay.

A I'm sorry. You need to direct that to a revenue agent.

Q Okay. So are you familiar with where they get their statutory authority to do that?

A Not really. The only thing I know about that it's the code section that they cite which is 6020(b) of the Internal Revenue Code.

Q Now, on the -- there was a master transcript. I wanted to say that it was 145. Yeah, there is. It is 145, complete transcript. Should that have contained a record of the 3175-C, frivolous filing form, had been -- or frivolous -- yeah, frivolous form had been issued?

A It would not. They maintain a separate database.

Q All right. So then that's a question more appropriate for the lady from your frivolous returns department then?

A Yes, sir.

Q All right. I'll save that for her then.

All right. Thank you, Mr. Hernandez.

Thank you, Your Honor.

THE COURT: Do you have any redirect?

MR. BECKER: No, Your Honor.
THE COURT: Thank you.
You may stand down.
(Witness excused.)
(The testimony of Kenneth Ludwig and Barry Rogers was had but is not herein included.)
(The following proceedings were had in the courtroom out of the presence of the jury:)
THE COURT: It was brought to my attention that today there was a filing, Document 121. It appears to be respectfully submitted by Rodney Dale Class and Carl Weston. I'll ask the defendant, are you aware of this filing?
MR. STANLEY: I heard the discussion of something being dropped here and identified as being from Mr. Class and Mr. Weston.
THE COURT: So was this not a filing by you? I'm trying to determine if there needs to be any ruling made by the Court or is this --
MR. STANLEY: It's not a filing by me, not prepared by me, not from me.
THE COURT: Very well.
Mr. Becker, do you know of any reason why the Court needs to make any type of a finding as to Document 121 or are you not aware of the --
MR. BECKER: I think that's what was dropped on the

ground. At lunch I had someone print it out. I believe if Mr. Stanley says it's not one of his pleadings, it should be stricken from the record. These are not parties to the case.

THE COURT: Very well. Document 121 will be stricken, and for the record it's a 40-page document entitled "Judicial Impeachment Notice." Any relief requested will be denied and this document will be stricken from the record.

Any other issues that have come to your attention, Mr. Becker?

MR. BECKER: No, Judge. If there's -- I anticipate if there's no cross-examination of the other witnesses employee -- employer witnesses, we'll move right along in the morning.

THE COURT: Very well. I have you currently listing 14 witnesses, if you don't take into account custodian of witnesses, and made it through three, so you may put on 11 witnesses or you don't know.

MR. BECKER: No, no. I have eight more.

THE COURT: Eight more. Okay. Mr. Stanley, do you have any issues that have been brought to your attention that we need to take up?

MR. STANLEY: I believe I've addressed them in cross-examination, so I have no other issues at this moment.

THE COURT: Okay. I will plan to prepare the Court's instruction packet maybe even overnight to give to the

parties. I think today there may have been a filing of a government's requested --

MR. BECKER: Yes, Judge. In response to Mr. Stanley's jury instructions that he submitted to the Court, one of which was a good-faith instruction, the government submitted an alternative good-faith instruction that is based on the Eighth Circuit pattern jury instruction for tax cases. Although right now it's the government's position there's no evidence to support such an instruction.

THE COURT: Very well. And I want to make sure that Mr. Stanley checks filings each day in case something is filed over the evening.

And as I think I mentioned in one of my pretrial discussions that the basic rule of thumb is that the approved instructions or the model instructions is the Court's starting point, and so for any instructions that you may have that deviate from the model, if you could be prepared to argue why there's a need for the deviation and supporting case law, that would be appreciated.

Very well. We'll be in recess. And if the parties can be here at five minutes before nine o'clock ready to go at nine.

Thank you. Have a good evening.

(Court adjourned at 4:45 p.m. until 9 a.m. Tuesday, June 1, 2016.)