UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| vs. | ) | Case No. 15-00271-01-CR-W-RK |
| HAROLD R. STANLEY, Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME II
BEFORE THE HONORABLE ROSEANN KETCHMARK
UNITED STATES DISTRICT JUDGE
JUNE 1, 2016
KANSAS CITY, MISSOURI

FOR THE PLAINTIFF:
MR. PAUL S. BECKER
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Floor 5
Kansas City, Missouri 64106

DEFENDANT APPEARING PRO SE:
MR. HAROLD R. STANLEY
P.O. Box 1236
Oologah, Oklahoma 74053

STANDBY COUNSEL:
Mr. F. A. White, Jr.
7924 North Cherry Street
Kansas City, Missouri 64118

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106



Case 4:15-cr-00271-RK Document 144 Filed 07/18/16 Page 1 of 178

INDEX

MAY 31, 2016


| | Page |
|---|---|
| Pretrial conference. . . . . . . . . . . . . . . . . . . . . | 17 |
| DEFENDANT'S OFFER OF PROOF | |
| CARL WESTON | |
| Direct examination by Mr. Stanley . . . . . . . . . . . | 31 |
| RODNEY D. CLASS | |
| Direct examination by Mr. Stanley . . . . . . . . . . . | 37 |
| GOVERNMENT'S EVIDENCE | |
| RAMON HERNANDEZ | |
| Direct examination by Mr. Becker. . . . . . . . . . . . | 66 |
| Cross-examination by Mr. Stanley. . . . . . . . . . . . | 132 |

## I N D E X
(continued)

Page

JUNE 1, 2016

JANICE WILLARD
Direct examination by Mr. Becker. . . . . . . . . . . . 155
Cross-examination by Mr. Stanley. . . . . . . . . . . . 176

SHAUNA HENLINE
Direct examination by Mr. Becker. . . . . . . . . . . . 177
Cross-examination by Mr. Stanley. . . . . . . . . . . . 191
Redirect examination by Mr. Becker. . . . . . . . . . . 198

WENDELL THOMAS
Direct examination by Mr. Becker. . . . . . . . . . . . 219
Cross-examination by Mr. Stanley. . . . . . . . . . . . 229

DAVID MELCHER
Direct examination by Mr. Becker. . . . . . . . . . . . 236
Cross-examination by Mr. Stanley. . . . . . . . . . . . 253

RICHARD LITTRELL
Direct examination by Mr. Becker. . . . . . . . . . . . 256
Cross-examination by Mr. Stanley. . . . . . . . . . . . 293
Redirect examination by Mr. Becker. . . . . . . . . . . 298
Recross-examination by Mr. Stanley. . . . . . . . . . . 299

Defendant's opening statement. . . . . . . . . . . . . . . . 309

INDEX
(continued)

Page

JUNE 2, 2016


Conference out of the hearing of the jury. . . . . . . . . . 333

DEFENDANT'S EVIDENCE

HAROLD R. STANLEY
Direct testimony of the defendant . . . . . . . . . . . 356
Cross-examination by Mr. Becker . . . . . . . . . . . . 362
Redirect testimony of the defendant . . . . . . . . . . 377

Defendant's closing argument . . . . . . . . . . . . . . . . 392

INDEX OF EXHIBITS


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE GOVERNMENT: | | | |
| 5 | Treasury regulation | 298 | 298 |
| 6 | Certification of lack of record | 75 | 76 |
| 8 | 2007 Form 1040 | 75 | 76 |
| 9 | 2008 Form 1040 | 75 | 76 |
| 10 | 2009 Form 1040 | 75 | 76 |
| 11 | Mailing to IRS | 75 | 76 |
| 11(a) | Payment document | 75 | 76 |
| 12 | Mailing to IRS | 75 | 76 |
| 14 | IRS account transcripts | 75 | 76 |
| 14(a) | 1990 account transcript | 75 | 76 |
| 14(b) | 1991 account transcript | 75 | 76 |
| 14(c) | 1992 account transcript | 75 | 76 |
| 14(d) | 1993 account transcript | 75 | 76 |
| 14(e) | 1994 account transcript | 75 | 76 |
| 14(f) | 1995 account transcript | 75 | 76 |
| 14(g) | 1996 account transcript | 75 | 76 |
| 14(h) | 1997 account transcript | 75 | 76 |
| 14(i) | 1998 account transcript | 75 | 76 |
| 14(j) | 1999 account transcript | 75 | 76 |
| 14(k) | 2000 account transcript | 75 | 76 |
| 14(l) | 2001 account transcript | 75 | 76 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 14(m) | 2002 account transcript | 75 | 76 |
| 14(n) | 2003 account transcript | 75 | 76 |
| 14(o) | 2004 account transcript | 75 | 76 |
| 15 | Mailing to IRS | 75 | 76 |
| 15(a) | Payment document | 75 | 76 |
| 16 | Mailing to IRS | 75 | 76 |
| 16(a) | Accepted for value document | 75 | 76 |
| 18 | IRS revenue agent report | 167 | 167 |
| 20 | IRS summary of changes | 172 | 172 |
| 21(a) | Summary of compensation and expenses | 170 | 170 |
| 22 | 11/21/08 Bio Pappel check and invoice | 65 | 66 |
| 23 | 7/15/09 Bio Pappel check and invoice | 65 | 66 |
| 26 | 2008 Bio Pappel 1099 | 65 | 66 |
| 27 | 2009 Bio Pappel 1099 | 65 | 66 |
| 30 | Mid America payments | 65 | 66 |
| 31 | Mid America invoices | 65 | 66 |
| 32 | 2005 Mid America 1099 | 65 | 66 |
| 33 | 2006 Mid America 1099 | 65 | 66 |
| 34 | 2007 Mid America 1099 | 65 | 66 |
| 35 | 2008 Mid America 1099 | 65 | 66 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 36 | 2010 Mid America 1099 | 65 | 66 |
| 37 | 2011 Mid America 1099 | 65 | 66 |
| 38 | 2005 Tri-State invoices, checks, documentation | 65 | 66 |
| 39 | 2006 Tri-State invoices, check, documentation | 65 | 66 |
| 40 | 2007 Tri-State invoices, checks, documentation | 65 | 66 |
| 41 | 2008 Tri-State invoices, checks, documentation | 65 | 66 |
| 42 | 2009 Tri-State invoices, checks, documentation | 65 | 66 |
| 47 | 2005 Tri-State payment log | 65 | 66 |
| 48 | 2006 Tri-State payment log | 65 | 66 |
| 49 | 2007 Tri-State payment log | 65 | 66 |
| 50 | 2008 Tri-State payment log | 65 | 66 |
| 51 | 2009 Tri-State payment log | 65 | 66 |
| 52 | 2010 Tri-State payment log | 65 | 66 |
| 53 | 2011 Tri-State payment log | 65 | 66 |
| 54 | 2012 Tri-State payment log | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 55 | 2013 Tri-State payment log | 65 | 66 |
| 56 | 2005 Tri-State 1099 | 65 | 66 |
| 57 | 2006 Tri-State 1099 | 65 | 66 |
| 58 | 2007 Tri-State 1099 | 65 | 66 |
| 59 | 2008 Tri-State 1099 | 65 | 66 |
| 60 | 2009 Tri-State 1099 | 65 | 66 |
| 61 | 2010 Tri-State 1099 | 65 | 66 |
| 62 | 2011 Tri-State 1099 | 65 | 66 |
| 63 | 2012 Tri-State 1099 | 65 | 66 |
| 64 | 2013 Tri-State 1099 | 65 | 66 |
| 66 | 2/5/07 Industrial Project Management invoices and payments | 65 | 66 |
| 67 | 2/26/07 Industrial Project Management invoices and payments | 65 | 66 |
| 68 | 3/22/07 Industrial Project Management invoices and payments | 65 | 66 |
| 69 | 4/10/07 Industrial Project Management invoices and payments | 65 | 66 |
| 70 | 4/27/07 Industrial Project Management invoices and payments | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 71 | 5/21/07 Industrial Project Management invoices and payments | 65 | 66 |
| 73 | 2010 Emerson Electric 1099 | 65 | 66 |
| 74 | 2011 Emerson Electric 1099 | 65 | 66 |
| 75 | 2012 Emerson Electric 1099 | 65 | 66 |
| 76 | 2013 Emerson Electric 1099 | 65 | 66 |
| 78 | 10/29/12 letter | 75 | 76 |
| 78(a) | Payment document | 75 | 76 |
| 78(b) | 2005 IRS notice | 75 | 76 |
| 78(c) | 2007 IRS notice | 75 | 76 |
| 78(d) | Payment document | 75 | 76 |
| 79 | Notice of determination | 75 | 76 |
| 81 | Request for collection, due process | 75 | 76 |
| 83 | Notice of Intent to Levy | 75 | 76 |
| 84 | Notice of tax lien | 75 | 76 |
| 85 | Notice of tax lien | 75 | 76 |
| 86 | IBC Bank signature card | 65 | 66 |
| 87 | IBC Bank statements | 65 | 66 |
| 87(a) | 9/11 statement | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87(b) | 5/12 statement | 65 | 66 |
| 87(c) | 1/13 statement | 65 | 66 |
| 88 | The Hartford account | 65 | 66 |
| 89 | Ally Bank sale contract | 65 | 66 |
| 90 | Ally Bank payment log | 65 | 66 |
| 91 | Ally Bank checks | 65 | 66 |
| 92 | Ally Bank GMAC application | 65 | 66 |
| 93 | Ally Bank 5/30/12 letter | 65 | 66 |
| 94 | Tri-State contracts | 65 | 66 |
| 94(a) | 1/08 Tri-State contract | 65 | 66 |
| 95 | Freedom Electric payments 2005-2013 | 65 | 66 |
| 96 | 2012 Freedom Electric 1099 | 65 | 66 |
| 97 | 2013 Freedom Electric 1099 | 65 | 66 |
| 98 | Freedom Electric invoices | 65 | 66 |
| 99 | Bank of America loan history | 65 | 66 |
| 100 | Bank of Oklahoma loan information sheet | 65 | 66 |
| 101 | Bank of Oklahoma loan application | 65 | 66 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 102 | Bank of Oklahoma HUD settlement statement | 65 | 66 |
| 103 | CitiMortgage statements | 65 | 66 |
| 104 | Community Bank of Raymore signature card | 65 | 66 |
| 105 | Community Bank of Raymore statements | 65 | 66 |
| 106 | Community Bank of Raymore offsets | 65 | 66 |
| 106(a) | Check No. 1032 | 65 | 66 |
| 106(b) | Check No. 1057 | 65 | 66 |
| 106(c) | Check No. 1119 | 65 | 66 |
| 106(d) | Check No. 1203 | 65 | 66 |
| 106(e) | Check No. 1141 | 65 | 66 |
| 106(f) | Check No. 1193 | 65 | 66 |
| 106(g) | Check No. 1103 | 65 | 66 |
| 106(h) | Check No. 1117 | 65 | 66 |
| 106(i) | Check No. 1315 | 65 | 66 |
| 106(j) | Check No. 1149 | 65 | 66 |
| 106(k) | Check No. 1290 | 65 | 66 |
| 106(l) | Check No. 1016 | 65 | 66 |
| 106(m) | Check No. 1100 | 65 | 66 |
| 106(n) | Check No. 1047 | 65 | 66 |
| 106(o) | Check No. 1308 | 65 | 66 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 106(p) | Check No. 1323 | 65 | 66 |
| 106(q) | Check No. 1056 | 65 | 66 |
| 106(r) | Check No. 1116 | 65 | 66 |
| 106(s) | Check No. 1055 | 65 | 66 |
| 106(t) | Check No. 1147 | 65 | 66 |
| 106(u) | Check No. 1175 | 65 | 66 |
| 106(v) | Check No. 1265 | 65 | 66 |
| 106(w) | Check No. 1110 | 65 | 66 |
| 106(x) | Check No. 1344 | 65 | 66 |
| 106(y) | Check No. 1237 | 65 | 66 |
| 106(z) | Check No. 1039 | 65 | 66 |
| 107 | Community Bank of Raymore offsets | 65 | 66 |
| 108 | Fidelity Insurance account setup | 65 | 66 |
| 113 | John Deere Financial acccount summary | 65 | 66 |
| 114 | John Deere contract | 65 | 66 |
| 115 | P&K Equipment records | 65 | 66 |
| 116 | P&K Equipment, John Deere revolving credit application | 65 | 66 |
| 117 | Rogers County, OK tax payments | 65 | 66 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 118 | Wells Fargo Bank signature card | 65 | 66 |
| 120 | Wells Fargo Bank application and signature card | 65 | 66 |
| 121 | Wells Fargo Bank statements | 65 | 66 |
| 122 | 2005 transcript of account | 75 | 76 |
| 123 | 2006 transcript of account | 75 | 76 |
| 124 | 2007 transcript of account | 75 | 76 |
| 125 | 2008 transcript of account | 75 | 76 |
| 126 | 2009 transcript of account | 75 | 76 |
| 131 | 10/29/08 mailing | 75 | 76 |
| 131(a) | Payment document | 75 | 76 |
| 132 | Notice of deficiency | 75 | 76 |
| 133 | 11/23/09 letters and attachments | 75 | 76 |
| 134 | 11/25/09 letter | 75 | 76 |
| 135 | Notice of determination | 75 | 76 |
| 136 | 9/20/12 letter | 75 | 76 |
| 137 | 10/15/12 letter | 75 | 76 |
| 141 | 2/25/13 decision letter | 75 | 76 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 145 | Complete account transcript | 75 | 76 |
| 154 | Letter 3175C | 183 | 183 |
| 155 | Frivolous Return Program input form | 180 | 180 |
| 156 | Letter 3175 template | 186 | 187 |
| 162 | Summary of mortgage payments | 274 | 274 |
| 164 | Summary of GMAC/Ally payments | 272 | 272 |
| 165 | Summary of John Deere payments | 282 | 282 |
| 166(a) | Summary of compensation | 159 | 159 |
| 167(a) | Summary of reimbursed expenses | 162 | 162 |
| 168(a) | Summary of business expenses | 163 | 163 |
| 169(a) | Summary of payments | 164 | 166 |
| 170 | Timeline of events | 289 | 289 |
| 172 | Summary of events and correspondence | 290 | 292 |
| 173 | Filing history diagram | 284 | 284 |
| 175 | Blank Form W-2 | 71 & 75 | 71 & 76 |
| 179 | 2005 wage and income transcript | 75 | 76 |
| 180 | 2006 wage and income transcript | 75 | 76 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 184 | Postal money order | 222 | 222 |
| 185 | Bank money order | 223 | 223 |
| 186 | Wells Fargo checks | 65 | 66 |
| 186(a) | Check No. 1508 | 65 | 66 |
| 187 | Wells Fargo checks | 65 | 66 |
| 187(a) | Check No. 1515 | 65 | 66 |
| 187(b) | Check No. 1507 | 65 | 66 |
| 187(c) | Check No. 1048 | 65 | 66 |
| 187(d) | Check No. 1155 | 65 | 66 |
| 187(e) | Check No. 1509 | 65 | 66 |
| 188 | Form 3949A | 262 | 262 |
| 189 | Photograph | ADMITTED 6/1/16 | |
| 190 | Photograph | ADMITTED 6/1/16 | |
| 191 | Photograph | ADMITTED 6/1/16 | |
| 192 | Photograph | ADMITTED 6/1/16 | |
| 193 | Photograph | ADMITTED 6/1/16 | |
| 194 | Photograph | ADMITTED 6/1/16 | |
| 198 | McKinley Paper report | ADMITTED 6/1/16 | |
| 199 | Photograph | ADMITTED 6/1/16 | |
| 200 | Photograph | ADMITTED 6/1/16 | |
| 202 | Summary of tax due and owing | 175 | 175 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 203 | Summary of payments to Cass County Collector | 286 | 286 |
| FOR THE DEFENDANT: | | | |
| 1 | Form 3949A | 356 | 356 |
| 2 | 8/2/09 letter | 358 | 358 |
| 6 | 7/15/09 letter | 360 | 360 |
| 9 | 11/5/12 letter | 361 | 361 |

JUNE 1, 2016

(The testimony of Brian Rychener, Terry L. Prince, and Isaac Rosas was had but is not herein typed.)

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Mr. Becker, are you ready to have the jury brought in?

MR. BECKER: Yes, Judge.

THE COURT: Ms. Moore.

MR. BECKER: Just for scheduling purposes, we have two witnesses this morning. Hopefully we'll make it somewhat close to noon.

THE COURT: Okay. If we need to take an earlier lunch, that's doable. Isn't it?

THE COURTROOM DEPUTY: Yes.

(The following proceedings were had in the presence of the jury:)

THE COURT: Please be seated.

Mr. Becker, are you ready to call your next witness?

MR. BECKER: Yes, Your Honor.

United States calls Janice Willard.

THE COURT: Please come up to the screen and stand and be sworn.

JANICE WILLARD, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good morning.
A Good morning.
Q Please state your name and spell your last name.
A Janice Willard, W-i-l-l-a-r-d.
Q Ms. Willard, how are you employed?
A I work for the Internal Revenue Service.
Q How long have you been doing that?
A Twenty-eight years.
Q What's your educational background?
A I have an associate's degree from Johnson County Community College and a bachelor of science in accounting from University of Missouri-Kansas City.
Q And any -- are you also a CPA?
A I am.
Q How long have you been at the IRS?
A Twenty-eight years.
Q Could you give us a brief history of, I guess going backwards, from where you are now to where you started?
A Sure. Of those 28 years, 24 of them have been as a revenue agent. The other four years I worked on the detail appeals where I prepared settlement reports when the case was resolved, and then another about three and a half years in the Stakeholder, Partnerships, Education and Communication Division, which I worked on individual income tax, education-type issues, and also worked with local partners in

providing voluntary income tax assistance within the community. So that's four years.

The other 24 have been as a revenue agent where my primary responsibility is to audit tax returns, and the last ten years I've been in a specialized group where primarily I support the criminal investigation function within the IRS.

Q In terms of as a revenue agent, what's the process of how matters are brought to your attention? I guess it's part now of the special enforcement group. What would that be?

A There's multiple types of duties that I perform. There's regular examinations where I receive the return for audit, do the entire examination myself. So contact with the taxpayer, request records, interview them, review the records and determine if there's any issues.

There's also cooperating agent requests in which criminal investigation has started a case, and I'm assigned to assist them in review of records and determination of any tax issues.

Q Was that the type of referral you received, then, for Harold Stanley?

A Yes.

Q Did you prepare the tax calculations, then, for Harold Stanley for tax years 2005 through 2009?

A I did.

Q What source documents -- how do you go about making the

determination of the tax that Mr. Stanley had due and owing from 2005 through 2009?

A You look at various things such as filing status, exemptions, whether they're allowed itemized deductions or standard deduction for business income. We looked at the 1099s that we received from the companies that paid Mr. Stanley for services. We looked through bank account information to determine potential business expenses to allow them.

We have calculated, I guess, conservative tax amounts. We've given him some expenses that may or may not be business, but we've allowed it. So that's kind of a general idea.

Q Can you take a look and were you able to determine whether or not Mr. Stanley filed tax returns in 2005, 2006, 2007, 2008, and 2009?

A Mr. Stanley filed tax returns for 2007, 2008, and 2009. No returns were filed for 2005 and 2006.

Q So how did you go about determining his income for those years?

A For 2007 through '9 the filed returns, we looked at the returns to determine what was reported. For all the years we looked at the 1099 information, which those are forms that are issued by a company who's paid Mr. Stanley for services. We also looked at invoices. Mr. Stanley invoiced these various companies for the services that he provided. So a combination

of that information allowed us to compute the correct income for each year.

MR. BECKER: Judge, may I approach?

THE COURT: Yes.

Q (By Mr. Becker) I want to show you what's marked for identification purposes as Government's Exhibit 166(a). Could you tell the jury what this is?

A This schedule summarizes the compensation that was received by Mr. Stanley for services that were provided. It's captured by year and by the particular paying company with the total for each company per year and with a total per year combined income.

Q Is that something, then, that you relied upon or determined to be accurate for his compensation for those tax years?

A Yes. It's accurate and, yes, I relied on it to calculate the income.

MR. BECKER: United States offers Government's Exhibit 166(a).

THE COURT: Any objection?

MR. STANLEY: No objection, Your Honor.

THE COURT: 166(a) is admitted.

MR. BECKER: Could we look at that, please.

Q (By Mr. Becker) And, Ms. Willard, could you go through it and explain to the jury the information on this chart,

166(a)?

A The left-hand side has the tax year, and then the columns following to the right have, by column, the paying company. So the first column is Freedom Electric. The numbers captured below in the column represent the total payments from that particular company for each particular year. So, for example, Freedom Electric paid Mr. Stanley $5,687 for services in 2006.

The next column shows McKinley Paper, which became Bio Pappel so it's got the information below showing the payments for each year.

The next column has Mid America Consultants followed by Tri-State G&T, Industrial Project Management, and Emerson Electric. The last column reflects the total per year combining the payments from all sources.

Q On the far right, then, is the total amount of compensation in the relevant tax year?

A Correct.

Q How did you use that information, then, in determining his taxes? Is that the starting point for gross income?

A This would be included as one of the elements of gross income, so this would be taxable income.

Q Were you able to determine in calculating Mr. Stanley's taxes for those years any expenses that would be allowable deductions from income?

A We did allow expenses, yes.

Q How did you determine those?

A We allowed a standard deduction. We allowed a personal exemption. For business expenses we allowed what were termed reimbursed expenses. When he received payments from these various companies, sometimes he was reimbursed for travel expenses. Since that was included as part of the 1099 income, he's allowed a deduction to offset that. We allowed that expense.

We allowed contract payments to his wife, Ellen Lorane. The invoices show that he received payments from these companies for services that Mrs. Stanley was providing, so we allowed him a deduction as if he had paid the money over to his wife.

We also allowed him what I referred to earlier as potential business expenses by looking through the bank accounts. Like there were payments to Sprint and some insurance companies, office supply stores. Things like that that could have been expenses, we've gone ahead and allowed even though on the filed returns for 2007, '8, and '9 he didn't claim any expenses like that. He only claimed the reimbursed expenses.

Q I want to show you what's been marked --

MR. BECKER: May I approach, Judge?

THE COURT: Yes.

Q (By Mr. Becker) -- for identification purposes as Government's Exhibits 167, 168(a) -- 167(a), 168(a), and 169(a), could you tell us what those are, please? What's 167(a)?

A 167(a) is a summary of the reimbursed expenses that have been allowed. It's captured by year and it's captured by each paying company, and those numbers tie to the invoices showing what was paid to Mr. Stanley for reimbursed expenses. So this summarizes that information.

MR. BECKER: The government would offer that into evidence as 167(a).

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

MR. BECKER: Can we put that up on the screen, please.

Q (By Mr. Becker) So what information -- I think you just described it, but how did you go about determining the amount of reimbursed expenses?

A The total shown per year by each company ties directly to the invoices. The invoices break down the payments that were for services and the payments that Mr. Stanley received for reimbursed expenses, which were like travel-type expenses. So each of these numbers ties back to the invoices.

Q And I guess we'll get to it in a minute. This would be

a deduction from his income in the tax calculation?
A Correct.
Q Next, please, look at Government's Exhibit 168(a). What is that?
A This is a summary of the estimated business expenses that we've allowed. There is the number that I referred to where we looked through the bank account information. If it was a vendor that could have been a business, like Sprint or office supplies, also computer-type things, those are reflected in this schedule. It may be business. It may not. We've given him the benefit of allowing the expense.
MR. BECKER: Government offers 168(a).
THE COURT: Any objection?
MR. STANLEY: No objection to 168(a).
THE COURT: Admitted.
MR. BECKER: Could we look at that, please.
Q (By Mr. Becker) So these are just lump totals for the year but not really broken - broken down by what?
A It's broken down by bank account and by tax year.
Q So Mr. Stanley had two bank accounts that you analyzed?
A There were two bank accounts that had expenses that could have been business expenses.
Q And these numbers were, then, used in the calculation of the tax that he would have had due and owing?
A Correct. He's been allowed these expenses.

Q Next please look at Government's Exhibit 169(a). Could you describe that, please?
A This is a summary schedule of the payments that have been allowed as an expense to Mr. Stanley for the services that were provided his wife, Ellen Lorane Stanley.
Q Is that an accurate summary of those expenses that you credited for Mr. Stanley's tax returns?
A Yes.
MR. BECKER: I'd offer that as Government's Exhibit 169(a).
THE COURT: Any objection?
MR. STANLEY: I object.
THE COURT: Will you approach, please.
(Counsel approached the bench and the following proceedings were had:)
MR. STANLEY: I'm trying to figure out what -- I'm trying to figure out what substantiation there is for suggesting that there were payments from husband to wife.
THE COURT: I think she's saying she credited you because you did pay that over and didn't keep that. Is that my understanding?
MR. BECKER: That's correct. It's a credit. It's a business expense that you were given the benefit of. I am going to ask her whether or not there was any evidence of any payments back and forth.

MR. STANLEY: We've always considered this to be like the classic family farm. I mean, the family farm, dad, mom, kids all contribute. At the end of the year there's one set of accounting. There's one set of accounting that dad fills out. So separating this out is a little -- seems to me very strange.

THE COURT: The government is offering this exhibit as what the IRS calculated as an allowable deduction, and do you have any objection to the exhibit as it's purporting?

MR. STANLEY: As long as it's limited to that's all that it's saying and not that it's imputing that Mrs. Stanley was liable for -- there was another set of -- that she had some kind of liability or some part of --

THE COURT: That's a fair area of cross-examination, but do you have any other objection besides relevancy, is how I'm interpreting your objection to be. Do you have any other objection? Otherwise, I'm going to overrule your objection unless you make any --

MR. STANLEY: Relevancy and accuracy because there's no evidence of --

THE COURT: Do you have any objection to the accuracy, that is, the calculations they allowed for a deduction in determining your tax liability?

MR. STANLEY: No, Your Honor.

THE COURT: Is there any other record you want to

make, Mr. Becker?

MR. BECKER: No, Judge.

(The proceedings returned to open court.)

THE COURT: 169(a) will be admitted.

MR. BECKER: Could we put that up on the screen, please, 169(a).

Q (By Mr. Becker) Could you walk us through, again, then, what is depicted on 169(a) and what was the basis for the numbers in the chart?

A On the left-hand side it's got the tax year, and then the next columns reflect the paying company, and the number reflected within the particular column ties to the invoices that Mr. Stanley provided to each particular company, and this number for each year by company would reflect the total shown on the invoices for services provided by Ellen Lorane Stanley. The total on the right reflects the total per year that's been allowed as a deduction in computing the tax.

Q In reviewing the IRS records, was there any record of Mr. Stanley filing a 1099 for the amounts that he billed for Mrs. Stanley?

A He did not file any 1099s for Mrs. Stanley.

Q In reviewing the bank records, Mr. Stanley's bank records, were there any evidence of separate payments to Mrs. Stanley that would correspond to these amounts?

A No. These would just reflect the payments that he

received for services she provided, and by allowing him a deduction is giving him the benefit. So if I remember correctly, there was an interview in which he stated that he didn't directly pay her, that she just spent the money that came in, I guess, jointly. So we didn't see specific payments.
Q But in determining his taxes, you gave him the benefit of claiming this as a deduction in your calculations?
A Correct.
Q Let's get to the tax calculations. I want to show you what's marked for identification purposes as Government's Exhibit 18.
MR. BECKER: May I approach, Judge?
THE COURT: Yes.
Q (By Mr. Becker) Would you tell us what that is, please?
A This is the examination report that I prepared for Mr. Stanley for tax years 2005 through 2009.
MR. BECKER: United States would offer that into evidence as Government's Exhibit 18.
THE COURT: Any objection?
MR. BECKER: No objection, Your Honor.
THE COURT: Admitted.
Q (By Mr. Becker) Just look, please, at the first page of Government's Exhibit 18, and could you describe for the jury the information or the process you went through to do these

calculations of Mr. Stanley's taxes for 2005 through 2009?

A I'll kind of go over the layout and then how the numbers work into there. So on the left-hand side it has Mr. Harold's identifying name and address. Over on the right it's got his taxpayer identification number, and the form number is Form 1040 is what individual taxpayers file.

Down below we've got columns. The left-hand column where it says, "Adjustments to Income," that provides a description of the item that we're adjusting. And then the three columns on the right show tax period. So the first one is 2005, 2006, followed by 2007. So below where it says A, B, C, and so on, those are the adjustments to income. If it's a positive number, that's increasing income. If it's a negative number, that's taking away income or allowing an expense. So like the first item is Schedule C1, business expenses for criminal tax, is a negative number. That means we're allowing a deduction. If you go down lower you'll see a positive number for income.

So these numbers reflected on the report tie to the other schedules that we just went through for the business expenses, reimbursed expenses, and the contract labor to Ellen Stanley.

Q And then could you look at line 7, please. What is the information there?

A Line 7 reflects the corrected tax liability for the

income tax for 2005, 2006, 2007.

Q And that would be the tax strictly on his income; is that right?

A That would be the income tax strictly on the income and allowing the expenses.

Q Are there additional taxes, then, that would be due as a self-employed person?

A Correct. On line 10(b) it shows the self-employment tax for all three years. It's based on the self-employment profit which is a different income line than the expenses. Also on 10(a) there is a tax for 2005 that represents a 10 percent penalty for early withdrawal of a retirement account.

Q And then what is the total tax liability for those years?

A On line 11 it shows $25,431 for 2005. 51,682 for 2006, and $37,049 for 2007.

Q Could we look at page 3, the same information for 2008 and 2009?

A Correct.

Q And what is the -- so the calculation is the same as we just walked through?

A Yes.

Q And what's the tax liability that Mr. Stanley had due and owing for tax year 2008 and 2009?

A For 2008 it's 73,198. For 2009 it's 72,540.

Q I'm going to show you what's marked for identification purposes as Government's Exhibit 21(a). Ask you to describe that for us, please?
A This summary reflects by year the compensation received that ties to one of the previous schedules, the allowed expenses, and the profit from the business for 2005 through 2009.
MR. BECKER: I'd offer that into evidence as Government's Exhibit 21(a).
THE COURT: Any objection?
MR. STANLEY: No objection.
THE COURT: Admitted.
MR. BECKER: Could we look at that, please.
Q (By Mr. Becker) Could you then -- this would, I guess, determining the profit from Mr. Stanley for those years, walk us through it and how you determine his net profit for those years.
A Okay. For 2005, I'll just start there, the compensation received line, the 90,909, that reflects the income that was received from the various companies. 1099s were received for all of those payments except for Freedom Electric.
The next section has the expenses, reimbursed expenses we've talked about earlier. It reflects the reimbursed expenses that were shown on the invoices. They were

included in income. So he's allowed a deduction for those. So it's 8,983 for 2005.

The next line is the subcontractor expense for Mrs. Stanley, the 9,495. And that ties to the invoices.

The next category is business expenses for criminal tax 2,476. That amount was the amount that's been allowed as potential business expenses based on reviewing the bank account information.

The total expenses for 2005 is 20,954 resulting in profit from self-employment of 69,955 for 2005.

Q And that would be what the taxable income for that year?

A That would be profit from self-employment. If there's interest income and other types of income, those would be added to it to include gross income calculations. This would just be one element of the income.

Q Could you tell us, then, what was the profit from self-employment in 2006, '7, '8, and 9?

A For 2006 it was 154,185.71. For 2007 it's 114,172.95. For 2008 it's 213,722.27. For 2009 it's 211,073.72.

Q Next I want to show you what's marked for identification purposes as Government's Exhibit 20. Ask you if you recognize that and tell us what it is?

A This is a summary of changes that I prepared for tax years 2005 through 2009 just to kind of explain in a little

more detail some of the items that went on the report.

MR. BECKER: Offer that into evidence as Government's Exhibit 20.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) Could you -- don't read that but summarize it for us, please, to explain to us how you calculated Mr. Stanley's tax due and owing from '05 through '09.

A Okay. Filing status during 2005 through 2009 Mr. Stanley was married. He filed joint returns for 2007 and '8, but his wife did not sign the returns. They weren't valid returns. So since he hasn't filed joint returns with his spouse, his filing status is basically married filing separate. He didn't qualify for head of household, which would be a status if you're considered unmarried, which means you lived apart from your spouse for the last six months of the year and you provide a home for a dependent child. He didn't qualify. Married filing separate was the status and that determines the tax based on the income.

I allowed him one personal exemption for himself. I did not allow an exemption for his spouse because she had her own earned income based on giving him a deduction for the income that she received. In effect, that eliminates him being

allowed to claim a personal exemption for her, but it was more beneficial to give him a deduction for the payments basically to Mrs. Stanley rather than the exemption. So we've given him the most conservative tax approach for that.

Q What is a Schedule C?

A Schedule C, this would be the income that he received for his engineering services, the 1099 miscellaneous income that he talked about from the various companies where he billed them; and then the expenses are the items we talked about, reimbursed expenses, the estimated expenses based on the bank account payments, and the contract work by Mrs. Stanley.

Q Were there any other income items that you calculated?

A There were. For 2005 there was a state tax refund. Mr. Stanley filed a 2004 return and itemized deductions, so one of the deductions that you're allowed to claim on your itemized schedule is state income tax. If you get a refund, you're required to report that as income, so that's included for 2005.

Also in 2005 he received a retirement distribution from National Financial Services. It wasn't rolled over into another qualified plan and so that's also an income item.

Q So there was also a tax related to that distribution?

A There is. The retirement distribution was pulled out prematurely, and there's a 10 percent penalty that applies, so that's included in the tax for 2005.

Q Now, what about other deductions? You talked about the

standard deduction. What was in your calculation?

A Basically I looked for the bank account information and other sources. So there was no mortgage interest paid in these years. I saw some charitable contributions, I believe in 2005, but the total that I was able to verify for itemized deductions were less than the standard. So he's been allowed the standard deduction for each year.

Q Was there any indication of student loan interest that would deductible for tuition?

A There was documentation Mr. Stanley did pay student loan interest in these years. He's not allowed a deduction for multiple reasons. First of all, you can't take a student loan interest deduction if you file married filing separate. Also his income levels exceeded the limit to be able to claim that. So basically that's a deduction that's phased out if your income exceeds a certain level. So he wasn't allowed that for two reasons.

Tuition, he paid tuition as evidenced by a Form 1098-T issued by an educational institution, but he's not allowed any kind of credit or deduction related to that because of the married filing separate status.

Q I show you what's marked for identification purposes as Government's Exhibit 202, and tell us what it is and if you recognize it and what is it.

A This is a summary of the tax due and owing schedule

that's broken down by year and the total tax due and owing that reflects the tax calculation that we showed on the prior schedule that had the three columns and the income and expense items. So this is a summary of the tax due and owing.

MR. BECKER: Offer that into evidence as Government's Exhibit 202.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) I believe you just described it, but could you, then -- so this was, what, the bottom figure for each of those individual tax years?

A Correct.

Q And in your review of Mr. Stanley's bank accounts, was there any record of payment from those bank accounts to the IRS?

A There was not.

Q In your review of the IRS records for Mr. Stanley, was there any record of payment by Mr. Stanley for this tax that's due and owing?

A There's no record of any payments.

MR. BECKER: I have no further questions at this time, Judge.

THE COURT: Any cross, Mr. Stanley?

MR. STANLEY: Yes, Your Honor.

CROSS-EXAMINATION BY MR. STANLEY:

Q Good afternoon -- or good morning.

A Good morning.

MR. STANLEY: I'd like to ask plaintiff's assistant to call Exhibit 21(a) back up for just a minute, please.

Q (By Mr. Stanley) So this is being called a profit from self-employment?

A Yes.

Q So there is -- there is no kind of deduction in here for the value of the labor involved in this?

A Can you be more specific to what labor you are referring?

Q Okay. Let's draw a quick analogy. If this was XYZ, Inc. and I was an employee of XYZ, Inc. and this XYZ, Inc.'s return, their deductions before profit would include the wages to whomever was their employer -- whoever were their employees, correct?

A Yes.

Q Okay. And that would be taken out before coming up with a profit from the business?

A Correct, the business profit. Self-employment profit is different. You're considered to be your own business.

Q And so all of it is profit basically?

A Your business income less your business expenses that are allowed results in the business income, and that's what's

taxable.

Q All right. I believe that is my question. Thank you for your time.

A Thank you.

THE COURT: Any redirect?

MR. BECKER: No, Your Honor.

THE COURT: You're excused. You can stand down.

THE WITNESS: Thank you.

(Witness excused.)

MR. BECKER: United States calls Shauna Henline.

SHAUNA HENLINE, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good morning.

A Good morning.

Q Please state your name and spell your last name.

A Shauna Henline, H-e-n-l-i-n-e.

Q How are you employed?

A I work for the Internal Revenue Service's Frivolous Return Program in Ogden, Utah.

Q How long have you been with the Internal Revenue Service?

A Twenty-seven years.

Q How long have you been with the Frivolous Return Program?

A Since November of 2000.

Q Could you describe for us, please, what is the Frivolous Return Program?
A The Frivolous Return Program is tasked with handling documents that have been determined to be frivolous, which simply means they have no basis in law. They lack merit.
Q How do items come to your program? How do they get referred over? How does the paperwork flow?
A Any employee of the Internal Revenue Service can make a referral to the Frivolous Return Program. We get most of our receipts from the people who are opening the mail and handling returns as they come in the door.
Q I'm sorry. Where is your program located?
A In Ogden, Utah.
Q Is that for the whole country? That's the one place, in Ogden, Utah?
A Yes. The program was centralized in Ogden in January of 2001.
Q What are your duties there at the Frivolous Return Program?
A I provide technical guidance to technicians who are handling frivolous filings. I serve as a liaison between IRS' Office of Chief Counsel and the Frivolous Return Program. Sometimes also headquarters and the Frivolous Return Program.
I write training materials, Internal Revenue manuals that relate to the Frivolous Return Program, and I conduct

civil investigations against people who promote frivolous filings.

Q Did you -- were you asked to review the records of the Frivolous Return Program to see if there is any record of filings by Harold Stanley?

A Yes.

Q Were you able to locate any documents for Mr. Stanley at the Frivolous Return Program?

A Yes.

Q How do you go about doing that?

A It's a database that is researchable by name, Social Security number.

Q And are those documents retained over the years by the Frivolous Return Program?

A Yes. That database is meant to help us track our inventory, so it contains a record of what is received in the Frivolous Return Program and how we responded and the dates of the receipts and the responses.

Q I want to show you --

MR. BECKER: May I approach, Judge?

THE COURT: Yes.

Q (By Mr. Becker) -- what's marked for identification purposes as Government's Exhibit 155. Could you tell us what that is, please?

A This is a copy of the Frivolous Return Program

inventory database record for Harold Stanley.

MR. BECKER: I offer that into evidence as Government's Exhibit 155.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

MR. BECKER: Put that up, please.

Q (By Mr. Becker) Could you explain to the jury, please, the information that's contained on the -- I guess the screen shot, which is Government's Exhibit 155?

A Sure. Up at the top you will note that the Social Security number of Mr. Stanley is shown, his last name, his first name, his address, the city and state.

Over on the right is an entry of when the letters were sent. Down below is a record of all of the documents that we received in the Frivolous Return Program, the dates that those were received, what those documents were, whether they were correspondence, whether they were returns. It shows when they were received in the IRS and also when they were received in the Frivolous Return Program and what actions the Frivolous Return Program took and what date that action was taken.

Q And a number of these -- let's just look at the very bottom one.

MR. BECKER: Pull that up, please.

Q (By Mr. Becker) What information is on that bottom

entry in the screen shot?

A That entry tells me that we received a piece of frivolous correspondence that had to do with tax period 2005. It was received in the IRS on March 13th of 2009 and was received in the Frivolous Return Program on July 1st of 2009. It had no bearing on any tax assessment, penalty assessment, and did not contain a legitimate request. Consequently, we destroyed it, and we did that on July 2nd of 2009.

Q I want to show you what's in evidence as Government's Exhibit 11. It should be up on the screen, but here's the certified copy. Now, if you'd look at, not the blue page, but the first page of that document, does that document correspond to the item that you just described in the screen shot as received by the IRS on March 13, 2009, then received by the Frivolous Return Program on July 1, 2009?

A Yes, it does.

Q Okay. Let's start by looking at the stamp, the first stamp at the bottom, please.

A That date stamp on the lower left-hand -- in the lower left-hand corner shows that it was received on March 13th of 2009, and that coincides on the FRP record to the receive date.

And up in the upper right-hand portion of the document it shows received July 1st, 2009, in the Frivolous Return Program, and that coincides with the date that is shown on the document that I just described in the Frivolous Return

Program master database.

Q And also in the master database it refers to a tax year of 2005. Is that consistent with this document?

A Yes.

Q So looking at this document, both this page and the next page, what is it about this document that you're familiar with in the Frivolous Return Program?

A On the first page there is an entry that says, "Accepted for value, autograph by Harold R. Stanley, authorized representative." That's kind of a typical statement that people use on frivolous filings.

Q Does that in any way pay Mr. Stanley's obligation to pay $56,000 for his taxes for that year?

A No.

Q Looking at the next page, what about this that would be consistent with the information or documents you receive at the Frivolous Return Program?

A Well, this is a piece of paper that's entitled, "Money Order." It says, "Paid to the order of United States Treasury." It's in the same amount as is shown on the first page as a balance due.

Q And is this some type of document that you receive with some regularity at the Frivolous Return Program?

A Yes. We would handle this as frivolous correspondence.

Q And is this in any way a payment to the IRS for the tax

due and owing?

A The IRS would not accept this as a payment.

Q As a result of this correspondence, that is Government's Exhibit 11, sent by Mr. Stanley, then referred to the Frivolous Return Program, was there a letter sent out to Mr. Stanley concerning the -- this type of correspondence?

A Yes. A Letter 3175, which is sent by the Frivolous Return Program, was sent. That is a letter that is sent when someone submits frivolous correspondence, and it's sent only one time per taxpayer.

Q I'm going to show you what's marked for identification purposes as Government's Exhibit 154 and ask if you recognize that?

A This is page 1 of the Letter 3175 that I just described that's sent when someone submits frivolous correspondence.

Q Was this sent to Harold R. and Ellen L. Stanley?

A Yes.

MR. BECKER: I offer this into evidence as Government's Exhibit 154.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) Could you please read the letter -- is this a form letter essentially that is sent out by the Internal Revenue Service?

A Yes.

Q Could you, then, read the letter that was sent to Mr. Stanley in July of 2009?

A "Dear taxpayer:

"This is in reply to your correspondence dated March 13, 2009."

Q Let me stop you there. I'm sorry. And that would be in response to Government's Exhibit 11 that was received in Philadelphia on March 13th of 2009?

A Yes.

Q That's where that date came from?

A Correct.

Q I'm sorry. Please continue.

A "We have determined that the arguments you raised are frivolous and have no basis in law. Federal courts have consistently ruled against such arguments and imposed significant fines for taking such frivolous positions.

"If you persist in sending frivolous correspondence, we will not continue to respond to it. Our lack of response to further correspondence does not in any way convey agreement or acceptance of the arguments advanced. If you desire to comply with the law concerning your tax liability, you are encouraged to seek advice from a reputable tax practitioner or attorney.

"The claims presented in your correspondence do not relieve you from your legal responsibilities to file federal

tax returns and pay taxes. We urge you to honor those legal duties.

"This letter advises you of the legal requirements for filing and paying federal individual income tax returns and informs you of the potential consequences of the position you have taken. Please observe that the Internal Revenue Code sections listed below expressly authorize IRS employees that act on behalf of the Secretary of the Treasury to: No. 1, examine taxpayer books, papers, records, or other data which may be relevant or material; No. 2, issue summonses in order to gain possession of records so that determinations can be made of the tax liability or for ascertaining the correctness of any return filed by that person; and, 3, collect any such liability.

"There are some people who encourage others to violate our nation's tax laws by arguing that there is no legal requirement for them to file income tax returns or pay income taxes. These people base their arguments on legal statements taken out of context and on frivolous arguments that have been repeatedly rejected by federal courts. People who rely on this kind of information can ultimately pay more in taxes, interest and penalties than they would have paid simply by filing correct tax returns.

"People who violate the tax laws also may be subject to federal criminal prosecution and imprisonment. Information

about the IRS'" --
Q Okay. So that particular page, then, if you could zoom out a little bit, there's some writing on that. Could you tell us what the red writing and signature is?
A It says, "Facially void. My records list no correspondence dated March 13th, 2009. Must be misdirected. Please forward to correct entities. August 7th, 2009, Harold R. Stanley."
Q Then --
A And Ellen L. Stanley.
Q I show you what's been marked for identification purposes as Government's Exhibit 156.
MR. BECKER: May I approach?
THE COURT: Yes.
Q (By Mr. Becker) What is that?
A This is a copy of our Letter 3175, a complete copy of a Letter 3175.
Q That's what you were just reading, a 3175 letter?
A Yes.
Q And this has the second page that continues from the one you were just reading?
A Yes.
MR. BECKER: I'd offer this into evidence as Government's Exhibit 156.
THE COURT: Any objection?

MR. STANLEY: No objection, Your Honor.

THE COURT: Admitted.

Q (By Mr. Becker) Would you please then -- we left off at the bottom of that page, "People who violate the tax laws." Is that continued on the form then?

A Yes.

Q Could you read the rest of this letter that was sent to Mr. Stanley, "People who violate"?

A "People who violate the tax laws also may be subject to federal criminal prosecution and imprisonment. Information about the IRS' criminal enforcement program is available on the Internet at www.irs.gov. Once there, enter the IRS keyword: fraud.

"The IRS is working with the United States Department of Justice and state taxing authorities to ensure that all taxpayers pay their lawful share of taxes and to seek criminal indictments or civil enforcement actions against people who promote or join in abusive and fraudulent tax schemes.

"You can obtain IRS Publication 2105, Why Do I Have to Pay Taxes?, from our Internet website at www.irs.gov/pub/irs-pdf/p2105.pdf. We also refer you to a document entitled The Truth About Frivolous Tax Arguments. It is also on our website at www." --

Q That's all right. You don't have to read that.

A "If you do not have Internet access, you can obtain copies of these documents from your local IRS office."

Q So, Ms. Henline, what is on the rest of this document, if you could please just summarize it?

A In the next paragraph is just general information about filing requirements and the IRS authority to collect taxes. It goes on to describe the penalty for filing frivolous returns, and has a toll-free number that people can call if they have questions about this letter. And this is a toll-free number that rings on the desk of a technician in the Frivolous Return Program. It isn't the same number that everybody else calls for customer service at the IRS. It rings on the desk of a tax technician in the Frivolous Return Program, and that person would be able to answer any questions about the frivolous nature of the filing.

Q I want to go over with you a few documents that were submitted by Mr. Stanley to the IRS in a letter dated October 29th, 2012, Government's Exhibit 78. Did you have a chance to review some of those items in advance of your testimony?

A Yes.

Q I refer you, first of all, in Government's Exhibit 78 to a letter sent to the Internal Revenue Service in Ogden, Utah. It appears to be for tax year 2005. Could you look at that and tell us, is this consistent with the type of document

you receive at the Frivolous Return Program?

A Yes.

Q Looking at the bottom, what is it about this document that's consistent with the documents that you receive at the Frivolous Return Program?

A He has taken a balance due notice and written across it, "Pay to the order of Department of the Treasury, sixty-three thousand dollars."

Q What about this authorized representative in the lower right-hand corner?

A That's the title that people will often use who are filing frivolous documents to describe themselves.

Q Next I'd like you to look, please, at a letter to Ogden, Utah, which is obtained as part of Mr. Stanley's letter to the IRS, a payment voucher for 2007. Is that consistent with the items that you receive at the Frivolous Return Program?

A Yes. In this case there's a payment voucher, which is a document that's used to be attached to a payment that's being forwarded to the Frivolous -- excuse me -- to the IRS. In this case he has written, "Pay to the order of Department of Treasury," and signed his name.

Q Would that constitute payment to the IRS?

A No, it would not be honored.

Q Next I want to show you another mailing to the IRS in

Ogden, Utah, for tax year 2008.

MR. BECKER: Could you go up, please, to the envelope part.

Q (By Mr. Becker) Now, you're in Ogden, Utah. Does this come -- necessarily come to you at the Frivolous Return Program or is that a service center there?

A That's just a service center address, not the Frivolous Return Program.

Q It would just go to the general processing center at Ogden?

A Yes.

Q And the bottom here, then, would that constitute payment to the IRS for 2008 tax liability?

A No, it would not be honored.

Q Why not?

A It's just a balance due notice on which he has written, "Pay to the order of Department of the Treasury, eighty-seven thousand dollars." It's just a balance due notice essentially.

Q Next I'd like to show you what's in part of Mr. Stanley's letter to the IRS in October 2012, Exhibit 78, another letter to Ogden, Utah. This one for tax year 2009. What is written on there?

A "Accepted for value and returned for value for settlement, closure and setoff of this presentment by Harold R. Stanley, A.R."

Q Is that consistent with the type of documents you receive from the -- at the Frivolous Return Program?
A It is.
Q And what about that language is familiar to you?
A It's typical language that people use when they are attempting to have us apply a --
Q Apply a payment?
A A payment or some kind of financial instrument to a balance due.
Q But that wouldn't in any way just cause the IRS to write off the tax due and owing?
A No.

MR. BECKER: I have no further questions at this time, Judge.

THE COURT: Is there any cross?

MR. STANLEY: Yes, Your Honor.

CROSS-EXAMINATION BY STANLEY:
Q Good morning, Ms. Henline.
A Good morning.
Q You're a member of the Frivolous Return Program. Is there -- what is the legal definition of frivolous?
A The legal definition is in the Internal Revenue Code Section 6702. I don't have it memorized.
Q All right. Thank you.

MR. STANLEY: Could we recall Exhibit 155 for just a

minute.

Q (By Mr. Stanley) Now, is there someplace on this sheet -- I haven't seen it yet but I do miss things. Is there someplace on this sheet where it identifies that a 3175C letter was sent out?

A Yes. Up at the top where it says, "Soft letter date," that's what we in the Frivolous Return Program call a Letter 3175. We call it that because it doesn't require a response from the taxpayer. It's just a soft letter. It's meant to warn people of the consequences of taking frivolous positions.

Q All right. On Exhibit No. 11 you mentioned an obligation to pay. Now, what is your basis for determining what is lawful payment?

A In this particular document there is a tax year interest computation that is attached to the correspondence, and it has the total amount due. Is that what you mean?

Q I apologize. I did not ask the question correctly apparently.

How do you determine whether a particular attempt to pay is lawful or unlawful? It is or is not valid? You said that there was an obligation to pay and that it had not been paid. So how do you make that determination? What's the law that tells you what is and is not lawful payment?

A Well, it isn't my role to interpret the law, but the IRS accepts the same kind of payment that everybody else

accepts; valid checks, cash, even credit card payments in some instances.

Q Okay. And that's written down someplace, but that's not your responsibility personally? Is that what I'm understanding?

A It's not my role to interpret the tax code.

Q Okay. But you can -- but you look at this correspondence and say it's frivolous, it's not valid payment?

A I look at this document and because of the characteristics of what's written on these documents, I would classify it as frivolous correspondence.

Q Classify it as frivolous but the legal basis is?

A It lacks merit.

Q Because of -- it all kind of -- to me it comes back to where's the law?

MR. STANLEY: Now, can you call back up Exhibit 154, please. And could you zoom in on the top half of it like you did earlier.

Q (By Mr. Stanley) Okay. This letter starts out saying it's in reply to my correspondence dated March 13th, 2009. Now, the second sentence of my written reply is, "I don't have any correspondence to you dated March 13th, 2009."

A We used the date that it was received in the IRS to get that date.

Q Well, but you're saying it's correspondence dated

March 13th. March 13th is not the date on the correspondence. That's the date you received it?

A Yes. So there's a date stamp on it.

Q So why does the letter says received March 13th?

A This letter can't be changed. The only things that can be changed on it are certain fields, and that would just be the date. It wouldn't be -- you know, we wouldn't be able to change the word "dated" to "received." It is only certain fields can be changed. This is a form. It's sent systemically so it can't be changed.

Q The person putting that date in can't look at the date that it was sent or some date that's on the correspondence and make up the date that a person can relate it to. This letter itself to me is frivolous because it's referencing correspondence that there was no such date.

MR. BECKER: Objection; argumentative.

THE COURT: Can you ask in terms of the question, please?

MR. STANLEY: I apologize.

Q (By Mr. Stanley) If a taxpayer is corresponding with the IRS, as I was at this time multiple years, sending things out on multiple dates and you're putting in the receive date and calling -- and saying that the correspondence is dated something else, how is the taxpayer to determine what piece of correspondence you're referring to if he doesn't have the

corresponding date?

A If you had questions about what the letter says and you were confused about the date, the quickest and most expeditious way to get a good answer to your question would have been to call the IRS toll-free number. That way you could say, "I don't understand. I didn't send this letter on March 13th. What's this letter about?" And the person who's answering that telephone call could easily explain to you that it was the letter that you sent and give you the dates that you're requesting and explain why it's frivolous.

MR. STANLEY: Can you scroll up a little bit to show it's in the middle and show my remark back, please.

Q (By Mr. Stanley) So instead of calling, I wrote back and said my records don't show anything. I'm confused. Now, when you receive something, written correspondence like that that says this letter's confusing, you don't feel any obligation to send any reply back?

A We only send one reply to frivolous correspondence and that's the Letter 3175 that was received.

Q Okay. Now, is there someplace in this letter that identifies a specific law being violated?

A It talks about the consequences of taking frivolous positions, and it notifies you that we considered the correspondence that you submitted to be frivolous. So, yes, it does talk about the law 6702.

Q Okay. But -- okay.

MR. STANLEY: Can we, then, call up 156, which I think is the next one -- oh, please go back to that for just one second. I'm sorry. 154. Please go back to that for one second.

Q (By Mr. Stanley) Is there someplace on this letter that identifies the tax year in question?

A No. Because the correspondence is just correspondence. It generally or oftentimes does not specify a tax period. So it's just all encompassing, so to speak.

Q So, again, if a taxpayer sent something in, sent multiple things in around the same time, he doesn't really know -- there is no way -- is there any way for him to identify what year this is associated with?

A If you were confused, the best thing to have done is to call that toll-free number.

Q All right. And are these letters sent certified to verify delivery?

A No, they are not.

Q Thank you.

MR. STANLEY: Go back to 156 and go to the second page. And can you zoom in on the listing. Yeah. Thank you. You apparently knew where I was wanting to go.

Q (By Mr. Stanley) You mentioned 6702 regarding payments. Is that listed there someplace that I'm not seeing

from a distance?

A In bold it says Internal Revenue Code, Section 6702.

Q Oh, for frivolous returns.

A For frivolous --

Q I'm sorry. I didn't mean -- I apologize. Is there a section there that talks about acceptable forms of payment? Does one of those listed there discuss acceptable forms of payment?

A No.

Q Okay. So this Letter 3175 was -- it was apparently issued, but does it contain anything that says what the specific problem is?

A And if you had called the toll-free number, then that person would have told you that the correspondence that you submitted was being treated as frivolous correspondence, that they were not accepting the alleged payments as such.

Q All right. Thank you. I'll leave that particular document.

You mentioned when we got to the letter that I sent to Mr. Melcher with the multiple years where I put in the documents from '5, '6, '7, '8, and '9 you mentioned the language I used was typical language that you reject as frivolous. So how often do you see that in a year?

A Thousands of times.

Q Thousands. Okay. So is it accurate to say that it's a

fairly widespread belief that this might work?

A It's a fairly widespread activity that people submit that type of language to frivolous correspondence.

Q All right.

MR. STANLEY: That is all of my questions, Your Honor. Thank you.

THE COURT: Any redirect?

MR. BECKER: Briefly, Judge.

REDIRECT EXAMINATION BY MR. BECKER:

Q So these last few questions and thousands of times it's submitted. Does it ever work?

A I have never heard of it being -- of it working.

Q Thank you.

THE COURT: Any recross?

MR. STANLEY: No, Your Honor.

THE COURT: You may be excused.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: It's a few minutes before noon, and we are going to take a recess until one o'clock.

And let me read an instruction to you. We are about to take a recess, and I remind you of the instruction I gave you earlier. During this recess or any other recess, you must not discuss this case with anyone, including the other jurors, members of your family, people involved in the trial, or anyone

else. If anyone tries to talk to you about the case, please let me know immediately. Do not read, watch, or listen to any news reports of the trial.

Finally, keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors. I may not repeat these things to you before every recess, but keep them in mind throughout the trial.

We'll be in recess.

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Please be seated.

We have an instruction packet submitted by the government as well as defendant's requested instructions. Would the parties be agreeable to meet back in the courtroom at 12:40 to go over the instructions, at least preliminarily at this point?

Mr. Becker?

MR. BECKER: Government will be ready.

THE COURT: Is that fine with you, Mr. Stanley?

MR. STANLEY: Yes, Your Honor.

THE COURT: 12:40 and we'll discuss instructions in the courtroom.

MR. BECKER: Scheduling issue, Judge. I anticipate that we -- the government's case would be finished somewhere around 2:30 or three and wondering if the defendant's ready to

proceed at that time.

THE COURT: If you only have one more witness?

MR. BECKER: Three.

THE COURT: Oh three. Okay. Okay. And, Mr. Stanley, are you ready to proceed if we wrap up the government's case in chief by three o'clock?

MR. STANLEY: Your Honor, it's a little difficult to say when we still have evidence issues outstanding. It's pretty hard to prepare testimony if you -- when the evidence that you're planning to present is all in limbo. Basically it's all in limbo.

THE COURT: Okay. Let's see if we can go through some of that and make some rulings. Are you referring to the government's motions in limine to exclude certain evidence?

MR. STANLEY: Yes, Your Honor.

THE COURT: And do you have -- what witnesses do you plan to call besides yourself at this point?

MR. STANLEY: Well, I've issued subpoenas to be able to recall Mr. Littrell, Mr. Melcher, the Federal Reserve Bank gentleman, and Ms. Simpson for examination that would not be restricted by cross.

MR. BECKER: The government would oppose recalling those witnesses. I am not aware of what is permissible on direct examination. Certainly --

THE COURT: Which of those witnesses have you

already called, Mr. Becker?

MR. BECKER: None.

THE COURT: Okay. So none have been called. And do you -- I don't mean for you to forecast your case in chief if you aren't wanting to, but of the three witnesses this afternoon, do you want to tell us who those three are?

MR. BECKER: Certainly. Wendell Thomas is first. He's from the Federal Reserve Bank. Next is David Melcher. He's the appeals officer from the IRS. And third would be the case agent, Rich Littrell.

THE COURT: So three of four will be called this afternoon it appears. Simpson may not be called at all by the government?

MR. BECKER: Correct.

THE COURT: So if you have properly subpoenaed Eden Simpson and she -- is she under your subpoena?

MR. STANLEY: I believe the subpoenas were given to the marshals yesterday. And I don't know if they were just planning on serving them as they came to court or as government witnesses or how they were planning to get that done.

THE COURT: Did you endorse them earlier, Simpson earlier? Have you endorsed Eden Simpson as a witness?

MR. STANLEY: I listed her as a witness for me.

THE COURT: But you just tried to subpoena her after trial started?

MR. STANLEY: That is correct, Your Honor.

THE COURT: Okay. If the marshals are able to properly serve her and she's able to be here pursuant to that subpoena, you may be able to call her.

And what is the general nature of the testimony that you're anticipating? You don't have to forecast anything that you're not wanting to. If you can give me just the general nature of what her evidence would be. I have her listed as revenue officer with IRS.

MR. STANLEY: Well, the purpose of subpoenaing Ms. Simpson was that I wanted to be able to ask her questions that were not necessarily cross of what Mr. Becker asks her. I wanted to be able to ask additional question in case they were not directly related to the questions that he had asked.

THE COURT: And he may not be calling her as a witness. I'm just trying to figure out if the marshals aren't able to subpoena her at this point, where does that leave you with Simpson? I don't see how you could call her, but I don't know if there's something that the parties might be able to stipulate to. I just don't know the nature of what you're trying to get into.

MR. STANLEY: Well, I had one specific line of questioning for her because of some correspondence that I received with her name on it.

THE COURT: Would you be able to do the same

cross-examination with Melcher, David Melcher, the appeals officer with the IRS?

MR. STANLEY: I'm not sure he has the same responsibilities within the IRS, and the correspondence was specifically signed by her. Like I say, I was anticipating that the government was going to call her. So it should not be a logistical problem to also be able to examine her outside the parameters of Mr. Becker's examination.

THE COURT: Another option is Littrell. You know, you may want to consider -- we do have a resource for you for just legal advice. Al White's here in the courtroom. If you want to utilize that resource, he'll be available for you. But you may find yourself -- if Simpson hasn't been subpoenaed and you haven't -- have you spoken with her or asked her if she would come in without a subpoena?

MR. STANLEY: No, I did not. Again, based on the government's list of witnesses -- I think her name has been on it since the very first list of witnesses. I did not anticipate that she would be canceled. I had just not anticipated that.

THE COURT: And rather than recalling Littrell, Melcher, and Thomas, have you listed those as witnesses?

MR. STANLEY: Yes, I did.

THE COURT: Would the government be opposed to letting the defense have an expanded cross-examination to cover

areas that he would cover if the witnesses were to be recalled or called on?

MR. BECKER: No objection reserving the right to object to relevance.

THE COURT: Exactly. I understand that.

MR. BECKER: I'm not going to object beyond the scope of direct.

THE COURT: Okay. Thank you.

And that way you'll know at least those three witnesses after they testify for the government, that during your cross, you will not be limited to just the areas they testified on direct. And, again, if you have any questions, I refer you to Mr. White to give you some just logistical advice.

Does that help in knowing what your afternoon -- you're prepared for?

MR. STANLEY: Well, it helps a little bit, but it still doesn't answer the question of the -- I think most of my exhibits are in the in limine motion. So it's pretty hard to even sit down and outline what my testimony is going to be. I know there's large objections to most of what I would offer during testimony.

THE COURT: After our pretrial conference -- we discussed this very issue at our pretrial conference on May 19th, and that afternoon I issued an order trying to set forth with specificity, as much specificity as I could, to give

you some parameters.

The overarching concern for the Court would be that you are instructed that you will not be permitted to argue or present evidence as to what the law is or was or ought to be. So any areas or exhibits regarding what the law is is not going to be admissible. You can, however, talk about what your beliefs of the law are and what you base those beliefs upon.

If you intend to use exhibits to show the jury what you relied on, you were specifically instructed that the defendant shall make any such items he intends to mark as exhibits at trial available to the government for review and inspection by no later than 5 p.m. on Wednesday, May 25th, 2016.

In that hearing I also gave you the example of a book and if it had some notation that would be fair cross-examination, the government, in fairness, needs to have those items to review to properly represent the United States.

I don't know how much more clear I could have been. We talked about this again yesterday, and I don't know what attempts you've made in that area. So, yes, you will be limited to what you can mark as exhibits as what you relied on if those haven't been produced for inspection or copied and provided to the government.

MR. STANLEY: The only -- the government's concern about certain of the exhibits was that certain of the exhibits

contain a combination of facts and a combination of legal arguments, and I believe their concern was that I was going to attempt to use that exhibit as the primary source of law and argue law based on that document. Those documents that are mixed I was planning to use for establishment of certain facts in those documents, not for some kind of a primary source of law.

THE COURT: If you provided those documents, you can utilize those documents pursuant to the parameters I outlined and the government's able to cross-examine you on those. But if you are utilizing documents that are instructing the jury as to what the law is, that's not permissible; and, of course, those would not be admitted into evidence that could be used as possibly an exhibit.

Mr. Becker, do you want to weigh in on this?

MR. BECKER: Just to be specific, one example from Mr. Stanley's Exhibit 3, it's his answer to the government's motion for summary judgment in his tax case. Well, that has law and facts from Mr. Stanley's point of view. It's his pleading. The law is not admissible. Court's made that clear. The facts in a pleading that he authored, if he wants to testify to those facts, what his recollection is, whatever, fine. I'm not sure it's relevant but he can talk about whatever facts are contained that he believes occurred in the tax court. But his pleading that he submitted to the tax court

in response to the motion for summary judgment, there's no basis for admissibility of that type of document.

THE COURT: Were you planning to get that actual document in or just reflect or repeat comments that were in that document as your basis for your belief in the law?

MR. STANLEY: I was just wanting to enter that document as black ink on white paper that this is the facts of a particular thing that I asked about in tax court. I don't want to just stand up here and say, Yeah, I've asked this and this and this and not have some substantiation of it.

THE COURT: I've not seen these documents, so it's hard for me to make a ruling on things. I'm just trying to guess in there. Could I have a look at that document?

MR. BECKER: I do believe they were attached to the government's second motion in limine, but I do have copies. This is what's marked as Defendant's Exhibit 3.

THE COURT: Thank you. And in your proposed exhibit No. 3, what in particular are you wanting the jury -- what evidence are you wanting to provide the jury?

MR. STANLEY: Well, if I had --

THE COURT: Or what section, what portion of this writing is relevant?

MR. STANLEY: If I have -- if I can have permission to approach, I'll be glad to hand you my highlighted version, which is slightly different. The only difference is the

highlighting.

THE COURT: Your highlight is what you are saying is relevant?

MR. STANLEY: Yes. May I approach?

THE COURT: Yes. So on page 9, the portions of 8 and 9 is what you want your testimony to be to the jury regarding the question asked in 7 and 8?

MR. STANLEY: Yes. It was to just to have proof that I asked the question in tax court as well as in the -- as well as in the referenced letter. The referenced letter is, I believe, my Exhibit D1. I also have it highlighted in this area that says I asked. I asked repeatedly about this item and didn't get a response.

MR. BECKER: In fact, there was a response. The tax court granted the motion for summary judgment and specifically said these arguments were frivolous and without merit. So there was an answer in the tax court which was appealed to the court of appeals which also denies which said that the granting of summary judgment was appropriate. So the fact that he writes something down in an unsuccessful pleading shouldn't be allowed to bolster his frivolous claims.

MR. STANLEY: The point is that I -- is that my intent was to get an answer with a law or statute that says, Here's the answer. And just calling something frivolous is not an answer. You need to tell me what is acceptable, just like I

was asking the lady this morning. You can call it frivolous but frivolous can be a lot of things. What specifically is the standard? If I don't know the standard, how could I comply?

THE COURT: I'll let you testify as to information you sought from the IRS, what your understanding was, what efforts you made to clarify, and the responses you received. You can refer to written answers. You can refer to those different procedural events. I'm not going to allow you to put in a document that is way more confusing to a jury than appropriate.

I would tell you, though, you're going to be cross-examined as to those areas as well when you open yourself up to testifying. But I will let you testify as to the contents in that you can tell the jury I asked IRS these questions. I didn't get a response as to these questions. But then if the government disagrees with that, they may be able to cross-examine you in those areas. Again, if you want to utilize Mr. White, he remains in the courtroom to go through these different approaches.

MR. STANLEY: All right. That helps. Thank you.

THE COURT: Anything else from the defense? Mr. Stanley, do you have other areas of concern that we may be able to clarify at this point?

MR. STANLEY: I don't think anything else is appropriate at this time.

THE COURT: Mr. Becker, do you have any other issues?

MR. BECKER: No, Judge. Thank you.

THE COURT: I'm sorry. You're only going to get a brief lunch. It's now 12:15. We'll begin back at 12:40 to discuss instructions.

(The noon recess was taken at 12:15 p.m. until 12:40 p.m.)

AFTERNOON SESSION

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: I think Ms. Russell has an instruction packet for each of you that we can all be on the same page.

The first instruction in the packet is a pro se defendant, and I'm inclined to give this without recommendation by either side. Does either side want to weigh in?

MR. BECKER: No objection, Judge.

THE COURT: Do you want to take a moment to read this, Mr. Stanley, and get back with us?

MR. STANLEY: Please.

THE COURT: I don't know that there will be any stipulations, and so No. 2.02 at the bottom may not be applicable in this case, but we'll have that in reserve.

Similarly, the next instruction, 2.04, I don't know that this will be applicable.

Mr. Becker?

MR. BECKER: It's possible on cross-examination the government will refer to some statutes and/or Treasury regulations.

THE COURT: So we'll hold that in reserve.

Now we are -- 3.01 typically begins the instructions read to the jury. I didn't make any changes to the government's proposed Instruction 3.01.

Instruction 3.02, no changes.

3.03, we may want to tweak the first paragraph when it talks about facts that have been stipulated, that is, formally agreed to by the parties; and then also if there's nothing that is judicially noticed, so we'll need to keep our eye for those potential changes.

On the list of things that are evidence, we altered No. 1 to instead of the lawyers representing the parties, we changed it to comment by the government's attorney and the defendant. Any objection to that change?

MR. BECKER: What instruction are we on, Judge?

THE COURT: I'm sorry. 3.03.

MR. BECKER: Okay.

THE COURT: Just to reflect the situation in this trial. Any objection to that tweaking of one on Instruction 3.03?

MR. STANLEY: Your Honor, my concern about this one,

as well as about the opening one is that it reduces me to a lawyer, and I don't mean that in a bad sense, but is that going to be confusing to the jury if I offer testimony under oath as if a witness? Do you understand why I'm struggling with this a little bit?

THE COURT: Do you have a suggested change? Or, Mr. Becker, outside of admissible testimony of the defendant?

MR. BECKER: I think that would be a good distinction or perhaps an affirmative statement that says that the defendant's -- the defendant's testimony is evidence that you could consider separate from his role in representing himself.

MR. STANLEY: Almost like we need to say something along the lines of when the defendant -- if the defendant takes the position of witness, then his testimony is to be regarded the same as any other witness, because this makes it sound like I might as well not say anything. I'm exaggerating but I think it's potentially confusing.

THE COURT: We could add a second sentence on one, however, testimony of the defendant that was admissible should be considered as evidence.

MR. STANLEY: I appreciate that.

MR. BECKER: As any other witness. I think that's fine.

MR. STANLEY: As any other witness would be great.

THE COURT: Ms. Russell referred us to the defendant representing himself, and we might be able to amend the last sentence, The defendant's testimony is evidence in contrast to his actions as a lawyer. So we might be able to pull that language in as well. That's a good idea.

Then on two, the model instruction say lawyers have the right to object, and we've changed that to the parties have a right to object.

And then in Section 3, I will be inclined to delete that if no testimony is struck from the record, and just to be on alert to remind us to put that in the right format to reflect what happened in the trial.

MR. BECKER: Well, that may be useful following defendant's offer of evidence.

THE COURT: Okay. And if we do strike evidence or anything from the record, I do want to leave that, but sometimes I have put that in there when I really don't need it, and I think it's kind of confusing.

Then also the, Finally if you were instructed that some evidence was received for a limited purpose. We may want to revisit that to see if there was anything for a limited purpose.

The next page, 3.04, the only tweaking we did was take out the possessive witnesses. We just deleted one of -- the S to be consistent throughout the instruction packet.

And, Mr. Becker, who are your experts in the case?

MR. BECKER: Wendell Thomas from the Federal Reserve Board. He's offering his opinion on the money orders.

THE COURT: And so if you do have him testify as an expert, we will have Instruction 4.10. We tweaked that with the S after the possessive mark.

On 4.12, I am not sure if the accuracy of those schedules, summaries, and charts have been challenged. I just want to bring that to the attention of both parties if that is appropriate in this case or not.

On the next instruction, Model 3.06, we didn't have any changes.

On plaintiff's 6.26, two things that I note. Both the two larger paragraphs on the first page end in the statute makes it a crime willfully to attempt in any way or manner to evade or defeat any income tax imposed by law. If we should set that sentence alone in its own paragraph form and not repeat that. Just something to think about, Mr. Becker, in your submitted instruction.

And then on the second page I don't know that it's helpful to have the paragraph that begins with, Even though the indictment alleges a specific amount. I don't know that even in the preliminary instructions we gave an amount, and I don't know if --

MR. BECKER: I can say that the indictment alleged

an amount and there's been calculations since then giving the defendant credit for further deductions. So that if you were to compare the tax due and owing chart, for example, the Government's 202 with the total amount in the indictment, it's a lesser amount by some -- I guess, a thousand or two. I don't know. But I would ask that remain there. It's not -- if someone were to be confused and say, Well, the indictment charges X and they only proved X minus a thousand. This addresses that issue.

THE COURT: I would be inclined, then, to change the language to, Even if the indictment alleges the specific amount of tax due for any calendar year or years, the proof need not show, and continue on and end that paragraph with the last line, Substantial income tax. Why don't you just take a look at that suggestion, Mr. Becker, and see if that helps.

MR. BECKER: I think that would address the issue, Judge.

THE COURT: And then before we have our final instruction conference, of course, Mr. Stanley, I'll want you to weigh in on each of the plaintiff's submitted instructions as well.

On Instruction 7.04, I did note the cases that you drew this instruction from, and I think the instruction is a helpful instruction. I am still reviewing that very last paragraph. I think the case that -- I think it's a combination

of the two cases where you pull the language; is that correct?

MR. BECKER: Yes, Judge.

THE COURT: And I really think the United States vs. Bussey, the Eighth Circuit case, is helpful, but I'm not sure about the helpfulness of that last paragraph, and I will just wait to see how the evidence comes in. It would be my inclination at this point.

And then the Court has supplied, and the plaintiff may have supplied this as well, the good-faith instruction. Did you supply that after we started?

MR. BECKER: Monday morning -- Tuesday morning, Judge, after reviewing defendant's submission.

THE COURT: And, Ms. Russell, can you remind me how we modified the good-faith instruction?

MS. RUSSELL: The only modification is in the first paragraph.

THE COURT: Which my understanding is that good faith would only go to Count 1, not Count 2. Is that your understanding, Mr. Becker?

MR. BECKER: Yes.

THE COURT: So that is the modification in, I believe, the one that you submitted just to make sure that the jury's clear on that.

Then with regard to Count 2, No. 4.26, there were no changes to the proposed instruction and no changes to

reasonable doubt.

And in the final directing instruction, 3.12, I'd like to specifically mention under fourth to send a note through my clerk, Terri Moore. I think it's confusing to use deputy or bailiff if she's never been called that in front of the jurors. And then, again, I repeat Ms. Moore instead of marshal or bailiff on this last page finally.

And then regarding the verdict forms, the case is now assigned to me so I will change Judge Sachs' initials to mine and add the word "form" to verdict consistent with the model instructions.

So that's where the Court is with the instructions at this point. When we have our final instruction conference, most likely at the end of the day, and be prepared to argue in the morning. Is that kind of where the thinking is of both parties?

MR. BECKER: I think that would be the schedule, Judge, yes. Thank you.

THE COURT: Mr. Stanley, is that what you were thinking that we would recess after the evidence today and have instructions and closing tomorrow?

MR. STANLEY: If it please the Court, I'm still contemplating my readiness to proceed once the plaintiff is done. I don't want to be disrespectful of the Court and overstep the boundaries that you've created, but I also don't

want to prejudice my presentation either. So it's a very careful balance there that I need to reach, and I don't want to be saying things that you end up having to strike from the record.

THE COURT: I appreciate that.

MR. STANLEY: I would prefer to start fresh in the morning with my opening statement in the morning if that's acceptable to the Court.

THE COURT: I appreciate you giving me that heads up, and I'll absolutely take that into consideration. We'll just go ahead and proceed now with the evidence and see where we are, but that may work out for the best and might have our instruction conference tonight instead of you testifying. We'll play that by ear, but I understand what you're saying.

MR. STANLEY: I appreciate that, Your Honor.

THE COURT: Okay. Are we ready to call the jury in, Mr. Becker?

MR. BECKER: Could I have a break?

THE COURT: Mr. Stanley, are you about ready to resume? Do you need a break?

MR. STANLEY: I think I did everything I needed to do during the short lunch break. I think I'm all right.

THE COURT: Have you had a chance over the lunch hour to reach out to Mr. White?

MR. STANLEY: We had a short discussion, yes.

THE COURT: Okay.

(The following proceedings were had in the presence of the jury:)

THE COURT: Please be seated.

Mr. Becker, are you ready to call your next witness?

MR. BECKER: Yes, Your Honor.

United States calls Wendell Thomas.

THE COURT: If you will remain standing and face my clerk.

WENDELL THOMAS, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good afternoon. Please state your name and spell your last name.

A Wendell Thomas, T-h-o-m-a-s.

Q Mr. Thomas, how are you employed?

A I'm with the Federal Reserve Bank of Kansas City.

Q How long have you been with the Federal Reserve Bank?

A This is my 24th year.

Q What do you do at the Federal Reserve Bank?

A I'm a senior enforcement examiner.

Q What is your background and training for that position?

A As a field examiner, you're required to go through a rigorous commissioning process. When I joined, I went through that process to become a bank examiner.

Q And what areas of the banking system do you become

familiar with?

A As a bank examiner, you're commissioned to examine any bank, federally regulated bank in the country, and I'm what is called a safety and soundness examiner.

Q What does that do?

A That entails all operations of the bank, the bank's capital, their asset, their earnings, the bank's liquidity, their sensitivity to market risk, and changes in the interest rates and the like.

Q As part of your duties and training at the Federal Reserve, have you had any training in the area of fraud?

A Yes. I'm presently a system instructor for a fundamentals of frauds class as well as an advanced fraud school.

Q Do you have any certification in that area?

A Yes. I'm a certified fraud examiner. I have my CFE. That was through -- I've had my CFE since 2005, which is I'm certified through the Associated Certified Fraud Examiners.

Q Does that take some specialized training and practice?

A Yes. It required, in my case, about a year of study because I was working as well, and it took me about a year to complete the training, and then it requires a certification test that's sanctioned by the association which you have to pass at a certain level, and then you get your certification which requires annual recertification.

Q I'd like to ask you about negotiable instruments. What does that mean in the banking system, in the Federal Reserve system?

A Well, a negotiable instrument is something, simply put, it's something that can be converted to cash.

Q Is a check a negotiable instrument, a check from someone's checking account?

A Yes.

Q What characteristics does that have, a check, to make it a negotiable instrument that would be able to go through the federal banking system?

A Well, a check -- you write a check. You make it payable to someone, some third party. A check also has an account number at a bank or a savings bank, and it also has a routing number. That routing number identifies the bank or the paying bank as a member of the Federal Reserve system.

Q Could you tell from the routing number the area of the country of the bank?

A Yes, you can.

Q Could you explain that to us, please?

A The Federal Reserve system is divided into 12 districts across the country. Our district in Kansas City is the Tenth Federal Reserve District; and if one who has a bank account in Kansas City has a routing number, that would begin with a 1 and a 0 identified as the Tenth Federal Reserve District. So your

nine-digit routing number if you have a bank account here in Kansas City, it will be begin with a 1, 0, then the rest.

Q Is a money order a negotiable instrument?

A Yes.

Q I want to show you what's marked for identification purposes as Government's Exhibits 184 and 185. First, could you tell us what 184 is?

A 184?

Q Yes.

A Government's Exhibit 184 is a postal money order.

MR. BECKER: I'd offer that into evidence as Government's Exhibit 184.

THE COURT: Any objection?

MR. STANLEY: No objection, Your Honor.

THE COURT: Admitted.

Q (By Mr. Becker) So looking at 184, what about this postal money order that would make it a negotiable instrument?

A It's in the amount of one dollar. The person who purchased this money order, purchased it for one dollar. It has a payable to on it. It also has what appears to be a routing number and an account number. Now, this is from the post office and not a bank.

Q Okay. If you'd look at Government's Exhibit 105, please. What is that -- 185. I'm sorry.

A This is Government's Exhibit 185 and it is a personal

money order from United Missouri Bank.

MR. BECKER: I offer that into evidence as Government's Exhibit 185.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) What is it about this money order that would make it a negotiable instrument, that is, you could convert it to cash as you said?

A It was purchased. It has a routing number. It has an account number. It also has a serial number on the top of it, which it says it's from a series or stock of money orders that are within a particular bank.

Q If you could look, please, at the numbers on the bottom and explain what those are.

A The numbers at the bottom, the first going from left to right, the left-hand -- the left number is the serial number from this particular stock.

Q And that matches the number up in the upper right-hand corner?

A Yes, it does.

Q Okay.

A And the second -- middle set of numbers is the routing number. Again, it begins with that 1, 0; and, again, the Tenth Federal Reserve District, United Missouri Bank being in this

Tenth Federal Reserve District.
Q That routing number would indicate some branch -- the United Missouri Bank?
A It would indicate that the United Missouri Bank is in the Tenth Federal Reserve District.
Q What's the final number there?
A The third set of number is the account number of UMB Bank where they purchased this. It's UMB Bank, the payor's account number.
Q So if you went to negotiate, cash this money order, it would come out of UMB --
A Account 50080, exactly.
Q I want to show you a series of documents that are in evidence in this case and ask you whether or not they're negotiable instruments that could be processed through the Federal Reserve banking system. Government's Exhibit 11(a). And, by the way, we had a chance obviously before today to review these documents prior to your testimony; is that right?
A Yes.
Q 11(a), is that -- purports to be a money order. Is that something that would be a negotiable instrument that you could convert to cash?
A No, it would not.
Q Why not?
A Well, first of all, the account number is not an

account number. It appears to be a Social Security number, and an account number is not one's Social Security number.

Q Is there any -- I guess we need a routing number or some bank that would be responsible for paying this amount?

A That would be correct as well. It has -- it doesn't appear to have a routing number from which an account -- or an account number. It has a tracking number. Money orders are tracked but they are tracked via the serial number. The exhibit we had before had a serial number that it can be tracked from, but this one -- to answer your question, it doesn't have a routing number or an account number at a bank.

Q Could this be processed through the banking system to move money from somebody to the United States Treasury?

A It does not have -- it does not have a -- it's not a postal money order or not a bank money order, so there is no payor bank here with an account number or postal.

Q One of the things -- and is the amount for this money order, in your experience, unusual?

A Yes, it is.

Q Why is that?

A Most money orders are denominations not in excess of a thousand. Money orders are normally used for persons that don't have a bank account. They may purchase a postal money order or a money order to pay their cable bill or something to that effect.

Normally banks do not issue money orders of very large denominations, like in this case $56,000, because normally money orders are paid via cash or a debit card from which they can purchase; and of this size of money order would be normally -- if you would say, for example, you were closing on a home or putting a down payment on a house where you would have a large denomination, normally the source of those funds would be the bank account that you might have. I don't think anyone comes to a bank with $56,000 in cash.

Q And gets a money order?

A And gets a money order.

Q I'll show you what's in evidence as Government's Exhibit 12. Would that be a negotiable instrument that someone could convert to cash?

A Well, this is not a check. It's not a money order. It purports to be a voucher. It does not have what appears to be a routing number. It doesn't have the payor bank from which the funds were negotiated, and it also -- the most prominent thing on this is that it's in the amount of $105,000. As I indicated before, a bank would not issue a money order in the amount of $105,000. If they did, it would have to be certainly an exception, but that's normally not the case, and the person would have to have an account with a bank in order to purchase a money order this size. But, again, this is a voucher. This is not a money order.

Q I show you what's in evidence as Government's Exhibit 15(a). Is this a negotiable instrument that the Treasury could take to the bank for $113,000?
A No, it is not.
Q Why not?
A It does not have -- there's no account from which those funds can be secured. Again, there's no routing number. There's no -- this could not be put through the system for payment.
Q Next I want to show you what's in evidence as Government's Exhibit 16(a). I have the original.
MR. BECKER: May I approach?
THE COURT: Yes.
Q (By Mr. Becker) The top document, then, is the original. If you could show that to the jury as you explain whether or not that would be a negotiable instrument.
A Again, this is not a check. This is not a money order. It has writing, "Accepted for value." This does not have an account number. It doesn't have a routing number. It cannot be presented to a bank teller to say, Accept this for payment. There is no account from which this can be negotiated.
Q Next I want to show you Government's Exhibit 78(a). Once again, would this be a negotiable instrument that could be deposited in the United States banking system to move the money to the Department of Treasury, 63,000?

A No. It has the same characteristics. It does not have the routing number. It does not have the payor bank. It is not a postal money order. To be clear, not all money orders come from banks. It could come from be it the post office, Western Union, or the bank. It would have to be an account and there is no account there.

And also the amount is very large of $63,000 is something that a bank, especially a post office, would not accept that large of an amount of money. At a bank you would be issued an official check or a cashier's check of large amounts in that respect.

Q Something that's drawn on the bank, the bank's own accounts, an official check or cashier's check?

A Yes, an official check or cashier's check would be drawn on the bank. The funds would be accepted from the individual to purchase that official check or cashier's check. Also such a large size most banks would say you have to be a customer of that bank from which they can secure those funds.

Q Finally, I'd like to show you Government's Exhibit 131(a). And I have the original here.

MR. BECKER: If I may approach.

Q (By Mr. Becker) If you could show the jury this as you describe it. That's entitled, "Money Order"?

A As you can see, this money order is of a large denomination. Again, as I explained, banks typically do not

issue money orders of this size. Also in the memo account you'll see what, again, appears to be a Social Security number, and the Social Security number can never be mistaken for an account number. Also if this were attempted to be negotiated across a teller line, there's no account. There's no routing number. There is no payor bank. Again, in the case of a postal order, it doesn't even say that.

So this is not a negotiable instrument from which someone can just take the Internal Revenue -- or United States Treasury, I'm sorry, could not take this to their bank, if you will, and negotiate that.

Q That's all. Thank you very much.

MR. BECKER: I have no further questions at this time.

THE COURT: Mr. Stanley, do you have any cross or questions?

MR. STANLEY: Yes, I do, Your Honor.

CROSS-EXAMINATION BY MR. STANLEY:

Q Good afternoon, Mr. Thomas.

A Good afternoon.

Q Let me start out with one background question that I don't believe Mr. Becker asked you. What is the relationship between the Federal Reserve banking system and the United States Treasury?

A What is the relationship between the Federal Reserve

and the United States Treasury?
Q Yes. Are they the same thing? Are they synonymous?
A They're not the same. The Federal Reserve system conducts monetary policy. It also protects the safety and soundness of banks that are members of the Federal Reserve, and they conduct, you know, monetary policy in terms of interest rates.
Q Okay. So is the Federal Reserve system a corporation of some kind? Is it an association of banks?
A There are banks that belong to the Federal Reserve system, yes.
Q But the Federal Reserve system is not the same as the U.S. Treasury?
A That is correct.
Q Okay. So they are separate entities?
A That is correct.
Q All right. All right. So your criteria for your examination of these items, was it, therefore, based upon the acceptability to the Federal Reserve Bank?
A Well, the Federal Reserve system, yes.
Q So are you authorized to speak for the United States Treasury as far as these issues or not?
A I'm authorized to speak in my experience as a Federal Reserve Bank Examiner.
Q Federal Reserve Bank Examiner. But are you an official

of some type with the United States Treasury also?
A Not an official of the United States Treasury, no.
Q So you're not an official with the United States Treasury. All right. So when you talk about your criteria for evaluating these -- did I understand you to say that your pass/fail criteria was can you convert it to cash?
A That would be correct.
Q Okay. So what exactly is cash?
A I don't understand the question, what is cash?
Q Well, what is cash? Is it a Federal Reserve Note? Is it coin? Is it currency?
A In that respect, yes. I mean, payable tender that you can deposit into an account --
Q Okay. So then --
A -- for payment. I'm sorry. For payment.
Q Okay. So where does the Federal Reserve Note come from?

MR. BECKER: Objection; relevance.

THE COURT: Would you approach, please.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: I think your question was, "Where does the Federal Reserve Note come from?" What's the relevance of where does a Federal Reserve Note come from?

MR. STANLEY: Well, I'm attempting to determine what

the substance is that you can exchange -- what backs the Federal Reserve Note? What is it?

MR. BECKER: But this is a federal criminal trial for tax evasion, and it's not relevant to have some speculative discussion about the Federal Reserve Note and what backs it.

MR. STANLEY: Well, my reason for me considering it to be relevant is that this criteria for negotiable instruments is that you can convert cash, which he equated to be Federal Reserve Notes and currency. Well, if it can be converted to Federal Reserve Notes, what are Federal Reserve Notes?

THE COURT: I'm going to sustain the objection.

MR. STANLEY: All right.

(The proceedings returned to open court.)

Q (By Mr. Stanley) One of the criteria you mentioned was an account number. Now, an account number in the Federal Reserve Bank -- let me see if I understood your statement. You would expect to see an account number for a Federal Reserve Bank on either a check or a money order. So you're taking that to be the substance behind the money order issued from a bank or issued from the post office is the money that's in the account? Is that an accurate statement?

A Yeah. When a money order is purchased, whether it be from the post office, whether it be from a grocery store, or a bank, it has to be purchased via cash in the form of currency or the form of debit card from which cash is taken, and that --

when that account is purchased, when that particular money order is purchased, you receive the -- the person who purchased the money order and receives the money order, they negotiate that, whether they go to a bank or post office, and those funds come out of an account from which those funds are deposited.

Q All right.

MR. STANLEY: So let's just call up any one of the -- Exhibit 12 is fine, if that's convenient. That's a good one to call up.

Q (By Mr. Stanley) So is there anything on this Exhibit 12 that would suggest that I intended for that to be a Federal Reserve Bank money order?

MR. BECKER: Objection. The witness can't speculate on the defendant's intent.

THE COURT: Can you rephrase the question, please?

Q (By Mr. Stanley) Does something on this document suggest a Federal Reserve Bank involvement?

A No.

Q Thank you.

But can you speak for the Treasury Department as far as the acceptability of this instrument?

A I can't speak -- if I understand -- I can't speak for the United States Treasury, but I can speak -- if the United States Treasury wanted to negotiate this item, there is nothing on the item that says it is from a bank, post office, whatever

the payor is.

Q Okay. Does the Treasury get all of its funds from the Federal Reserve Bank?

A I can't answer that question.

Q Okay. What is the process if a Federal Reserve Bank receives a bad money order?

A They would go back to the purchaser. Now, if the purchaser -- for example, just like a check that is negotiated. If the check bounces, they go back to the person who wrote the check.

Q So if someone presents a money order at a Federal Reserve Bank and it's insufficient funds or whatever, that Federal Reserve Bank returns it to the person that submitted it? Is that an accurate question or accurate statement?

A Well, when a money order is purchased, it's usually purchased with cash, and typically the person receives some sort of receipt or there would be some sort of carbon copy that identifies it as being purchased on that day, and essentially a money order should be -- it would not be issued if the funds were not there.

Q Okay. But do people ever counterfeit money orders and try to submit them to the Federal Reserve Bank?

A For example, bearer -- if you don't write on there who it is to, if I leave the payable to blank, somebody can get ahold of the money order and they can write whatever they want

to themselves. For example, the money order is purchased with good and available funds.

Q All right. All right. But if you receive a bad check from somebody, insufficient funds or something like that, closed account, then the Federal Reserve Bank returns that check back to the person who submitted it?

A Yes, with associated fees and penalties for passing bad check. If there is an account at that bank, they would assess fees and request it be made whole.

Q All right. Thank you.

MR. STANLEY: No further questions, Your Honor. Thank you, Mr. Thomas.

MR. BECKER: Can we approach for a second, Your Honor.

(Counsel approached the bench and the following proceedings were had:)

MR. BECKER: Although he wasn't on the defendant's witness list that he wanted to recall, I believe he should be excused. There's no further need for recalling this witness.

THE COURT: Is he finally excused?

MR. STANLEY: Mr. Thomas? I'm sorry. Yes. That was the intent.

THE COURT: Okay.

(The proceedings returned to open court.)

THE COURT: Mr. Thomas, you can be excused.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Please call your next witness.

MR. BECKER: United States calls David Melcher.

THE COURT: Please come forward and walk up to the screen and remain standing and face my clerk, Ms. Moore.

DAVID MELCHER, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good afternoon.

A Good afternoon.

Q Please state your name and spell your last name.

A David Melcher, M-e-l-c-h-e-r.

Q Mr. Melcher, how are you employed?

A I work for the Internal Revenue Service.

Q How long have you been doing that?

A Almost 30 years.

Q What's your educational background?

A I have a degree in business from the University of Missouri.

Q What is your position at the Internal Revenue Service?

A Right now I work in the appeals office. I'm in the appeals office and try to resolve tax disputes without litigation.

Q Where is that located, your particular office?

A 2345 Grand Boulevard in Kansas City, Missouri.

Q So just down the street?
A Just down a block.
Q How long have you been in the appeals office?
A Ten years.
Q Could you a little more fully describe the appeals process for us, please?
A Sure. Whenever the Service issues a Notice of Intent to Levy, which is basically a balance due notice that says, Hey, pay us or we'll take your stuff, that grants a taxpayer the right to appeal, Hey I have a different way to resolve this.
The other method is when the Service files a Federal Tax Lien, the taxpayer has the right to come back to appeals and say, Hey, I have a different way to resolve this or indicate why he disagrees with the filed Federal Tax Lien.
Q So obviously there's a bit of a process with the Internal Revenue Service before it comes to you?
A Certainly.
Q What -- could you take us, briefly but, you know, sort of the steps before it comes to your office?
A Quite frequently these balance due amounts have been out in the field or on the books to say for many years. In other words, there has to be a valid balance due. The Service sends out a balance due notice. At least ten days have passed, then there's still a balance due notice, the Service has the

authority to file a Federal Tax Lien at that time.

The taxpayer can contact the 1-800 number. Frequently they've already worked with taxpayer assistance. Frequently they've already contacted the Internal Revenue Service through various types of correspondence or in person or through the courts; and then by the time it comes to me, they have this appeal process regarding the Notice of Intent to Levy or filing of the Federal Tax Lien.

Q And so this hearing that they have, what is that called?

A Collection due process hearing.

Q And what can the taxpayer do -- what are they contesting at a collection due process hearing?

A If it's the issuance of the Notice of Intent to Levy, they're protesting -- they're contesting that the Service could take any type of collection action. In other words, they can say I have an installment agreement I'd like to propose. I can full pay this. I can offer a compromise. Whatever issues they raise we'll consider in appeals within reason.

We also verify the functionality of the tax assessment by taking a look at the tax amount making sure there's still an outstanding balance due.

Q Let's stop there a minute. What would you do on a request for collection due process hearing to determine whether or not there was still an amount that was due and owing on a

tax year?

A First of all, we would go to IDRS, which is our internal computer system which holds all the balance due accounts. It has information on the tax assessed, penalty assessed, what's currently owing, the history of that account, in other words, if they made any payments. There's literally hundreds of codes that could be on there that would give us some indication what's going on with the case. So that's the first thing we would do and go back and verify if there is a balance due.

Q So all those codes in the data system would tell you whether or not there's been any payments made and accepted by the IRS?

A That is correct.

Q So how do you, then, sort of make contact with or respond to in the first instance with the taxpayer who's requested the collection due process hearing?

A First of all, we would review the account and what the taxpayer says. We issue a letter that just says, Hey, we have this appeal. We'll get back to you. Personally when I get it, I'll send out an appointment trying to address some of the issues they raised, and I'll set a specific appointment; and if they have any questions, it indicates they can contact me before the appointment.

Q I'm going to show you a number of documents that are in

evidence. First of all, Government's Exhibit 81. Would you look at that, please. What is that?

A That's the actual form that I send out to request a collection due process hearing.

Q And in this case obviously we've reviewed these documents that relate to taxpayer, Harold R. Stanley; is that right?

A Correct.

Q Did you handle his request for collection due process hearing?

A I did.

Q When was that?

A 2012.

Q October of 2012?

A Yes.

Q What is Government's Exhibit 81? Could you just relate the information and what it means to you when you get one of these forms?

A Sure. I can't see the rest of the form, but its either the Notice of Intent to Levy or the filing of the Federal Tax Lien. I would take a look at it to determine if it was timely because for the issuance of the Notice of Intent to Levy the taxpayer has only 30 days in order to request the timely appeal. If it's past 30 days, they still have an appeal, but they can't dispute the determination in tax court. There's

still -- it's called an equivalent hearing.

After filing the Federal Tax Lien, they get a Letter 3172 which actually gives them a deadline to request the appeal, take a look at that to see if it was timely or not. Again, even if it's past the date on the 3172 letter, as long as it's within one year, we still give an equivalent hearing.

Q Look at page 2 and tell us what the information that you noted on page 2.

A This one is actually "Filed Notice of Federal Tax Lien."

Q Okay. So that box is checked?

A That is correct.

MR. BECKER: If you'd scroll down, please.

Q (By Mr. Becker) The handwriting in there, what does that mean to you? You received this form so what did you understand that to mean? What did you do about it?

A It says, "Tax liabilities settled per U.C.C. 2006 currently before Eighth Circuit Court of Appeals." U.C.C. is some type of Uniform Commercial Code. I have no idea how that applies to him. I looked to see if there was any appeal out there in circuit court, and I didn't find anything.

Q So when it says, "Liabilities settled per U.C.C.," did you determine in 2012 whether or not Mr. Stanley still owed money to the Internal Revenue Service?

A He did.

Q And what's the date that this was submitted to you or it's signed by Mr. Stanley?
A August 29th, 2012.
Q Next I want to show you Government's Exhibit 136. What is this?
A This is just our acknowledgment letter indicating that we received the appeal.
Q Is this -- at the top there is this a letter that -- I suppose it's computer generated. Was that done at your direction? This letter, do you type this up? How does this letter go out?
A Yes. It comes to us and then we'll send that letter out.
Q And what information is in this letter to Mr. Stanley?
A I just talked about the appeals process, what we do, you know, what they can expect during the appeals process, how they can contact me.
Q And is that at the top there your name and telephone number to contact you?
A It is.
Q What's the date this letter was sent out?
A September 20th, 2012.
Q Next I want to show you Government's Exhibit 137. What is this?
A This is my specific appointment letter which would have

been issued to Mr. Stanley scheduling our appointment.

Q Let's first look at the top then. What's the date of this letter?

A October 15th, 2012.

Q And what were the tax years that were being appealed or reviewed?

A 2005, 2006, 2007, 2008, and 2009.

Q Then what was the -- was this an appointment that you made, then, with Mr. Stanley?

A That is correct.

Q And what -- we'll get to the actual telephone call in a minute. But what is the purpose of the call with the taxpayer?

A The purpose of the call is to allow them to raise whatever issues they have. The purpose is to set the specific appointment to inform them that they have this opportunity, you know, to discuss this with a settlement officer in appeals.

Q Next I want to show you Government's Exhibit 78. What is that?

A That is a letter from Mr. Stanley just indicating that he received my letter, and he gave me a corrected telephone number.

Q Now, what was -- could you read the second to the last paragraph there, please?

A "Attached are copies of documents responding to presentments from the IRS for the subject tax years. No

original signed document has been returned by the IRS, and no notice of dishonor identifiable with these documents has been received from the IRS. The liabilities therefore stand settled under the Uniform Commercial Code."

Q Did that mean anything to you?

A It did not.

Q Did you go forward with the appeals process based upon the fact that Mr. Stanley still owed money to the IRS?

A I did.

Q I want to review some particular documents in this that were attached to this letter from Mr. Stanley. First of all, Government's Exhibit 78(a). Did you review these documents?

A Yes.

Q And did you determine whether or not these had been valid payments to the Internal Revenue Service for Mr. Stanley's tax obligations?

A These were actual balance due notices issued by the Internal Revenue Service and he had handwritten on there, "Paid to the order of Department of Treasury, sixty-three thousand dollars and no cents," and then checked the box indicating the amount enclosed was 63,000, and then signed it as Harold R. Stanley, authorized representative.

Q I'd like you to look at 78(b). Now, could you read, please, for the jury the part where it says, "Why am I getting this notice?" and, "What should I do?"

A This is a balance due notice from the Internal Revenue Service regarding past taxes for 2005. It says -- it shows the specific amount owed of $61,641.37. It says what you should do, "If you can make a payment, make your check or money order payable to the United States Treasury. Write tax year 2005 and this Social Security number on your payment." So the Service can properly apply it.
Q And if we could look at the next page, please, actually at the bottom there, No. 2, if -- it says, "If you can't pay." Could you read that part, please?
A No. 2 says, "Complete and detach the payment stub at the end of this notice."
Q I'm sorry. And further down it says, "If you can't pay the full amount owed."
A It says, "If you can't pay the full amount owed, pay as much as you can."
Q What's the next line?
A "Review the payment options listed on the back of this page," which would have talked about compromised installment agreements, other ways to pay.
Q Let's look at the next page of Government's Exhibit 78 under payment options. Page 6 of 78. What are the payment options that were given to Mr. Stanley or that were in this advice to Mr. Stanley for his tax that was owed for 2005?
A It says, The following payment options may be available

to you. Please call us at 800 to discuss these options and make payment arrangements. To see if you are eligible for an online payment agreement, go to the website and get one of those -- it states specifically the options that may be available are the installment agreement, automatic deductions from your checking account, payroll deductions, or credit card payments.

Q And going back to the previous page, what was the date of this letter to Mr. Stanley?

A August 23rd, 2010.

Q Next if we could please look at Government's Exhibit 78(c). Did you review this when it was received from Mr. Stanley?

A I did.

Q And does this language, "Accepted for value and returned for value for settlement, closure and setoff," cancel the debt to the IRS?

A No. That makes no sense to me.

Q Next we look at Government's Exhibit 78(d), as in David. This is part of Mr. Stanley's letter back to you on October 29th of 2012. These two -- the images on this page, did that indicate to you any payment to the Internal Revenue Service for the tax due and owing for 2009 of $96,000?

A No. Again, he had wrote on there, "Payment to the order of Department of Treasury." That part of the statement

says, "Make your check or money order payable to the United States Treasury." However, he did not attach a copy of payment or check or money order.

Q If we could look at page 35 of 78, please. And this is similar to what we saw for 2005. Are there instructions on -- what's the date of this letter, first of all?

A August 23rd, 2010.

Q And are there instructions on here to Mr. Stanley in how he should pay the amount due of $85,000?

A Again, it says, "What should I do? If you can make a payment, make your check or money order payable to the United States Treasury. Write tax year 2008 and this Social Security number on your payment. Complete and detach the payment stub at the end of this notice. Send the stub and your payment in the enclosed envelope."

Q The next page, does it also have the same payment options that would have been available for Mr. Stanley, the installment --

A Installment agreement, automatic deductions, payroll deductions, and credit card payments.

Q Now, did you, in fact, then have a conference with Mr. Stanley on October 31st, telephone conference 2012?

A I did.

Q Could you tell us about that conversation, please?

A Yes. It would have started out where I identified

myself, and he indicated, you know, I'm a settlement officer in appeals. We're a separate function within the Internal Revenue Service. We're not bound by the decisions or determinations of any other function. Then I would have opened it up to Mr. Stanley to raise whatever issues he would like to raise. He indicated that he received a notice, I think it was like August -- a couple weeks after the Service that issued it, then he responded within a few weeks after that.

Q So that would have been he was saying that he received a levy notice on August 17th, 2012, and responded thereafter?

A That is correct.

Q Did he tell you -- did you talk to him about that Mr. Stanley had, in fact, included the deficiency notice that he sent back to you?

A Well, another thing we talked about after that was he said he did not receive any of the deficiency notices. One of the things that the Internal Revenue Service -- if there's a statutory notice of deficiency, the Service has to be able to prove that it was mailed to the last known address or the taxpayer received it.

So I explained to him that for the taxpayer's 2007, 2008, 2009 there were originally filed tax returns and the Service doesn't assess those statutory notice procedures; in other words, they don't have to send out the certified mailing because the taxpayer filed that tax return himself.

Now, for 2009 there was an additional assessment which required the statutory notice of deficiency procedures. In other words, if that notice was issued, he said he hadn't received it, however, he had included that part of his correspondence.

Q Did Mr. Stanley say anything to you about payments that he had made to the IRS?

A I reviewed those documents that he sent to me, and he stated to his knowledge these were payments to the Internal Revenue Service, and I told him this is nothing more than the bill you received from the Internal Revenue Service and you handwrote on it, you know, "Pay to the order of the United States Treasury." That's not a payment instrument.

I asked him if he had a copy of the check or some other payment instrument or some type of verification that these amounts have been debited from a checking account or from some transfer of funds. He indicated he did not.

Q And so you were asking for some proof that his bank accounts had transferred some money over to the IRS?

A That is correct.

Q Did Mr. Stanley provide any proof or anything like that?

A He did not. However, at the conclusion of the conference, I indicated I'd grant him an additional week to submit substantiation that these were payments to me.

Q I'm sorry. Then did Mr. Stanley come back in a week or at any time while you handled the appeal process to show any proof that money had come from his bank account to the IRS?
A He did not submit any additional substantiation.
Q I want to show you, then, Government's Exhibit 79. What is this?
A This is my determination letter that would have been sent by certified mail for Mr. Stanley regarding our conference and my determination.
Q And what's the date of this determination?
A February 25th, 2013.
Q What was the result, I guess on page 2, the bottom line on your determination?
A "The filing of the Federal Tax Lien by the Service was appropriate. The lien action is sustained. A further explanation is contained in the attachment to this letter."
Q And then there's a multipage attachment?
A That is correct.
Q If we'd look at what's numbered as page 5 of that attachment, the paragraph that says, "You submitted copies of balance due." It's on page 5: Could you read that paragraph to us, please, as part of your determination?
A "You submitted copies of balance due notice letters which were sent to you and you handwrote 'Money Order Pay to: Department of Treasury.' You attempted to indicate that these

letters were some type of payment on your debt. You were informed that these documents did not represent actual payment instruments and you were granted additional time to submit substantiation that the debts had been paid. You failed to provide any additional information."

Q Next I want to show you Government's Exhibit 151 -- 141. What is this?

A This is a decision letter. The decision letter is similar to determination letter, but it's a decision regarding the issuance of the Notice of Intent to Levy. The decision letter was not timely. Because it was not timely, the collection due process hearing, I believe, would have been a determination.

Q So these are essentially the same proceeding, but there were two letters because one was tell us why?

A One was timely and it also explained what his appeal rights are in tax court. One was not timely and he does not have appeal rights in tax court.

Q And what's the second one we're looking at on 141?

A I'm sorry. What was the question?

Q Which one was this? Was this the timely one or the untimely one?

A This was the untimely one regarding the issuance of the Notice of Intent to Levy.

Q And what was the summary of the decision?

A "Issuance of the Notice of Intent to Levy by the Service was appropriate. The proposed levy action is sustained. A further explanation is contained in the attachment to this letter."

Q And the memorandum that's in support of that decision, is that identical to the one you just read to the jury?

A It is, correct.

MR. BECKER: And I have nothing further at this time, Judge.

THE COURT: Mr. Stanley, do you have any cross?

MR. STANLEY: I do, Your Honor. Also I believe I need permission -- we need permission to approach the bench.

THE COURT: Come on up.

(Counsel approached the bench and the following proceedings were had:)

MR. STANLEY: There's been a question about the statements made. The statements made that I did not send him anything within the week time period. Yet I have the letter I sent him within the week time period with USPS track and confirm showing it was delivered. Of course, that's presenting evidence.

THE COURT: It seems like there was testimony at some point that there was -- he did not receive a response.

MR. BECKER: Correct. And the letter Mr. Stanley's referring to -- he's never shown us any tracking information.

It's our position it was not received by the IRS. We received a copy of that letter from Mr. Stanley when he was interviewed some years ago, but the IRS record does not reflect receipt of this letter.

MR. STANLEY: The United States Postal Service says it was delivered.

THE COURT: Is it marked as an exhibit?

MR. STANLEY: It is.

THE COURT: Can you give that to me?

MR. STANLEY: Certainly.

MR. BECKER: Defendant can ask about it.

THE COURT: I'll let you cross-examine him as to a letter that you --

MR. STANLEY: Okay. All right. Thank you.

(The proceedings returned to open court.)

CROSS-EXAMINATION BY MR. STANLEY:

Q Good afternoon, Mr. Melcher.

A Good afternoon.

Q I want to clarify one statement that you made. You mentioned that you gave me an opportunity to present something within a week and I didn't. I did send a letter on November 5th, which would have been five days after our conference, and I do have USPS tracking as delivered. Are you saying that you did not actually receive this that I have USPS tracking on?

MR. BECKER: Judge, perhaps the witness can be shown the exhibit.

MR. STANLEY: Certainly.

THE COURT: You may show the witness your documents, and for the record you've marked that as an exhibit; is that correct?

MR. STANLEY: Yes. It is marked as D9.

THE COURT: Thank you.

A I did not get this.

Q (By Mr. Stanley) Does anything on the tracking give you any suggestion of why you might not have gotten it?

A 333 West Pershing is not my address. That's the address of the service center, which is a large place. It's possible it went somewhere there.

Q Okay. Mr. Melcher, during our phone call, did I at some point ask you to define lawful payment?

A I don't recall you saying that, but if you did -- I mean, we had the discussion that this was the things that you submitted do not appear to be payment instruments. I asked you if you had some type of substantiation that these were payment instruments.

Q Okay. All right. That is the question that I had for you.

MR. STANLEY: Thank you very much.

THE COURT: Could I ask the parties to approach.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: Mr. Stanley, I had this as one of the witnesses that you wanted to call, and did you completely ask all the questions you wanted of him?

MR. STANLEY: Yes. I stepped outside of what he had directed on purpose.

THE COURT: Is he excused?

MR. STANLEY: He is excused.

MR. BECKER: Yes, Judge.

(The proceedings returned to open court.)

THE COURT: You are excused. You can stand down.

(Witness excused.)

MR. BECKER: Judge, we have one more witness. I'd like maybe five minutes to get organized.

THE COURT: Yes. We'll take a recess at this time. It's 2:15. Let's come back at 2:35, 20-minute early recess.

(Recess taken at 2:15 p.m.)

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Mr. Becker, it's just your case agent now?

MR. BECKER: That's right. Should we give the jury, Terri, their whole break?

THE COURTROOM DEPUTY: I can check to see if they're

back there. I'll do a head count.

(The following proceedings were had in the presence of the jury:)

THE COURT: Please be seated.

Mr. Becker, are you ready for your next witness?

MR. BECKER: Yes, Your Honor.

United States calls Special Agent Rich Littrell.

RICHARD LITTRELL, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. BECKER:

Q Good afternoon. Please state your name and spell your last name.

A Richard Littrell, L-i-t-t-r-e-l-l.

Q How are you employed?

A I'm a special agent with IRS Criminal Investigation.

Q How long have you been doing that?

A About seven years.

Q What's your educational background?

A I have a bachelor's in accounting and business from the University of Kansas. I've also got a master's in accounting also from the University of Kansas. I'm a certified public accountant in Missouri.

Q Briefly could you tell us about your duties as an IRS special agent in the criminal investigation division?

A We conduct various investigations regarding income

taxes and other financial investigations regarding money laundering and Bank Secrecy Act violations.

Q How do cases, investigations come to you, other than from your boss, how do they come into the office for criminal investigation?

A There are a variety of ways. We rely on the civil counterparts, what you think of as an IRS auditor. Sometimes they'll come across something with criminal potential that they'll refer to criminal investigation. We have walk-in referrals where people may come in with a tip. Other federal law enforcement agencies will come to us with cases where they want our financial investigative experience to assist with cases. So really, I mean, a variety of different ways.

Q Were you assigned the criminal investigation for criminal tax violations of Harold Stanley?

A I was.

Q When was that?

A In 2013.

Q How did that referral come to your office?

A We had a program where we -- an agent went and looked at individuals in the state of Missouri who had professional licenses and looked to see -- who also had state tax issues. That was just a list and we took that information and had an analyst do some research on that, and Mr. Stanley was one person, one investigation sent to me to investigate.

Q What -- so what do you do to begin the process of your criminal investigation?
A Well, I like to see the information that was sent to me other than the allegation our analyst had done and to make sure everything's right, check the IRS computer system, IDRS, to see what income documents are out there, 1099s or W-2s have been submitted by employers for Mr. Stanley.
Q Let me stop you there. So you -- the IDRS system, can you access that?
A Me personally, no. We have an analyst that does that for us.
Q So you request a work-up of some type? What happens?
A In this case I would request all the income documents for Mr. Stanley, such as the 1099s, 1098s, W-2s, any information that employers or financial institutions, the documents they submit to the IRS. I would request any information on Mr. Stanley.
Q Were you able to identify sources of income for Mr. Stanley?
A I was.
Q From what various companies?
A There was several different companies; Mid America Consultants, Industrial Project Management Associates, Freedom Electric, Tri-State G&T, and McKinley Paper which is now known as Bio Pappel.

Q I'm going to show you what's in evidence as Government's Exhibit 59. Is this one of the documents you would have retrieved in determining Mr. Stanley's income?
A This is a 1099 for 2008 from Tri-State for Mr. Stanley indicating Tri-State had paid him $254,784.43. So when I retrieved this information, it doesn't come across exactly in this format. It's more of a text format. All the information that's on here we can retrieve from our system.
Q Did you also identify any bank accounts that Mr. Stanley would have used even before 2005 through 2012, 2013?
A Yes.
Q Where were the bank accounts that Mr. Stanley maintained?
A Community Bank of Raymore, Wells Fargo, and IBC Bank.
Q Did you obtain Mr. Stanley's -- the bank records from those banks?
A Yes.
Q And did you obtain -- once you identified these sources of income, did you obtain any records from those businesses?
A Yes.
Q What records did you obtain?
A From the businesses we would get purchase orders, invoices, payment documentation, copies of checks, basically anything that Mr. Stanley would have submitted to the companies and the companies used them to pay Mr. Stanley.

Q Sort of all the documents we've been looking at for the last day?

A Yes.

Q From the companies?

A Yes.

Q Using that, how do you go about determining his income, his expenses, the tax due and owing?

A We would use a variety of methods. First looking at the 1099s because that is what the employers had reported. Did they pay Mr. Stanley? We look at the 1099s and also look at the actual payment logs that the companies provided me showing that they did, in fact, make a payment from their company for Mr. Stanley for the services that he provided them.

I also looked at his bank accounts to see, you know, that this income was coming into the account and also that there wasn't any other income from maybe some other source that hadn't reported the income on a 1099.

As far as expenses go, looked at the various invoices that the businesses had submitted, tried to find any expenses that may be deductible, which I know Revenue Agent Willard talked about the business expenses, payments to Mrs. Stanley. Any business expenses that we found in his bank accounts that, you know, could be a business expense, we went ahead and gave him the benefit of the doubt that was, in fact, a business expense.

Q So did you then work with the revenue agent to calculate the amounts Mr. Stanley was due and owing for his taxes 2005 through 2009?
A Yes.
Q Then did you, in your investigation, uncover any things that you would consider to be acts of evasion of payment of that amount?
A Yes.
Q What was that?
A There were fake money orders, just pieces of paper that had "money order" written on them. There were documents that -- correspondence from the IRS that Mr. Stanley had wrote "accept for value" or some variation of that, as well as payment vouchers where sometimes he would write "money order" on, and sometimes the payment vouchers were just submitted and there was no actual payment with the voucher.
Q Also, I want to show you what's mark for identification purposes as Government's Exhibit 188.
MR. BECKER: May I approach, Judge?
THE COURT: Yes.
Q (By Mr. Becker) And ask you if you recognize that and tell us what it is?
A Yes. On the first page there's a tracking confirm receipt from the United States Postal Service indicating the attached document was delivered to Fresno, California,

August 6th, 2009. And the document attached here is a Form 3949A, Information Referral, listing Mr. Stanley as the taxpayer.

MR. BECKER: Offer that as Government's Exhibit 188.

THE COURT: Any objection?

MR. STANLEY: No objection, Your Honor.

THE COURT: Admitted.

MR. BECKER: Could we look at 188, page 2.

Q (By Mr. Becker) Tell us what -- what is this form?

A It's a Form 3949A, Information Referral. What this is typically used for is for a referral to come in to IRS Criminal Investigation. So in one instance what we would use this form for is if our civil counterparts had been doing an audit and found a case they'd like us to look at, they would fill out this form and submit it to criminal investigation for us to review it, so just referring information to criminal investigation.

MR. BECKER: And scroll down.

Q (By Mr. Becker) What is the information that's being referred to the Criminal Investigation Division by Mr. Stanley?

A In this one he's written "Tax year 2006. Appears that agents are collecting multiple settlements without proper accounting to the year's alleged tax debt. Has resulted in a July 6, 2009, threat of lien of assets, attached. Multiple prior settlement instruments were provided and no timely

rejection occurred. Silence equals acquiescence."

He also says that, "July 15, 2009, a 3751C form letter was mailed alleging a frivolous filing on a date for which I have no record of any transmittal. Front page attached."

Q And I believe the second sentence there, that's something we saw earlier in Government's Exhibit 154, the 3175 letter?

A Yes. I believe he just had a typo in here to the form letter.

Q Okay. And does this type of referral cause the Criminal Investigation Division to do anything to follow-up or, you know, obstruct their mission essentially?

A Well, if I had received this, I would have done some preliminary investigation to see, you know, what's going on here with this Mr. Stanley. It's unclear what exactly he's saying is going on here. So that's somewhat confusing. But, you know, I would at least take a look and see what's going on here, and it would definitely take me away from my current investigations.

Q And essentially is it asking to investigate the IRS?

A That's what it appears to be saying, yes.

Q Let's look at Mr. Stanley's bank records. Did you review those bank records? Obviously you talked about determining his income and expenses; is that right?

A Yes.
Q Did you also review the bank records to see if he made any payments from those bank accounts to support his lifestyle?
A I did.
Q First Government's Exhibit 106. What is that?
A There's a check here to Midwestern General Agency.
Q And that essentially in bulk is the bank records from the Community Bank of Raymore?
A Exhibit 106 actually is all, what we call, offsets for the Community Bank of Raymore account. So all the checks, all the deposit items in to and out of that account.
Q And that -- and the record should reflect I'm holding in my hand Government's Exhibit 106. It's pages and pages of microfilm or scanned copies of checks and deposits?
A Yes.
Q Did you analyze that account for these items, then, to determine whether or not he made payments from that account?
A I did.
Q Did you similarly analyze accounts at Wells Fargo Bank?
A I did.
Q Government's Exhibit 186 and 187, what are those?
A 186 are, again, the same offsets from Wells Fargo, account ending 6661.
Q And that, again, is multipages of offsets of checks and deposits from that account?

A Yes.
Q What's 187?
A Again, these are the checks and deposit items for Wells Fargo, account ending 6415.
Q And, finally, Government's Exhibit 87. What is that?
A That is the bank statements from International Bank of Commerce or IBC Bank, account ending 590.
Q In what name?
A Harold R. Stanley.
Q Now, if we look at some of these individual checks, did you determine if there were any checks paid by Mr. Stanley for telephone service in 2005, 2006?
A Yes.
Q I show you what's in evidence as Government's Exhibit 106(a). What is that?
A That's a check to Cass County Telephone dated July 25th 2005 for $94.65 signed by Harold Stanley.
Q Government's Exhibit 106(b), what is that?
A A check to Cass Tel dated September 1st, 2005, for $95.31 signed by Harold R. Stanley.
Q Next Government's Exhibit 106(c)?
A Check to Cass Tel dated January 2nd, 2006, for $96.54 signed by Harold R. Stanley.
Q Next did you determine if there's -- and, again, these are just examples of what would be many checks in those

accounts?
A Correct.
Q Did you determine if there were any checks on Mr. Stanley's account for Internet or cable service?
A Yes.
Q I show you 106(d), as in David.
A A check to Fair Point Communications dated October 7th, 2006, for $193.32 signed by Harold R. Stanley.
Q What's Fair Point Communications?
A It's a company that provides Internet, phone, and cable, TV.
Q Next I'll show you Government's Exhibit 187(a).
A It's a check to Comcast Cable dated March 1st, 2012, for $135.20 signed by Harold R. Stanley.
Q Were you able to determine, find any checks that Mr. Stanley paid his bills for his electric bill from the checking accounts?
A Yes.
Q I show you Government's Exhibit 106(e). What is that?
A Check to Osage Valley Electric Coop dated January 19th, 2006, for $148 signed by Harold R. Stanley.
Q What did you determine Osage Valley Electric Coop to be?
A It's essentially a power company.
Q For Mr. Stanley's home or what?

A Correct, for his home in Peculiar.
Q Next look at 106(f).
A It is another check to Osage Valley Electric Coop dated August 14th, 2006, for $163 signed by Harold R. Stanley.
Q Did you determine if he paid his cell phone bill from these checking accounts?
A Yes.
Q I show you Government's Exhibit 106(g). What is that?
A A check to Sprint dated November 9th, 2005, for $161.29 signed by Harold R. Stanley.
Q I show you Exhibit 106(h). What's that?
A That is a check to Sprint dated January 2nd, 2006, for $212.10 signed by Harold R. Stanley.
Q 106(i), what is that?
A Check to Sprint dated September 26th, 2007, for $29.95 signed by Harold R. Stanley.
Q And then finally Government's Exhibit 187(b).
A That's a check to Sprint dated May 1st, 2011, for $24.83 signed by Harold R. Stanley.
Q And for the amounts, then, to Sprint, did you give him the benefit of those being a deduction as a business expense in your tax calculations?
A We did.
Q Now, I guess that wouldn't be true for an electric bill or something like that?

A No.

Q Okay. Did you find any evidence that he paid insurance from his checking accounts?

A I did.

Q I show you what's in evidence as Government's Exhibit 106(j). What is that?

A A check to Guide One Insurance dated January 19th, 2006, for $406.77 signed by Harold R. Stanley.

Q What's Guide One Insurance?

A It's an insurance company that offers various different financial products, including auto and home insurance. So we went ahead and gave him the benefit of the doubt that this could be a business expense.

Q I show you 106(k).

A Another check to Guide One Insurance dated July 2nd, 2007, for $385.67 signed by Harold R. Stanley.

Q I show you 106(l). What is that?

A A check to Midwestern General Agency dated June 24, 2005, for $945 signed by Harold R. Stanley.

Q And is there a notation for the -- whatever is in the left-hand corner there?

A It looks like comp general liability. Midwestern General Agency offers workers' compensation and employer liability insurance, and for this check we would have also given him a business expense.

Q I show you Government's Exhibit 106(m). What is that?
A A check to New York Life Insurance dated November 9th, 2005, for $517.72 signed by Harold R. Stanley.
Q I show you Government's Exhibit 187(c). What is that?
A A check to Guide One Insurance dated January 30th, 2008, for $357.50 signed by Harold R. Stanley.
Q And that would be the -- from the Wells Fargo account?
A Correct.
Q And, finally, Government's Exhibit 187(d), as in David.
A A check to Midwestern General Agency dated June 13th, 2008, for $892.50 signed by Harold R. Stanley.
Q Did you give him a business expense for this check as a liability insurance?
A Yes.
Q Next, in your review of the bank accounts, did you determine whether or not Mr. Stanley had any loans, either mortgage or automobile?
A Yes.
Q I show you what's, first of all, relating to automobile, what's in evidence as Government's Exhibit 92. Would you tell us what this is, please?
A That's a GMAC Financial Services application that Mr. Stanley filled out.
Q And what was the purpose -- after reviewing the documents relating to this transaction, what was Mr. Stanley

doing?

A He was purchasing a pickup truck.

Q And what's the information there, personal information he sets forth in the top of that document, basically a loan application for his automobile or truck?

A Yes.

Q What is he saying about his profession, his ability to pay, his professional life?

A He listed he's a professional engineer and that he is self-employed. It says his present employer is self. Has his phone number. Lists that he's been at his current -- his present job for two years and six months, and lists his gross income as approximately $150,000.

Q What's at the bottom, then? Is there a signature and a date?

A There is. It's signed by Harold R. Stanley dated June 9th, 2007.

Q So then when he says he's been in business about two and a half years at that point, self-employed?

A Approximately, yes.

Q And he listed his income as $150,000. He says approximately. Pretty much monthly or per year?

A I assumed it to be yearly. It lined up with our income figures that we found in the bank accounts and 1099s.

Q I show you Government's Exhibit 89, then. What is

that?

A This is the Retail Installment Sale Contract for GMAC Flexible Finance Plan. Basically it would be Mr. Stanley getting a loan to purchase a vehicle, in this case a 2007 Chevrolet 3500 pickup.

Q And what was the price that Mr. Stanley, I guess, was taking out a loan to purchase this automobile -- or truck?

A The amount financed was $51,568.17.

Q Total amount of his payments would be what?

A $65,128.32.

Q Did you find any checks in the bank accounts to make payments on this loan?

A I did.

Q I'm showing you what's in evidence as Government's Exhibit 106(n). What is that?

A This is a check to GMAC dated August 22nd, 2005, for $550 signed by Harold R. Stanley.

Q Next I'll show you Government's Exhibit 106(o). What is that?

A A check to GMAC dated August 17th, 2007, for $1,000 signed by Harold R. Stanley.

Q And Government's Exhibit 106(p).

A A check to GMAC dated November 3rd, 2007, for $500 signed by Harold R. Stanley.

Q Now, these were just examples of the checks that you

located in the bank account payable to GMAC; is that right?

A Correct.

Q Did you make a summary of those checks?

A I did.

Q I show you what's been marked for identification purposes as Government's Exhibit 164.

MR. BECKER: May I approach?

THE COURT: Yes.

Q (By Mr. Becker) What is that?

A This is the summary I made of payments made to GMAC and also Ally. They sort of changed their business names part of the way through this loan. It totaled all the payments we were able to find Mr. Stanley made to GMAC and Ally.

MR. BECKER: I offer that into evidence as Government's Exhibit 164.

THE COURT: Any objection?

MR. STANLEY: No objection, Your Honor.

THE COURT: 184 is admitted -- I'm sorry -- 164.

MR. BECKER: Correct, Judge.

Q (By Mr. Becker) Could you just show the jury the information that you put together on Government's Exhibit 164?

A I list the various dates, who was paid, GMAC or Ally, and the amount for each payment we located, both in the bank records and also cross-referencing with the records that Ally or GMAC had provided.

Q What's the date range of payments?
A It starts out July 2007 and goes down to May of 2012.
Q What's the total amount Mr. Stanley paid to GMAC or Ally Bank for the truck?
A $62,254.02.
Q Next did you find payments in the bank account to CitiMortgage?
A I did, yes.
Q I'm going to show you a check, Government's Exhibit 106(s). Can you tell us what that is, please?
A That's a check to CitiMortgage dated September 1st, 2005, for $2,050 signed by Harold R. Stanley.
Q Did you determine whether or not there were any records of mortgage being held by City Bank -- CitiMortgage for Mr. Stanley?
A I did.
Q Did you prepare -- now, this particular check, I'm sorry, 106(s), what money was going -- this is the Community Bank of Raymore check in 2005. What money was going into that account so that they could write a check out for $2,000 for the mortgage payment?
A All the payments Mr. Stanley received from various companies we talked about. Of course, other miscellaneous deposits, returns for small things, but the actual, you know, income in there is all Mr. Stanley's.

Q Did you prepare a summary of the mortgage payments based upon the mortgage records and Mr. Stanley's bank records, that mortgage being held at CitiMortgage?

A I did.

Q I show you what's been marked for identification purposes as Government's Exhibit 162.

MR. BECKER: May I approach?

THE COURT: Yes.

Q (By Mr. Becker) Could you tell us what that is, please?

A It's a summary I created of mortgage payments to CitiMortgage and Bank of Oklahoma.

MR. BECKER: I offer that into evidence as Government's Exhibit 162.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) Could you explain to us, please, what the information is on this summary that you put together?

A So the first area here are payments from Community Bank of Raymore account 2015, payments from that account to CitiMortgage. It lists out the various dates and payment amounts.

Q And what's the date range from the Community -- payments out of the Community Bank of Raymore, the date range,

and the total amount?
A It goes from July 2005 through October 2008.
Q Through October 2008. So '05 through October 2008?
A Correct.
Q What's the total amount?
A $51,202.50.
Q And what's the next listing?
A The next one is Wells Fargo account ending 6415, payments from that account to CitiMortgage. It lists the various dates and amounts for those payments. Dates ranging from April 2007 to February of 2009.
Q And how much total is that?
A $23,410.
Q And, finally, what other payments did you track from International Bank of Commerce account?
MR. STANLEY: Objection.
THE COURT: You may approach.
(Counsel approached the bench and the following proceedings were had:)
MR. STANLEY: The International Bank of Commerce stuff is starting months after the end of the 2005 to 2009 indictment. I don't think it's appropriate to be displaying it or discussing it. I should have objected before it went up.
THE COURT: Any relevance?
MR. BECKER: Yes, Judge. It's evasion of payment of

the taxes that were due and owing for tax years 2005 through 2009; but as Mr. Stanley has pointed out, the conduct has to extend well into the future years, and this shows his ability to pay, funds available to him in those years to pay his outstanding tax obligations.

THE COURT: Objection is denied.

(The proceedings returned to open court.)

MR. BECKER: Objection overruled, Judge?

THE COURT: Yes.

Q (By Mr. Becker) So could you tell us, please, this summary of the payments you noted from the International Bank of Commerce on this mortgage account?

A Payments from IBC Bank account ending 9840 to Bank of Oklahoma. It lists the various dates and amounts for those payments.

Q Could you tell us the date range and the total amounts from those other accounts?

A Yes. It starts in September of 2010 and goes to January of 2014.

Q And the total amount? I'm sorry.

A The total amount was $57,082.19.

Q And this final amount then?

A Payments from Wells Fargo account ending 6661 to Bank of Oklahoma. The date range of April 2011 through January 2012. Payments totaling $4,571 .17.

Q And what is the total? What's the explanation at the bottom there for those two different totals?
A So CitiMortgage was for his house in Peculiar, Missouri, and there was $74,612.50 paid on the mortgage for that house in Peculiar, I guess another house in Oklahoma, and with the mortgage at the Bank of Oklahoma, the total payments on that mortgage was $61,653.36.
Q So let's look at that for one minute, please. The Bank of Oklahoma, did you review those mortgage documents to determine when Mr. Stanley took out that loan?
A I did.
Q I show you what's marked or in evidence as Government's Exhibit 100. Could you tell us what that is, please?
A Bank of Oklahoma mortgage, the mortgage loan information sheet for Mr. Stanley.
Q And what's the date of that particular mortgage information sheet?
A The date on this mortgage -- I think it's at the bottom.
Q Let's just go up to the information that's on this sheet then. What was the -- at the top, then, the information about this loan application, loan information sheet?
A It lists an estimated sales price of $300,000 for the house and the estimated loan amount of $240,000.
Q What was the customer information?

A Customer information is Harold R. Stanley with his Social Security number and birth date, and it indicates that he is married. It lists an address of 10707 East 240th Street in Peculiar, Missouri. It states that he owns that house.
Q And the next section, then employment, income information. Is there any information about Mr. Stanley?
A Yes. It says his job title was electrical engineer, and he has a base monthly income of $12,500.
Q How much is that per year?
A $250,000, 240.
Q We'll get your calculator out.
A I need a calculator big time asking me to do math on the stand.
Q Next I ask you to look next, please, at Government's Exhibit 101. And what is this?
A This is a Uniform Residential Loan Application.
Q And if we could look at the last page, please, at the bottom. And what information is there on the last page?
A It's signed by Harold R. Stanley, dated 7/27/2010.
MR. BECKER: Could we scroll up to the first page again, please.
Q (By Mr. Becker) What information is on the first page in terms of the amount of the loan that's being applied for and who's applying for it?
A The amount is $192,000. It lists an address of 3705

Big Sky Lane in Talala, Oklahoma.

Q That was the home that was being purchased by Mr. Stanley?

A Correct.

Q And on the next page, then, there's financial information at the top. Could you relate that to us, please?

A Yes. It lists a base income of $14,887.67 for Mr. Stanley.

Q And that's, what, per month?

A It says monthly income.

Q I won't ask you to do math on that one.

A Thank you.

Q Did you, and I believe you did, look at the summary of payments then on this loan application; is that right?

A Yes.

Q Finally, in this area did you see any purchases and payments to John Deere Credit for items he might have purchased from John Deere?

A Yes.

Q Show you what's marked or in evidence as Government's Exhibit 116. What is this?

A It's a John Deere Credit Lawn & Grounds Care Finance Application for Mr. Stanley. It lists his address in Talala, Oklahoma, his home phone, and it says income of $150,000.

MR. BECKER: Could you scroll down to the bottom,

please.

Q (By Mr. Becker) What's the signature and date on that?

A Harold R. Stanley, August 17th, 2010.

Q I want to show you what's in evidence as Government's Exhibit 114. What is that?

A That's a Retail Installment Contract for John Deere Credit.

Q What's the date on that?

A It's received September 9th, 2010, by John Deere.

Q And does it indicate what it is Mr. Stanley was purchasing at that time?

A Various equipment from P & K Equipment.

MR. BECKER: Could you scroll down, please.

A He actually lists out equipment being purchased. There's a compact utility tractor for $17,212.52; a backhoe for $7,188.21.

Q (By Mr. Becker) Look at the next page, please. And the top, those items?

A A loader for $2,999, I think it's 8 cents; medium duty posthole digger for $930.40; an auger for $319.02; and another auger, 6-inch auger for $275 and I think it's 36 or 38 cents.

Q So then what's the financial bottom line on this purchase by Mr. Stanley?

MR. BECKER: Scroll down a little bit there.

A The total sales price was $29 ,148.51.

Q (By Mr. Becker) In 2012 did you determine that Mr. Stanley made further purchases from John Deere?
A Yes.
Q I show you what's in evidence as Government's Exhibit 115. Can you tell us what that is?
A Yeah. This is a sales invoice from P & K Equipment, which is a John Deere dealership. It says that it's for equipment purchased by Mr. Stanley. It lists a 825 G&Y John Deere for $16,937.62.
Q Did you look up what a G&Y is?
A I believe it's a Gator, John Deere Gator.
Q Four-wheel?
A Yeah.
Q What was the total amount that was -- of the sale? The sale price was 16 something?
A Correct.
Q And what was the -- any cash or deposit on that?
A It says he had a deposit of $2,000.
Q The amount due was what?
A $14,937.62.
Q Did you prepare, based upon your reviewing of the bank accounts, a summary of the payments to John Deere Credit, John Deere Financial?
A Yes.
Q I show you what's been marked for identification

purposes as Government's Exhibit 175. What is that?
A That's a summary I made of all the payments to P & K Equipment and John Deere Credit.
MR. BECKER: I offer that into evidence as Government's Exhibit 165.
THE COURT: Any objection?
MR. STANLEY: Originally he said 175. I have -- was hitting the wrong place. No objection.
THE COURT: Admitted.
Q (By Mr. Becker) Can you tell us the information that's on this summary?
A Yes. This lists various payments. The first one is to P & K Equipment, which is the John Deere dealership; and then other payments to John Deere Credit, and it has the date and the amount for the payments.
MR. BECKER: Can you scroll down to the bottom, please.
Q (By Mr. Becker) What's the date range on that, 2010 through?
A 2010 through October of 2013.
Q What's the amount that Mr. Stanley paid John Deere during that time?
A $49,463.24.
Q Next I want to show you what's in evidence as Government's Exhibit 106(t). What is that?

A That's a check from the Community Bank of Raymore to the U.S. Department of Education for $1,000 dated January 19th, 2006, signed by Harold R. Stanley.
Q I show you Government's Exhibit 106(u).
A That's a check to the U.S. Department of Education dated March 17th, 2006, for $323.65 signed by Harold R. Stanley.
Q 106(v).
A A check to the U.S. Department of Education dated April 2nd, 2007, for $577.24 signed by Harold R. Stanley.
Q Next did you, based upon the transcripts that is -- that Mr. Hernandez talked -- we placed in evidence yesterday in terms of the history of tax payments or filing by Mr. Stanley from 1990 all the way through 2004 and then the tax years of 2005, '6, '7, '8, and '9, did you compile that information on a chart?
A I did.
Q I show you what's been marked for identification purposes as Government's Exhibit 173. What is that?
A That's a chart I made detailing Mr. Stanley's tax filing history, as well as the tax due and owing for 2005 through 2009.
Q What was that based upon, that chart?
A The account transcripts and the tax computations by myself and Revenue Agent Willard prepared.

MR. BECKER: I offer that into evidence as Government's Exhibit 173.

THE COURT: Any objection?

MR. STANLEY: Yes.

THE COURT: You may approach.

(Counsel approached the bench and the following proceedings were had:)

MR. STANLEY: Your Honor, this is redundant to the information that was presented yesterday.

THE COURT: Is that your only objection?

MR. STANLEY: That's my objection. We're burdening the record with duplicate information.

THE COURT: Overruled.

(The proceedings returned to open court.)

MR. BECKER: Is that admitted, Judge?

THE COURT: Yes.

Q (By Mr. Becker) This is also on the screen. Could you briefly go through, then, the tax history compliance for Mr. Stanley from 1990 through 2004?

A Yes. This just shows that from 1990 through 2004 he was filing returns, had tax withheld from his paychecks from various employers, and then based on the returns would either get a refund or he may have to pay at the end of the year.

Q Could you -- you don't have to go through the numbers. Just tell us the information that's in each relevant year.

A Like in 1990 it lists tax withheld of $9,768, which is withholding from the employers, then shows that a refund of $1,211.13 was issued by the IRS.
Q Then there's similar information for each of the tax years between 1990 and 2004; is that right?
A Correct. The only difference would be rather a refund being issued or if a payment were made. Then a couple years there was refunds and payments due back and forth between Mr. Stanley and the IRS.
Q So the record shows that between 1993 and 1997 each of those years Mr. Stanley had tax due and owing and made a payment to the IRS?
A Correct.
Q Did you find in the bank records any evidence that he paid his Cass County property taxes?
A Yes.
Q I'm going to show you what's in evidence as Government's Exhibit 106(w). What is that?
A This is a check to Pam Shipley, collector, who is the Cass County Collector, dated December 31st, 2005, for $1,304.20 signed by Harold R. Stanley.
Q Next if you'd look, please, at Government's Exhibit 106(y).
A This is a check to Pam Shipley, Cass County Collector, dated December 27th, 2006, for $1,263.47 signed by Harold R.

Stanley. It also lists out various account numbers.
Q Next 106(x).
A It is a check to Pam Shipley, collector, dated December 21st, 2007, for $1,076.29 signed by Harold R. Stanley.
Q Did you prepare a summary of the payments that you found out of Mr. Stanley's bank accounts to the Cass County Collector?
A Yes.
Q I show you what's marked for identification purposes as Government's Exhibit 203. What is that?
A That's a summary I prepared for the payments to Pam Shipley, Cass County Collector.
MR. BECKER: Offer that into evidence as Government's Exhibit 203.
THE COURT: Any objection?
MR. STANLEY: No objection.
THE COURT: Admitted.
Q (By Mr. Becker) Could you explain the summary of payments that you prepared relating to payments Mr. Stanley made to Cass County?
A Yes. This lists out the date, the bank account, and the amount of payments from Mr. Stanley's accounts to Pam Shipley, the Cass County Collector. It shows total payments of $13,952.22.
Q In this area did you find payment to the Missouri

Department of Revenue?

A I did.

Q I show you Government's Exhibit 106(z). What is that?

A It is a check to the Missouri Department of Revenue dated August 3rd, 2005, for $191.71 signed by Harold R. Stanley.

Q What's the notation in the memo section?

A It's got Mr. and Mrs. Stanley's Social Security numbers then says 2004 I.T.

Q I'm going to show you -- just run through briefly the tax calculations that Revenue Agent Janice Willard did. Did you assist in determining those figures based upon the bank records and the 1099s?

A I did.

Q And specifically if we could -- some of the business expenses, Government's Exhibit 169(a), if you would look at that, please. What is that?

A That's a summary of payments to Ellen Lorane Stanley that we were able to find in all the invoices from the various companies Mr. Stanley had worked for.

Q And this was, then, determined to be a business expense for Mr. Stanley?

A We gave him the benefit of the doubt and deducted them as a business expense.

Q Is there any indication in the IRS records that Mrs.

Stanley filed a tax return for this amount?

A No.

Q Or paid tax due on this amount?

A No.

Q Finally, then, I'd like to show you a couple more charts, Government's Exhibit 202. Based upon your investigation, was this the amount of tax that was due and owing for years 2005 through 2009?

A Yes, it was.

Q Did you, in reviewing all of the documents that are in the IRS system, create a timeline chart that would list out all of those documents chronologically?

A Yes.

Q I'm going to show you what's marked for identification purposes as Government's Exhibit 170. What is that?

A That's a timeline that I created.

Q Based upon what?

A Based on all the evidence that has been previously discussed and admitted.

Q For example, the IRS documents or what type of things are listed there?

A Yes. Based on documents found in the IRS case files, notices mailed by the IRS, tax returns filed, just various events we've discussed.

MR. BECKER: Offer that into evidence as

Government's Exhibit 170.

THE COURT: Any objection?

MR. STANLEY: No objection.

THE COURT: Admitted.

Q (By Mr. Becker) Could you look at that, please, and just very briefly give some idea of the information that's contained on the timeline?

A It starts out "IRS mailed CP59 to Stanley." So all these different entries is where IRS mailed different automated notices mailed out by the IRS letting him know you haven't filed a tax return or you have unpaid taxes and you need to pay your taxes.

Going down, it lists the different exhibit numbers that we've talked about for the various mailings that Mr. Stanley sent to the IRS and all the notices the IRS sent back to Mr. Stanley. It lists when he filed his 2007, 2008, 2009 tax returns.

Q Did you have a chart created depicting this information?

A I did.

Q That would give a timeline of the events in the investigation of this tax case?

A Yes.

Q I show you what's in evidence -- or marked for identification purposes as Government's Exhibit 172. What is

that?

A This is a chart that was created showing it's a summary of significant events and correspondence based off of this timeline.

MR. BECKER: Offer that into evidence as Government's Exhibit 172.

THE COURT: For some reason I have that as already admitted.

THE COURTROOM DEPUTY: I do not.

THE COURT: Any objection to 172?

MR. STANLEY: I'm sorry, Your Honor. I need a minute at the bench.

(Counsel approached the bench and the following proceedings were had:)

MR. STANLEY: I'm trying to figure out when Mrs. Stanley suddenly got put into this criminal investigation.

THE COURT: Do you have an objection to 172?

MR. STANLEY: No. The objection is comments that were made about a previously admitted exhibit that talked about the payments to Ellen Lorane Stanley, which we already established there were no such real payments, and I withdrew my objection to it on the basis that it was not going to be used for any basis other than as creating an expense to me. Suddenly her name's been added to this criminal proceeding. I find that very serious. That might even be a mistrial to throw

somebody in as an accused nonpayor in the middle of the stinking trial.

THE COURT: Do you have any response, Mr. Becker?

MR. BECKER: No, Judge. I believe it was a proper question relating to the tax situation of the defendant.

MR. STANLEY: But Mrs. Stanley is not the defendant here. Only I'm the defendant. And this accuses her of something, and there's been no evidence presented in support of it, no indictment, no nothing.

THE COURT: And I can assure you there would be no verdict form with her name. We've instructed the jury, if I haven't already, I know it's in the filed instructions, that only you are in trial -- on trial.

MR. STANLEY: That's why I've blown up is I'm the one on trial. She isn't. And I find it extremely unprofessional to drag her name into it. I didn't even like the payments part of it to say she paid no tax on it. That's a low blow. There's probably a better legal term for it, but it's hitting below the belt.

THE COURT: Okay. First things first. No objection to 172, but you want a standing objection to your wife being --

MR. STANLEY: Being bad mouthed, maligned or whatever words you want to use.

THE COURT: Your objection will be noted.

MR. STANLEY: And I, frankly, haven't looked at 172

because I was seeing red at the moment.

THE COURT: All right.

MR. STANLEY: I have no objection.

THE COURT: Okay.

(The proceedings returned to open court.)

THE COURT: Exhibit 172 is admitted.

Q (By Mr. Becker) Agent, could you please tell us the information, then, you were able to summarize and put on this chart?

A Yes. This chart kind of has two sides. On the top it shows the actions by the IRS and kind of summarizes the reminder notices are consistently being mailed for each tax year here. Letting him know either you haven't filed a tax return or that you have unpaid taxes that need to be paid.

On the bottom it shows activities by Mr. Stanley. It shows that in 1990 through 2004 he filed tax returns. Sometimes he got a refund or paid the tax due.

Then December 2004 he became an independent contractor. He did not file returns for 2005 or 2006. It shows that he did file returns for 2007, 2008, and 2009. The tax due was left off of this. Then there's various mailings, exhibit numbers on there that we previously discussed that are frivolous mailings.

Q So, I'm sorry, then, for each of these notations there's the date of the particular mailing and the exhibit

number in this trial?

A Correct.

Q All the way through into I guess that would be October, late October of 2012?

A Correct.

Q That would be the letter to Mr. Melcher who just testified here?

A Yes.

Q And in review of all of these records, was there any indication that Mr. Stanley paid the IRS the money from his bank account to the IRS for $250,000 for tax years 2005 through 2009?

A No.

MR. BECKER: I have no further questions at this time, Judge.

THE COURT: Mr. Stanley, do you have any cross?

MR. STANLEY: Yes, I do, Your Honor.

CROSS-EXAMINATION BY MR. STANLEY:

Q Good afternoon, Mr. Littrell. I've called you Littrell apparently for so long incorrectly, I'm having trouble getting the right name. Littrell?

A It happens. It's okay. It's commonly mispronounced. No problem.

MR. STANLEY: Would you please call 188 back up for me, please. And go ahead and go to page 2 would be fine.

Q (By Mr. Stanley) When did you get this Information Referral?
A I did not receive it until you provided a copy to me.
Q Okay. Did you have any -- did you make any attempt to find it in the IRS system from 2009?
A I attempted to -- I called out to the Fresno criminal investigation group to see if they had anything on it, and they did not.
Q Okay. Do you agree that --
MR. STANLEY: Please go back to the first page.
Q (By Mr. Stanley) Do you agree that the front page shows a USPS tracking to confirm that something was sent to Fresno?
A It shows it was sent to Fresno, California, yes.
Q But we have no idea what happened to it from there?
A I don't know where exactly it was sent to. I would be assuming.
Q I would have to go back to my records to check the address, but it was sent to IRS CID in Fresno.
A Okay.
Q It just boggles my -- sorry. Wrong direction to go.
Do you find it unusual that a criminal investigation complaint can't be found?
A No.
Q So they're lost routinely?

A I don't handle that many so I couldn't say that's routine or not.
Q Okay. When you and I met in person for an extended time, how did you answer me when I asked you for the -- do you recall how you answered me when I asked you for the lawful definition of payment?
A I recall you asking me that, yes.
Q Do you recall your answer?
A I don't recall my specific answer.
Q Okay. So do you today know the lawful definition for payment?
A I do.
Q Okay. Can you share that with us?
A Yeah, I can. When I first got this case and you asked what is the definition of a payment, I'm an investigator. I want to go out and investigate things, and I spent maybe 20, 30 minutes researching the law and found the Treasury regulation that states how you pay the IRS.
Q So you did find a Treasury regulation?
A I did.
Q Okay. Did you feel any obligation to get back with me since I'd asked that question and you weren't able to answer it at the meeting and share that with me?
A When we had the meeting, I don't believe I looked it up at that point.

Q I'm pretty sure you hadn't because -- well, sorry. I can't testify as to my memory of your answer.
All right. So on 188 there is no received stamp. You received it from me at our meeting?
A Correct. I received it from you.
Q All right. And then did I correctly understand you to say that if you personally had received that report in 2009, you would have investigated it?
A Well, what I would have done if I received this -- obviously not knowing anything about the case and saw this Mr. Stanley and what was presented in this document, I probably would have done some preliminary research just to see what's going on, you know. Is there -- does Mr. Stanley owe tax? What's going on? In this case I would have researched and saw you had a large tax liability that was being handled by our civil counterparts and would have let them do the tax administration how they see fit and wouldn't have done anything further at that point.
Q So you wouldn't have felt any obligation to go back and contact the person reporting the event and say there's nothing criminal here. You need to go through the process or whatever your answer would have been?
A It's a little hard. In this case it depends on who submits the referral. In a lot of instances we can't go contact someone and let them know because we can't be

disclosing IRS information about other people.

Q Right. Well, this was -- I was turning this on myself so you weren't, you know, you weren't contacting -- there was no need -- excuse me. That's out of place.

I believe on Item 162.

MR. STANLEY: And you don't have to go through -- yeah, you do need to go there, please, Exhibit 162. And go to the second page.

Q (By Mr. Stanley) Okay. When you were commenting on this, did I hear you to say that the house in Peculiar was my house?

A You told me that you lived there, you conduct business there, all your invoices for your company lists that address. I believe the mortgage is actually in your wife's name, but you do live there. You do conduct business out of there. So I guess it is your house.

Q Okay. I -- that's testifying.

Do you recall that during discovery that the deed for the house is actually solely in Lorane's name?

A That's correct.

Q All right. Thank you.

MR. STANLEY: I believe that is the end of my questions, and this satisfies the -- yes.

THE COURT: I understand. Thank you.

Mr. Becker, do you have any redirect?

MR. BECKER: One second, Judge, please.

Just briefly, Judge.

REDIRECT EXAMINATION BY MR. BECKER:

Q I want to show you what's marked for identification purposes as Government's Exhibit 5, the first page here.

MR. BECKER: I'd offer this as -- it's from the Code of Federal Regulations, Section 301.633-1 and ask the Court to take judicial notice that it's from the Code of Federal Regulations and offer it in evidence as Government's 5.

THE COURT: May I look at it, please. The Court will take judicial notice of Exhibit No. 5.

Q (By Mr. Becker) This is in evidence, then, as Government's Exhibit 5. In your cross-examination you talked about finding the authority on how do you pay the IRS? What is that?

A That is -- you listed the statute number, but it talks about the receipt of payment and the authority to receive payment.

Q Could we look at that section, please, right there.

What -- does it say payment should be received by the IRS?

A I'll just start reading. "District directors, Service Center directors, and Compliance Center directors may accept checks or drafts drawn on any financial institution incorporated under the laws of the United States or under the

laws of any State, the District of Columbia, or any possession of the United States, or money orders in payment for internal revenue taxes, provided the checks, drafts, or money orders are collectible in United States currency at par."

Q That's fine.

MR. BECKER: I have no further questions, Judge.

THE COURT: Does that cause any need for recross?

MR. STANLEY: Yes, Your Honor.

THE COURT: You can proceed.

RECROSS-EXAMINATION BY MR. STANLEY:

Q Mr. Littrell, this is repeating the same question in a way. Did you find any record of anyone sending identification of this statute, of this Treasury regulation to me at some point?

A Not in this specific form. I believe in many of the special -- the 3175 letter has various documents, and I'm fairly certain that it does talk about this statute.

Q That -- well, let's double-check the 3175C.

A It talks about, you know -- there's a document that Ms. Henline talked about a little bit too, the websites where you could go to refer for more information. It talks about the various statutes for payment, filing returns, things like that.

Q All right.

MR. STANLEY: Do you remember that exhibit number to go back to the 3175C template?

MR. BECKER: Exhibit 156.

MR. STANLEY: Thank you.

Q (By Mr. Stanley) So do you see any listing there of this Section, was it 301. something? I don't remember.

A It's not listed out here where the sections are listed, but the two documents that refer to about frivolous tax arguments and why do I have to pay taxes, it's several pages long, and talks about all kinds of different frivolous filings with the IRS. It actually goes into code sections and case law discussing why those arguments are, in fact, frivolous.

Q And do you have specific knowledge that that website has been -- looks the same today as it did in 2009 when this letter would have been sent out?

A I did not look at the business website in 2009 when the letter was sent out. You can access these two documents on the IRS website.

MR. STANLEY: Thank you, Your Honor. No further questions.

MR. BECKER: Judge, may we approach.

(Counsel approached the bench and the following proceedings were had:)

MR. BECKER: This is one of the witnesses Mr. Stanley indicated he may seek to recall. I don't know if he's done. Otherwise, we should --

THE COURT: I believe he stated this concludes

his --

MR. STANLEY: That was intended to be my recall.

THE COURT: Do you have any other witnesses?

MR. BECKER: We're done.

THE COURT: Are you wanting to orally rest at this point?

MR. BECKER: Yes.

THE COURT: Okay. Then my inclination is to take a 15-minute break. My decision is if we get through after four o'clock, I would evaluate whether we should go forward. I want to take a recess and continue to move forward. So I want to talk about that outside the hearing of the jury. So let's excuse the jury.

(The proceedings returned to open court.)

THE COURT: You may stand down. Thank you.

(Witness excused.)

MR. BECKER: Your Honor, that's the end of the government's case in chief.

THE COURT: Thank you.

At this point, ladies and gentlemen, it's 3:50 and we will take a 15-minute recess and return back at 4:05.

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: Please be seated.

Mr. Stanley, do you have any type of a motion at the

end of the State's case?

MR. STANLEY: I don't believe I have a motion right this minute.

THE COURT: That's okay. Having considered whether the evidence is insufficient to sustain a conviction under Rule 29B, the Court finds there is sufficient evidence at this point to deny any motion if you -- if the defense was to have any for judgment of acquittal at this time.

We'll now move to the defense case in chief, and I think you had advised the Court that you have one witness, Ms. Simpson, that you are interested in calling. Is that still your position, or were you able to ask your questions through any of the IRS personnel? If you want to share with me.

MR. STANLEY: I did not get to ask that question of any of these people because they were in enough different -- their positions were different enough from Ms. Simpson's that the specific questions I wanted to ask her appear that they would be out of their area of expertise.

THE COURT: If for some reason -- I don't know that you've given the marshals sufficient time to serve the subpoena; and if you want to make a record tomorrow morning of what that evidence -- what those questions would have been, you may want to think about that tonight so you can make a record. I doubt that the marshals will be held at fault for any reason for not properly serving that witness during -- after the trial

has started. I was trying to think ahead of any complaint in the record.

I would like to give Mr. Stanley some time to get his thoughts together, possibly talk to Mr. White about the format that you want to take with your testimony. There are a lot of options. Mr. White can probably talk you through some of those options. I would like to hear if the government has any specific objections as to the form of the defendant testifying.

MR. BECKER: No, Judge. I believe he can, as these things go, do narrative or question and answer, whichever he feels is most comfortable for him presenting his testimony.

THE COURT: Thank you.

Mr. White, are you willing to visit with the defendant about what possible options there might be in giving a narrative or some other format?

MR. WHITE: Sure.

THE COURT: Then I'd like to give Mr. Stanley an opportunity to get his thoughts together and any other materials. So I had asked that the jury come back. It's now five 'til four, and I would like to give -- let me ask, Mr. Stanley. Approximately how long do you think your testimony will be?

MR. STANLEY: Your Honor, I had originally planned to stay with the Court's instructions of a 30-minute opening

statement and an hour or so on testimony with the clarifications on exhibits. It probably makes more sense to request leave of the Court to extend the opening statement with less time for testimony since there's not going to be very many exhibits to be placed into evidence.

THE COURT: I will give you leeway in this area. I'm not going to hold you to a certain time period on your opening as long as you are not repeating yourself and as long as you're not going out of bounds from the areas that we've discussed previously about instructing the jury on what the law is or should be or was.

So we will -- and then after -- we'll go as long as we can 'til five with your testimony and see where we are at five. Let's let you have 15 minutes to pull your thoughts together, and we'll call the jury in a little late, at ten after four.

Ms. Moore, is that doable?

THE COURTROOM DEPUTY: Yes.

THE COURT: Mr. White, is that fine with you?

MR. WHITE: Yes.

THE COURT: Mr. Becker, do you have any objection?

MR. BECKER: No, Judge.

THE COURT: All right. We'll be in recess.

(Recess taken at 3:55 p.m.)

(The following proceedings were had in the courtroom

out of the presence of the jury:)

THE COURT: Please be seated.

Couple things before we bring the jury in for opening statements. My intention is to have the defense opening statements and then let the jury go home for the day and begin tomorrow with defense evidence.

It was brought to my attention that there was a security concern last night. Have they discussed that with you, Mr. Becker and Mr. Stanley, about someone saying that they were an attorney when they weren't and getting through security by someone flashing their credentials for them through a secured door? So we're pulling that -- trying to pull that tape and audio to see what there is. I don't know if that was any of this case or some other case.

Do you know, Mr. Stanley?

MR. STANLEY: Well, we were -- we were at the plaza level just settling down for the day, and we were at the plaza level. We knew that was street level. Saw somebody and said, Is there an exit on this floor so we don't have to go up the elevator, then climb down all the stairs? We were parked over on whatever the next street is to the west there, and whoever it was said, Sure. And I don't recall anybody saying we were anything like a lawyer.

THE COURT: Okay. I think that was the greater concern, but they should not be flashing their credentials for

anyone unless they confirm the security of that person. So there was a glitch in our security that we'll have to deal with. But -- so the CSOs did tell you do not use the plaza exit or ask anyone to use their credentials to allow you --

MR. STANLEY: Yes. We had no ill intent at all. It was just, Is there a way out? And the person said, Yeah, there's a way out here. And maybe he thought because I was dressed in a suit that I was an attorney, and there was no intent of deceiving anybody.

THE COURT: And it may be more of a security end on whoever allowed you access. They probably shouldn't have done that as well without knowing you specifically. Okay.

Then I do want to make a quick record before we call the jury back, just because I might forget this, that you are clear that you have no burden of proof, that you have no burden to prove that you're not guilty and the burden remains on the government; and that if you chose to not testify or put on any evidence, that the Court would affirmatively submit an instruction if you so requested to instruct the jury that they cannot use that fact in any way in their deliberations or draw any negative inference regarding that. Do you understand that you don't have to testify unless you choose to do so?

MR. STANLEY: Yes, I understand that, Your Honor.

THE COURT: I'm just afraid we'll do opening statements, then it's too late for you to change your mind if

you thought you had some burden of proof.

I also want to -- since the defendant has reserved his opening to the beginning of his case, I will remind the jury, as I did before the government's opening, that opening statements is not evidence but simply a summary of what a party expects the evidence to be. Especially in light that tomorrow we may hear similar evidence, similar statements in simply a different format of testimony versus opening statements.

Is there any objection to that, Mr. Becker?

MR. BECKER: No, Judge. I would note that if Mr. Stanley's opening statement goes beyond the parameters of an opening statement, I would object -- I will object, and I'm not going to state the reason because the reason is that it's beyond the parameters of an opening statement outlining the evidence he expects to present to the jury.

THE COURT: Yes. And it's a little tricky with this situation of the defendant representing himself and giving opening statement with that opening statement discussing what he plans to testify, because the general rule is you cannot put forth arguments in opening statements. So I'm sure the government's going to be on high alert to object to those -- if it gets too much argumentative rather than here is what the evidence will be.

I will also sua sponte remind you bring it to the bench and if I think the opening statement is out of line, out

of bounds of the rules.

Anything else, Mr. Becker?

MR. BECKER: Nothing, Judge, from government.

THE COURT: Anything, Mr. Stanley?

MR. STANLEY: I believe I'm fine. Thank you.

THE COURT: Okay. And do you intend to give your opening statement from in the well area, or do you need any documents or are you good to go with IT?

MR. STANLEY: Well, I did not notify the plaintiff of any plan to show anything during opening statements.

THE COURT: Okay.

MR. STANLEY: So I had not planned to show anything. I may want to have my book of exhibits in case I forget a date or something like that. I assumed I should speak to them from the lectern so that the speaker system would work.

THE COURT: That's probably best. There's also a microphone to the left of the court reporter if you want to put your documents, but I don't want you to be too close to the jury. I want you to mind your space, but that's another option. The lectern is absolutely fine and very common.

MR. STANLEY: All right.

THE COURT: Okay. Are we ready, Ms. Moore?

THE COURTROOM DEPUTY: Yes, I believe we are.

(The following proceedings were had in the presence of the jury:)

THE COURT: Please be seated.

It is now 4:20 and we've made a good deal of progress today. For logistical information for the jury, we will now have the defense case, and my intention is to have opening statements, and at that point we will probably recess for the night since it will probably be around five o'clock.

I do want to remind you that the defendant will now make his opening statement. As I mentioned at the beginning of the trial before the government's opening statement, an opening statement is not evidence but is simply a summary of what a party expects the evidence will be.

Mr. Stanley, are you ready?

MR. STANLEY: Yes, Your Honor.

THE COURT: You may proceed.

MR. STANLEY: Thank you.

DEFENDANT'S OPENING STATEMENT

MR. STANLEY: Ladies and gentlemen, thank you for taking the time to be here with us this week. I know it's a sacrifice for you to be here, for you to be spending your precious time here, and I will do my very best to respect your precious time and not take up any more of it than I need to to present my side of this case.

I intend to present evidence tomorrow that will show that I'm not guilty of the crimes that I've been charged with. Over the past day and a half you've heard testimony from my

clients who were very gracious in their assessment of my engineering work, and I guess what I would like for you to take away or think about from that evidence --

THE COURT: I'm going to ask you to approach, please.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: I want to give as much leeway as I can, but up to this point you've made maybe one statement that's been in the proper form. Up to this point it's been references or arguments or persuasive. This is simply a time to just put forth the evidence would be as far as -- I would ask that you conform your opening to that format.

MR. STANLEY: Okay.

THE COURT: It's a common mistake. Young lawyers usually give opening statement in closing and closing statements in opening, but this is not the time to argue, just what your evidence will be. And if it helps, the parameters of what is your defense and what is that defense based on.

MR. STANLEY: Okay.

THE COURT: I can't give you any other direction. I can give you a chance to speak with Mr. White at any point, if you want to.

MR. STANLEY: Okay. Thank you.

(The proceedings returned to open court.)

MR. STANLEY: The evidence will show that I've made a good-faith effort, made a good-faith effort to work with the IRS, to determine lawful means and methods of payment, and that I did not receive answers that I believe were completely lawful, supported to my satisfaction.

And you've already heard a lot of evidence from the plaintiff concerning my life. You've seen more of my finances than I would be comfortable sharing with a stranger on my own, and you've also seen that I made repeated and consistent attempts using consistent documents to try and settle liabilities, and I believe those represent a very clear, good-faith effort to satisfy those.

I'll present you additional details when I present my testimony, because I believe that if you have a disagreement with someone, if something's been passed to you --

MR. BECKER: Objection, Judge.

THE COURT: We can approach.

(Counsel approached the bench and the following proceedings were had:)

MR. BECKER: This isn't an outline of what the evidence is going to be, I believe, and this is what we argue about. I mean, that's not an outline of the evidence.

THE COURT: In this case his testimony will be what his beliefs are and his statement. I believe that a different disagreement with someone may be exactly what his testimony is

going to be.

MR. BECKER: Judge, he's standing up there testifying right now is the objection.

THE COURT: So to the form of the information?

MR. BECKER: Yes.

THE COURT: Rather than you testifying, if you could put it in the form of the evidence will be, and my belief is if you have a disagreement, the evidence will be, that my belief is that the evidence will be and what it is that you are going to testify to.

MR. BECKER: It covers a lot. Just say the evidence will be.

MR. STANLEY: Okay.

(The proceedings returned to open court.)

MR. STANLEY: The evidence will be that I repeatedly tried to submit acceptable forms of payment, and that I did not receive specific answers, and that I continued on the same path based on my beliefs. The evidence will show that.

And that I made those requests numerous times over the last five and a half years and received the Treasury regulation we visited about today last Friday.

So the rest of what I will say to you I will have to submit when I give my testimony, and I appreciate your time.

Thank you.

THE COURT: Thank you, Mr. Stanley.

Although it is just 4:30, I think it's best if we recess for the evening, and we will resume at nine o'clock in the morning. If you could be here at 8:45 in the jury deliberation room ready to go at nine o'clock, that would be great. I hope you all have a wonderful evening and travel safely home. And let me read the instruction to you.

You must not discuss this case with anyone, including the other jurors, members of your family, people involved in the trial, or anyone else. If anyone tries to talk to you about the case, please let me know or Ms. Moore immediately. Do not read, watch, or listen to any news reports of the trial.

Finally, keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

Have a good evening and we'll be in recess.

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: You may be seated.

I have two things on my mind before I ask the parties if they have any issues. I would like to review the exhibits before we leave tonight just to make sure -- since I was off on one of them, to make sure we're all on the same page; because after we have closing arguments, I'll ask both parties to assemble their exhibits because jurors often request

those exhibits in their deliberations.

Then, secondly, on the instructions, I don't know that we are in a position to move much further than we did in our preliminary instruction conference. I'm curious if the parties would entertain coming in early tomorrow to talk about the instructions or if we need to wait until after the defense case in chief and then have a finalized instruction conference. I can go either way. Mr. Stanley may be more focused on his testimony tomorrow morning than instructions. So I'd like to get input from both the parties.

Mr. Becker.

MR. BECKER: Judge, I think we've made a lot of progress by the Court's providing us the draft package, and obviously we can review it tonight. I don't think we're any further along tomorrow morning than we were, you know, several hours ago. So I would suggest that we finish the defense case and primarily determine whether or there's evidence of a good-faith instruction; and then if so, which one to give. Hopefully with the progress we've made, that will be a brief conference before -- I know the logistics of the Court getting the jury instructions together are --

THE COURT: We're in good shape. We just need to put the icing on all the little phrases. That's it.

MR. BECKER: I mean, the little phrases part that the Court's -- that I highlighted that's the Court's

suggestions, I have no objection. I think they're appropriate. Those are all good tweaks to make them applicable to the case at hand. So those -- I think the little things are all pretty clear. It's just several other matters, and it would be best if we could spend 15 or 20 minutes after the evidence is closed.

THE COURT: What is your position, Mr. Stanley? Are you in agreement?

MR. STANLEY: Yes, Your Honor.

THE COURT: Okay. Anything else, Mr. Becker?

MR. BECKER: Nothing from the government, Judge.

THE COURT: Mr. Stanley, any issues with your case in chief that you want to bring to our attention?

MR. STANLEY: Nothing at this time.

THE COURT: One last-ditch effort. If you are really wanting to get some document or item, show it to Mr. Becker at this late 11th hour. I don't know that there's anything he can do about it, but you may be able to at least try if you haven't done that as ordered May 25th, last Wednesday, if there's any items that you want to utilize during your testimony, I would, again, urge you to get those to Mr. Becker. He may be willing to work with you on that.

MR. STANLEY: Thank you.

THE COURT: Anything else?

MR. BECKER: Nothing, Judge. Thank you.

THE COURT: If we could be back in the courtroom at 8:30 to touch base. Very good. We'll be in recess.

Thank you, Mr. White.

(Court adjourned at 4:35 p.m. until 8:30 a.m. Thursday, June 2, 2016.)